**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**HOME1ST LENDING, LLC,** a Florida limited liability company,
and **THERESA LENTINI-LOPEZ,** individually,

Plaintiffs,

**v.** **Case No.** 6:26-cv-01477-CEM-NWH

**FIRST HORIZON BANK,**

Defendant.
_______________________________________/

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, **HOME1ST LENDING, LLC** ("Home1st") and **THERESA LENTINI-LOPEZ** ("Ms. Lentini-Lopez"), sue Defendant, **FIRST HORIZON BANK** ("First Horizon"), and allege:

**INTRODUCTION**

1.- This action arises from First Horizon's processing of unauthorized wire and Automated Clearing House ("ACH") transactions and its failure to act after receiving actual, transaction-specific notice that an active fraud was underway in Home1st's commercial banking accounts.

2.- On November 20, 2025, while a fraudster impersonating First Horizon's fraud department was communicating with Home1st personnel, Home1st notified First Horizon's Lake Mary Branch Manager, Greg Gorney, of the purported fraud-department call and sought verification.

3.- Mr. Gorney did not verify the caller, alert First Horizon's fraud or security personnel, restrict the accounts, suspend digital access, or direct Home1st to stop communicating with the caller. Instead, he stated that the fraud department did not tell branch personnel

what was occurring, noted that there had been many recent fraud issues, and permitted Home1st's representative to continue communicating with the purported First Horizon fraud department.

4.- At 11:42 a.m. that same day, Home1st sent Mr. Gorney an email expressly stating that it was still dealing with the fraud department and that any wire sent that day was fraudulent. This communication provided First Horizon with written, transaction-specific notice that the security procedures associated with Home1st's accounts had been compromised and that any wire sent that day should be treated as fraudulent. First Horizon did not respond to the email or take timely protective action despite having a reasonable opportunity to do so.

5.- The unauthorized activity included a Twenty-Five Thousand Dollar and 00/100 ($25,000.00) wire from Home1st's account ending in 3126 and ACH activity that caused an additional net loss of approximately Three Hundred Sixty Thousand Dollars and 00/100 ($360,000.00).

**6.-** First Horizon's systems separately stopped an attempted ACH batch of approximately Seven Hundred Forty Thousand Dollars and 00/100 ($740,000.00), demonstrating that transaction limits and automated controls existed and could prevent suspicious transfers.

7.- First Horizon did not begin competent account-restriction and recovery efforts until after Ms. Lentini-Lopez appeared at the Lake Mary branch on November 21, 2025, by which time the fraud had progressed and recovery opportunities had been lost.

8.- First Horizon later represented that the outgoing ACH activity had been reversed and that Home1st's accounts would be restored. Home1st relied by making payroll, funding, operational, and mitigation decisions. Ms. Lentini-Lopez separately relied in her

individual capacity by committing personal funds and undertaking personal financial burdens. First Horizon thereafter reversed or failed to maintain the credited amounts.

9.- Home1st seeks recovery of the unauthorized-transfer losses and its direct damages under Florida's Uniform Commercial Code, the Banking Agreements, and an independent post-notice gross-negligence theory pleaded in the alternative. Home1st and Ms. Lentini-Lopez assert separate claims for the specific post-notice representations and promises directed to each claimant, each claimant's own reliance, and each claimant's own resulting damages.

## PARTIES

10.- Plaintiff Home1st Lending, LLC is a Florida limited liability company with its principal office in Lake Mary, Florida.

11.- Ms. Lentini-Lopez is a citizen of Florida and the sole member and managing member of Home1st. Accordingly, Home1st is a citizen of Florida.

12.- At all relevant times, Ms. Lentini-Lopez was Home1st's Chief Executive Officer, an authorized signer, and a full-access user of the affected accounts. Home1st, not Ms. Lentini-Lopez individually, was the named owner of the commercial accounts at issue.

13.- Ms. Lentini-Lopez asserts individual claims only for direct representations made to her, her personal reliance, and losses she personally sustained, and not merely for injury derivative of Home1st's losses.

14.- In reliance on First Horizon's representations concerning the reversals and restoration of Home1st's accounts, Ms. Lentini-Lopez personally contributed Fifty Thousand Dollars and 00/100 ($50,000.00) from her own funds to meet immediate expenses and undertook additional personal financial burdens. Her individual claims seek

only direct personal losses caused by her own reliance and do not seek Home1st's unauthorized-transfer losses, lost corporate funds, or damages based solely on her ownership interest.

15.- Defendant First Horizon Bank is a Tennessee banking corporation with its principal place of business in Memphis, Tennessee.

16.- First Horizon conducts business in Florida and maintained the Lake Mary branch through which the affected accounts and fraud reports were handled.

**JURISDICTION AND VENUE**

17.- This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because Plaintiffs are citizens of Florida, First Horizon is a citizen of Tennessee, and the amount in controversy exceeds Seventy-Five Thousand Dollars and 00/100 ($75,000.00), exclusive of interest and costs.

18.- First Horizon removed this action to this Court on July 10, 2026.

19.- This Court has personal jurisdiction over First Horizon because First Horizon conducts business in Florida, maintained and serviced the affected accounts in Florida, and committed the acts and omissions alleged herein through its Florida operations and employees.

20.- Venue is proper in the Orlando Division under 28 U.S.C. §§ 1391 and 1441 because the action was pending in Seminole County before removal and a substantial part of the events and omissions occurred in Seminole County, Florida.

21.- All conditions precedent have occurred, have been performed, have been waived, or have been excused.

## GENERAL FACTUAL ALLEGATIONS

### A. The Banking Relationship and Contractual Duties

22.- Home1st maintained multiple commercial checking accounts with First Horizon, including accounts ending in 3053, 3088, 3126, 3142, 0178, 3061, 3134, 8787, 3150, 3169, 3177, and 0151.

23.- Home1st used First Horizon's digital-banking, treasury-management, ACH, and wire-transfer services for those accounts.

24.- Home1st's authorized signers included Ms. Lentini-Lopez and Christian Lopez. Ms. Lentini-Lopez and Mr. Lopez had full access, while other users had limited duties involving internal transfers or deposits.

25.- The parties' banking relationship was governed by the **Treasury Management Services Master Agreement and Service Terms**, the **Digital Banking Agreement**, the applicable account agreements, Service Documents, security-procedure documents, user-entitlement records, and transaction-limit records, including versions maintained by First Horizon and applicable during November 2025 (collectively, the "Banking Agreements").

26.- First Horizon drafted and maintained the Banking Agreements and its records identify the versions, Service Documents, security procedures, user entitlements, and transaction limits applicable to Home1st in November 2025.

27.- The Treasury Management Services Master Agreement provides that enrollment in or use of a service constitutes acceptance of the agreement and that Service Documents supplement and become part of the governing terms.

28.- The Treasury Management Services Master Agreement states that First Horizon "will exercise ordinary care and perform each Service in accordance with reasonable commercial standards applicable to Bank's business, and in compliance with all applicable laws, regulations and this Agreement."

29.- The same agreement provides that First Horizon's reliance on existing security procedures continues only "until or unless Bank has received notification that existing Security Procedures have been compromised and Bank has had a reasonable opportunity to act upon such notice."

30.- The agreement requires a client to notify First Horizon immediately of suspected loss, theft, or compromise of security credentials, unauthorized use of the Digital Banking Service, or receipt of instructions or confirmations the client did not place.

31.- The agreement authorizes First Horizon to delay or refuse a transaction when First Horizon believes the transaction is not genuine or authorized, suspects a possible breach of a security procedure, or suspects that an account or service is being used for or targeted by fraudulent activity.

32.- First Horizon also reserved the right to establish limits and restrictions regarding transaction amounts and frequency.

33.- The Digital Banking Agreement similarly provides that First Horizon may suspend access to protect its systems or a customer's account and instructs users who believe a credential has been compromised or a transaction is unauthorized to contact First Horizon immediately.

34.- Home1st used token authentication. First Horizon did not provide Home1st with another security option that Home1st declined.

35.- First Horizon has contended that Home1st's payment permissions were set to "Approve Own" rather than dual control. Home1st did not knowingly reject a specific dual-control security procedure offered by First Horizon for the transactions at issue.

36.- Whether the security procedure First Horizon contends governed the disputed transactions was agreed upon, commercially reasonable under the circumstances, properly implemented, actually followed, and applied in good faith presents disputed factual issues.

**B. First Horizon Receives Actual Notice During the Active Fraud**

37.- At approximately 10:13 a.m. on November 20, 2025, a fraudster called Home1st from telephone number (800) 382-5465, which appeared on caller identification as First Horizon Bank.

38.- Home1st employee Belkis Ricardo answered the call and transferred it to Mr. Lopez.

39.- The caller claimed to be associated with First Horizon's fraud department and stated that someone was initiating a wire from Houston, Texas.

40.- The caller knew Mr. Lopez's full name, his First Horizon user identification, and the location of his prior login. The caller could also identify when Mr. Lopez logged into First Horizon's portal during the call.

41.- Mr. Lopez observed an unauthorized Twenty-Five Thousand Dollar and 00/100 ($25,000.00) wire in the portal.

42.- At approximately 10:21 or 10:22 a.m., while the suspected fraud was active, Mr. Lopez telephoned Lake Mary Branch Manager Greg Gorney.

43.- Mr. Lopez told Mr. Gorney that he had received a call from a person claiming to be First Horizon's fraud department, that the caller was discussing an alleged unauthorized

wire, and that he was seeking confirmation from First Horizon that the call was legitimate.

44.- Mr. Gorney stated, in substance, that First Horizon's fraud department did not tell branch personnel what was occurring and that there had been many recent fraud issues.

45.- Mr. Lopez told Mr. Gorney that he would continue communicating with the purported fraud department.

46.- Mr. Gorney did not direct Mr. Lopez to terminate the call, advise him that First Horizon's fraud department would not conduct the interaction in that manner, independently contact First Horizon's fraud or security personnel, restrict the affected accounts, disable or suspend compromised credentials, stop or review outgoing transactions, or otherwise take immediate protective action in response to the reported fraud.

47.- At 11:42 a.m. on November 20, 2025, Mr. Lopez emailed Mr. Gorney with the subject "Fraud Issue" and stated: "Still going through the motions with the Fraud department. Any wire sent out today was fraudulent, so it's been fun dealing with that."

48.- The 11:42 a.m. email provided First Horizon with actual, written, transaction-specific notice that the purported fraud-department interaction remained active and that any wire sent from Home1st that day was unauthorized and fraudulent. The communication also confirmed that the suspected compromise was ongoing rather than merely reporting a completed historical transaction.

49.- Mr. Gorney did not respond to the email and did not promptly cause First Horizon to freeze or restrict the accounts, disable digital access, contact the purported fraud department, open a fraud case, or stop outgoing activity.

50.- First Horizon therefore had actual notice of an active fraud and compromised security procedures no later than 11:42 a.m. on November 20, 2025.

**C. The Unauthorized Transactions and Ignored Warning Signs**

51.- On November 20, 2025, an unauthorized Twenty-Five Thousand Dollar and 00/100 ($25,000.00) wire was sent from Home1st's account ending in 3126 to a beneficiary identified as Amiyah Moore.

52.- Neither Home1st nor any person authorized to act for Home1st intended to issue or approve that payment order for the benefit of Amiyah Moore.

53.- The wire was outside Home1st's ordinary and authorized business purposes.

54.- The fraud also involved efforts to concentrate funds from multiple Home1st accounts into an operating account and to initiate unusually large ACH batches.

55.- One attempted ACH batch was approximately Seven Hundred Forty Thousand Dollars and 00/100 ($740,000.00).

56.- First Horizon's system did not pay that batch. First Horizon's representatives initially stated that it failed for insufficient funds, while First Horizon later asserted that the batch exceeded a daily limit.

57.- Under either explanation, the attempted Seven Hundred Forty Thousand Dollar and 00/100 ($740,000.00) batch was a material warning that unusually large activity was occurring during a reported active fraud.

58.- First Horizon's system also processed ACH activity involving approximately Three Hundred Eighty Thousand Dollars and 00/100 ($380,000.00) after First Horizon had been notified of the active fraud.

59.- The ACH activity consisted of multiple transactions and was inconsistent with Home1st's ordinary transaction volume and pattern.

60.- First Horizon had contractual authority and technical capability to delay or refuse transactions, restrict access, and apply transaction limits when it suspected compromised security procedures or fraudulent activity.

61.- First Horizon did not timely use those controls after receiving the telephone report and the 11:42 a.m. written notice.

**D. The November 21 Branch Report and Delayed Response**

62.- On the morning of November 21, 2025, Home1st's bookkeeper, Analice Kronitzer, informed Ms. Lentini-Lopez that the accounts and digital access had not been deactivated and that transactions remained pending.

63.- Beginning at approximately 8:56 a.m., Ms. Lentini-Lopez called First Horizon's Lake Mary branch. She reached First Horizon employee Brittanyann after multiple attempts.

64.- Brittanyann reviewed the accounts and directed Ms. Lentini-Lopez to come to the branch.

65.- Ms. Lentini-Lopez arrived at approximately 9:26 a.m. Mr. Gorney was present in his office but did not take charge of the response or speak with Plaintiffs concerning the ongoing fraud.

66.- Brittanyann advised that the attempted Seven Hundred Forty Thousand Dollar and 00/100 ($740,000.00) transaction had not been paid and that other ACH transactions needed to be reversed.

67.- Brittanyann stated that she had not previously completed an ACH reversal form, did not know how to handle multiple transactions in a batch, and that Mr. Gorney was the branch employee who knew how to complete the process.

68.- Brittanyann sought assistance from another First Horizon employee and a person identified as Misty while Ms. Lentini-Lopez and Mr. Lopez remained at the branch for hours.

69.- During the branch meeting, the fraudster continued calling Mr. Lopez. Brittanyann directed Mr. Lopez not to answer or to terminate the call and stated that the accounts would be locked and online access removed.

70.- First Horizon did not confirm that all access was disabled. On or about November 26, 2025, Plaintiffs learned that user access associated with Juan Diaz and Ruth Macellari remained available for two accounts.

71.- Later on November 21, 2025, Ms. Lentini-Lopez called First Horizon's Treasury Management number, (800) 778-5915, to seek further help.

72.- The representative stated that Treasury Management did not handle fraud calls and that fraud concerns had to be directed to the branch, even when the branch was closed.

73.- First Horizon's delayed and fragmented response prevented prompt use of available recall, reversal, account-restriction, credential-disabling, receiving-bank, and fraud-escalation procedures.

**E. First Horizon's Specific Post-Notice Representations and Plaintiffs' Reliance**

74.- On November 24, 2025, Ms. Lentini-Lopez spoke directly with First Horizon employee Gina Baez concerning the status of the fraud response and the affected accounts.

75.- Ms. Baez represented that the ACH transactions had been reversed and outlined a plan to open new accounts and restore online access.

76.- At approximately 5:20 p.m. on November 24, 2025, First Horizon communicated by telephone and email that the outgoing ACH transactions had been reversed.

77.- On November 24, 2025, Home1st deposited One Hundred Six Thousand Three Hundred Thirty-Five Dollars and 35/100 ($106,335.35) to cover payroll while relying on First Horizon's representation that the ACH activity had been reversed and the accounts would be restored.

78.- On November 25, 2025, Ms. Baez met with Ms. Lentini-Lopez at Home1st's office to assist in opening replacement accounts while First Horizon addressed the fraud.

79.- During the November 25 meeting, Ms. Baez stated that First Horizon had "dropped the ball," that First Horizon had ignored multiple red flags, that First Horizon should have responded to the first attempted large ACH transaction, and that First Horizon's procedure after a failed transaction was to contact the customer.

80.- Ms. Baez stated that the accounts would be restored and that First Horizon would take care of the situation.

81.- These statements concerned existing facts—the status of reversals, the Bank's fraud response, whether warning signs had been ignored, and the status of the accounts—as well as specific assurances of restoration.

82.- First Horizon knew Plaintiffs needed accurate information immediately to fund payroll and rent, address outstanding checks, preserve operations, and determine whether to pursue other recovery and financing measures.

83.- Plaintiffs reasonably relied on First Horizon's superior knowledge of its own account entries, reversal requests, receiving-bank communications, and restoration process.

84.- Based on First Horizon's representations, Plaintiffs continued awaiting First Horizon's response, deposited funds, funded payroll and operating expenses, and did not immediately pursue every alternative funding or recovery measure available to them.

85.- Ms. Lentini-Lopez personally contributed Fifty Thousand Dollars and 00/100 ($50,000.00) to cover expenses and personally undertook other financial burdens while relying on First Horizon's stated reversal and restoration plan.

86.- First Horizon subsequently reversed, failed to maintain, or failed to complete substantial credits associated with the ACH reversal process.

87.- First Horizon's representations concerning completed reversals and restoration were false, misleading, or made without reasonable care because the ACH reversals were not final or assured and the accounts were not restored as represented.

**F. Damages and Present Controversy**

88.- Home1st's presently known unauthorized-transfer loss is Three Hundred Eighty-Five Thousand Dollars and 00/100 ($385,000.00), consisting of the Twenty-Five Thousand Dollar and 00/100 ($25,000.00) wire loss and approximately Three Hundred Sixty Thousand Dollars and 00/100 ($360,000.00) in net ACH loss.

89.- Home1st also sustained direct mitigation expenses, fees and charges, loss of use of funds, payroll and operational disruption, and other recoverable actual damages.

90.- The disruption impaired Home1st's payroll operations and employee retention and required Home1st to move funds and establish replacement banking arrangements.

91.- Ms. Lentini-Lopez directly sustained the individual losses alleged above based on representations made to her and her personal reliance, separate from her status as Home1st's member.

92.- A present controversy exists because First Horizon denies responsibility for the disputed transactions and relies on alleged security-procedure compliance, security credentials, "Approve Own" permissions, contractual limitations, and Home1st's alleged conduct to shift the loss to Home1st.

**COUNT I — REFUND OF UNAUTHORIZED PAYMENT ORDERS**

**Fla. Stat. §§ 670.202 and 670.204**

**Home1st Against First Horizon**

93.- Home1st realleges paragraphs 1 through 92 as if fully set forth herein.

94.- The Twenty-Five Thousand Dollar and 00/100 ($25,000.00) wire issued in Home1st's name was a "payment order" and part of a "funds transfer" governed by Chapter 670, Florida Statutes.

95.- Home1st did not authorize the payment order to Amiyah Moore and received no benefit from it.

96.- In addition, and pleaded in the alternative based on information presently available to Home1st, the unauthorized ACH activity consisted of one or more outgoing ACH credit instructions entered through Home1st's digital-banking profile and issued in Home1st's name as sender.

97.- The fraudsters used compromised access to cause the ACH instructions to appear as if they had been initiated and approved by authorized Home1st users, even though Home1st did not authorize the instructions or intend to pay the recipients.

98.- Each ACH instruction directed First Horizon to pay, or cause another bank to pay, a fixed or determinable amount to a third-party beneficiary, without a condition to payment other than time of payment.

99.- First Horizon accepted the ACH instructions and received payment by debiting Home1st's account. Accordingly, each outgoing ACH credit instruction constituted a separate "payment order" within the meaning of section 670.103, Florida Statutes.

100.- The gross unauthorized ACH payment orders totaled approximately Three Hundred Eighty Thousand Dollars and 00/100 ($380,000.00). After reversals, returns, and recovery activity, approximately Three Hundred Sixty Thousand Dollars and 00/100 ($360,000.00) remains unrecovered.

101.- The precise ACH entries, beneficiaries, originating and receiving accounts, SEC codes, batch and file identifiers, timestamps, user identifications, devices, IP addresses, approval history, settlement entries, returns, reversals, and net refundable amount should be maintained in First Horizon's records and will be confirmed through discovery.

101(a).- Under section 670.202, Florida Statutes, First Horizon bears the burden of proving that any agreed security procedure was commercially reasonable and that First Horizon accepted each payment order in good faith and in compliance with the security procedure and any written agreement or customer instruction restricting acceptance.

101(b).- First Horizon cannot satisfy those requirements as to the wire or the outgoing ACH credit payment orders because, among other reasons:

(a) the procedure offered and actually applied did not reasonably account for the type, value, frequency, or circumstances of Home1st's payment orders;

(i) First Horizon did not offer Home1st a specific alternative security procedure for the disputed transactions that Home1st knowingly rejected;

(ii) First Horizon had actual notice of an active fraud and compromised credentials through the telephone report to Mr. Gorney and the 11:42 a.m. written notice that any wire sent that day was fraudulent;

(iii) First Horizon failed to act on transaction-specific notice before the loss and recovery opportunities became final;

(iv) First Horizon failed to comply with its transaction limits, security procedures, agreements, and instructions applicable to the payment orders;

(v) First Horizon failed to use its contractual authority to delay or refuse transactions it had reason to believe were unauthorized or associated with compromised security procedures; and

(vi) First Horizon's acceptance and handling of the payment orders under these circumstances was contrary to statutory requirements or not in good faith.

101(c).- The unauthorized wire and outgoing ACH credit payment orders were not effective as Home1st's orders under section 670.202, Florida Statutes.

101(d).- Under section 670.204, Florida Statutes, First Horizon must refund the payments received from Home1st to the extent First Horizon is not entitled to enforce them, including associated charges and interest as provided by law.

101(e).- First Horizon has failed and refused to refund the Twenty-Five Thousand Dollar and 00/100 ($25,000.00) wire debit and approximately Three Hundred Sixty Thousand Dollars and 00/100 ($360,000.00) in net unrecovered ACH debits.

101(f).- Alternatively, if discovery establishes that some or all of the disputed ACH entries were incoming ACH debits rather than outgoing ACH credit payment orders governed by Chapter 670, Home1st preserves its contractual and other pleaded grounds for recovery of those amounts.

101(g).- Home1st has suffered actual damages as a direct result.

**WHEREFORE**, Plaintiff Home1st Lending, LLC demands judgment against Defendant First Horizon Bank for a refund of the Twenty-Five Thousand Dollar and 00/100 ($25,000.00) unauthorized wire payment and approximately Three Hundred Sixty Thousand Dollars and 00/100 ($360,000.00) in unauthorized and unrecovered ACH payment orders, subject to adjustment based on First Horizon's records and discovery, together with interest, associated charges, costs, and all further relief the Court deems just and proper.

**COUNT II — BREACH OF CONTRACT**

**Home1st Against First Horizon**

102.- Home1st realleges paragraphs 1 through 92 as if fully set forth herein.

103.- Home1st and First Horizon entered enforceable Banking Agreements governing the accounts, Digital Banking Service, ACH Transaction Service, Wire Transfer Service, security procedures, Service Documents, user entitlements, and transaction limits.

104.- Home1st accepted those agreements through enrollment in and use of First Horizon's services, and First Horizon accepted Home1st's deposits, fees, and use of the services.

105.- First Horizon expressly promised, among other things, to exercise ordinary care, perform each service according to reasonable commercial standards applicable to its business, and comply with applicable law and the Banking Agreements.

106.- First Horizon further agreed that its reliance on existing security procedures continued only until it received notice that the procedures had been compromised and had a reasonable opportunity to act.

107.- First Horizon reserved contractual authority to delay or refuse transactions when it believed they were unauthorized, suspected a security-procedure breach, or suspected that an account was targeted by fraud.

108.- Home1st performed its material contractual obligations, including paying fees, maintaining the accounts, using the required token authentication, and immediately notifying First Horizon of the suspected active fraud. Alternatively, any further performance was excused by First Horizon's prior material breaches.

109.- First Horizon breached the Banking Agreements by:

(a) failing to act after receiving actual telephone and written notice that the security procedures were compromised and that any wire sent on November 20, 2025, was fraudulent;

(b) continuing to rely on compromised credentials after receiving notice and a reasonable opportunity to act;

(c) failing to exercise ordinary care in responding to the reported fraud;

(d) failing to perform the Digital Banking, ACH, and Wire Transfer Services according to reasonable commercial standards;

(e) failing to comply with the parties' security procedures, transaction limits, user entitlements, account restrictions, and written instructions;

(f) failing to delay or refuse transactions First Horizon knew or had reason to believe were unauthorized or associated with compromised security procedures;

(g) failing to timely restrict the accounts, disable compromised access, initiate recalls and reversals, and escalate the active fraud; and

(h) shifting unauthorized losses, debits, fees, and charges to Home1st despite First Horizon's breaches.

110.- Home1st alleges that any contractual limitation of liability does not bar recovery of the damages sought to the extent the limitation is inapplicable under its terms or unenforceable as applied to First Horizon's alleged gross negligence, willful misconduct, bad faith, violation of nonwaivable statutory duties, or other conduct excluded from the limitation. Home1st further alleges that First Horizon may not rely on a contractual provision to the extent doing so would permit it to avoid obligations imposed by applicable law.

111.- First Horizon's conduct was grossly negligent and/or in bad faith because it received transaction-specific notice during an active high-value fraud, possessed contractual authority and technical means to intervene, failed to take basic protective action, ignored the 11:42 a.m. written notice, and delayed competent escalation until the next day.

112.- First Horizon's breaches directly and proximately caused Home1st's unrecovered unauthorized-transfer losses and other direct actual damages.

**WHEREFORE**, Plaintiff Home1st Lending, LLC demands judgment against Defendant First Horizon Bank for actual damages, prejudgment interest, costs, and all further relief the Court deems just and proper.

**COUNT III — GROSS NEGLIGENCE**

**Home1st Against First Horizon, in the Alternative and Only as to Independent Post-Notice Conduct**

113.- Home1st realleges paragraphs 1 through 92 as if fully set forth herein.

114.- This count does not seek to impose duties inconsistent with Chapter 670 or recover in tort merely because First Horizon accepted a payment order.

115.- This count is pleaded only in the alternative and only to the extent First Horizon's conduct after receiving actual notice of the active fraud constituted independent conduct or an undertaking outside the mere acceptance and processing of payment orders governed exclusively by Chapter 670.

116.- After Home1st sought immediate assistance, First Horizon undertook to investigate, restrict Home1st's accounts, disable access, process ACH reversals, contact appropriate personnel, open replacement accounts, and restore Home1st's banking relationship.

117.- First Horizon thereby owed Home1st a duty to perform those undertakings with reasonable care and not increase Home1st's risk of harm through a materially deficient response.

118.- First Horizon knew that failure to respond promptly to an active fraud involving Home1st's high-value transactions created a clear and present risk of substantial loss to Home1st.

119.- First Horizon breached its independent post-notice duties to Home1st by:

(a) failing to escalate the fraud report after the telephone call and 11:42 a.m. email;

(b) failing to timely disable compromised access and restrict Home1st's affected accounts;

(c) failing to coordinate a competent response among the branch, Treasury Management, Corporate Security, ACH operations, and wire operations;

(d) assigning the November 21 response to personnel who stated they did not know how to complete the necessary ACH reversal process;

(e) failing to verify that all affected access had been disabled;

(f) delaying recall, reversal, receiving-bank, and fraud-case activity; and

(g) providing contradictory or incomplete information that impeded Home1st's mitigation efforts.

120.- First Horizon's conduct amounted to gross negligence because, despite actual knowledge of an active high-value fraud and readily available means to intervene, First Horizon demonstrated a conscious disregard of or indifference to Home1st's rights and the foreseeable consequences.

121.- First Horizon's independent post-notice conduct directly and proximately caused Home1st avoidable loss, diminished recovery, mitigation expense, and other actual damages.

**WHEREFORE**, Plaintiff Home1st Lending, LLC demands judgment against Defendant First Horizon Bank for actual damages, costs, and all further relief the Court deems just and proper.

## COUNT IV — NEGLIGENT MISREPRESENTATION

### Home1st Against First Horizon, in the Alternative

122.- Home1st realleges paragraphs 1 through 92 as if fully set forth herein.

123.- This count concerns specific post-transaction information First Horizon supplied for Home1st's guidance during the fraud response. It does not seek to impose liability merely for accepting or processing a payment order.

124.- On November 24, 2025, by telephone and email, First Horizon, through Gina Baez and other personnel, informed Ms. Lentini-Lopez in her capacity as Home1st's Chief Executive Officer that the outgoing ACH transactions had been reversed and that Home1st's accounts would be restored.

125.- On November 25, 2025, at Home1st's office, Ms. Baez reiterated that First Horizon would take care of the situation and restore Home1st's accounts while assisting with replacement accounts.

126.- The statements that the ACH transactions "had been reversed" and that Home1st's accounts would be restored conveyed false or incomplete information concerning existing reversal entries, the status and finality of the recovery process, and First Horizon's ability or intention to maintain the credited amounts.

127.- First Horizon had superior and exclusive access to its account records, reversal status, receiving-bank communications, and restoration process and supplied the information for Home1st's guidance in its business decisions.

128.- First Horizon knew or should have known that the ACH reversals were not final or assured and that Home1st's accounts had not been restored.

129.- First Horizon failed to exercise reasonable care or competence in obtaining or communicating the information.

130.- First Horizon knew Home1st needed accurate information to decide whether to deposit additional funds, issue payroll, pay rent and vendors, seek emergency financing, and pursue other recovery measures.

131.- Home1st reasonably relied by depositing One Hundred Six Thousand Three Hundred Thirty-Five Dollars and 35/100 ($106,335.35) for payroll, continuing operations based on the stated reversal and restoration plan, and delaying or altering other mitigation measures.

132.- Home1st's reliance caused direct and ascertainable damages distinct from the mere processing of the disputed payment orders.

**WHEREFORE**, Plaintiff Home1st Lending, LLC demands judgment against Defendant First Horizon Bank for actual damages, costs, and all further relief the Court deems just and proper.

**COUNT V — NEGLIGENT MISREPRESENTATION**

**Theresa Lentini-Lopez Against First Horizon, in the Alternative**

133.- Ms. Lentini-Lopez realleges paragraphs 1 through 92 as if fully set forth herein.

134.- This count is limited to statements made directly to Ms. Lentini-Lopez, her personal reliance, and her direct individual losses. It does not seek Home1st's transfer losses or damages merely resulting from her ownership of Home1st.

135.- On November 24, 2025, First Horizon employee Gina Baez spoke directly with Ms. Lentini-Lopez by telephone concerning the fraud response and represented that the outgoing ACH transactions had been reversed and that the accounts would be restored.

136.- At approximately 5:20 p.m. that day, First Horizon communicated by telephone and email that the outgoing ACH transactions had been reversed.

137.- On November 25, 2025, at Home1st's office, Ms. Baez again told Ms. Lentini-Lopez that First Horizon would restore the accounts and take care of the situation.

138.- The statements conveyed false or incomplete information concerning existing reversal entries, the finality of the ACH recovery, and First Horizon's restoration process.

139.- First Horizon had superior and exclusive knowledge of those matters and supplied the information directly to Ms. Lentini-Lopez while discussing the immediate funding crisis and replacement banking arrangements.

140.- First Horizon knew or should have known that the reversals were not final or assured and that the accounts had not been restored.

141.- First Horizon failed to exercise reasonable care or competence in obtaining or communicating the information.

142.- First Horizon knew Ms. Lentini-Lopez was addressing immediate payroll and operating obligations and that she would use the information to decide whether to commit personal funds and assume personal financial burdens.

143.- Ms. Lentini-Lopez reasonably relied on First Horizon's superior knowledge and direct representations by personally contributing Fifty Thousand Dollars and 00/100 ($50,000.00) to meet expenses and by undertaking additional personal financial obligations that she otherwise would not have undertaken, or would have addressed differently, had First Horizon accurately disclosed the actual status of the reversals and restoration process..

144.- Ms. Lentini-Lopez's personal contribution and obligations involved her own funds and liabilities, not Home1st's ownership of the unauthorized-transfer claims.

145.- Ms. Lentini-Lopez suffered direct, ascertainable personal damages as a result of her reliance on First Horizon's representations, separate from any injury belonging to Home1st.

**WHEREFORE**, Plaintiff Theresa Lentini-Lopez demands judgment against Defendant First Horizon Bank for her direct actual damages, costs, and all further relief the Court deems just and proper.

**COUNT VI — PROMISSORY ESTOPPEL**

**Home1st Against First Horizon, Pleaded in the Alternative**

146.- Home1st realleges paragraphs 1 through 92 as if fully set forth herein.

147.- This count is pleaded in the alternative to the extent the Court determines that First Horizon's November 24–25, 2025 restoration promises fall outside the enforceable Banking Agreements.

148.- First Horizon, through Ms. Baez, made definite promises to Home1st, communicated through its Chief Executive Officer, that First Horizon would restore Home1st's affected accounts and take care of the situation after the outgoing ACH transactions had been reversed.

149.- First Horizon made the promises while assisting Home1st with replacement accounts and knowing that Home1st faced immediate payroll, rent, check, and operating obligations.

150.- First Horizon should reasonably have expected the promises to induce Home1st to continue funding operations and to act according to First Horizon's stated restoration plan.

151.- Home1st relied on the promises by depositing One Hundred Six Thousand Three Hundred Thirty-Five Dollars and 35/100 ($106,335.35) for payroll, continuing to fund operations, and altering its mitigation and recovery decisions.

152.- Home1st's reliance was reasonable and foreseeable because First Horizon alone controlled the affected accounts, reversal entries, restoration process, and communications with receiving institutions.

153.- First Horizon did not restore the accounts or maintain the reversed or credited ACH amounts as promised.

154.- Home1st suffered a substantial detriment from its reliance, and injustice can be avoided only by enforcing the promises or awarding appropriate reliance relief.

**WHEREFORE**, Plaintiff Home1st Lending, LLC demands judgment against Defendant First Horizon Bank for reliance damages or other appropriate equitable relief, costs, and all further relief the Court deems just and proper.

**COUNT VII — PROMISSORY ESTOPPEL**

**Theresa Lentini-Lopez Against First Horizon, Pleaded in the Alternative**

155.- Ms. Lentini-Lopez realleges paragraphs 1 through 92 as if fully set forth herein.

156.- This count is limited to promises made directly to Ms. Lentini-Lopez, her personal reliance, and her individual detriment.

157.- On November 24 and 25, 2025, First Horizon, through Ms. Baez, promised Ms. Lentini-Lopez that First Horizon would restore the affected accounts and take care of the situation.

158.- When making and repeating the promises, First Horizon knew Ms. Lentini-Lopez was personally addressing the immediate funding crisis and understood that payroll, rent, checks, and other obligations required immediate funding.

159.- First Horizon should reasonably have expected its promises to induce Ms. Lentini-Lopez to commit personal funds and undertake personal obligations while awaiting First Horizon's promised restoration.

160.- Ms. Lentini-Lopez relied by personally contributing Fifty Thousand Dollars and 00/100 ($50,000.00) to meet expenses and undertaking additional personal financial burdens.

161.- Her reliance was reasonable because First Horizon controlled the affected accounts, reversal entries, restoration process, and receiving-bank communications and had represented that restoration would occur.

162.- First Horizon did not restore the accounts or maintain the reversed or credited ACH amounts as promised.

163.- Ms. Lentini-Lopez suffered a direct personal detriment from her reliance, separate from any injury belonging to Home1st, and injustice can be avoided only by enforcing the promises or awarding appropriate reliance relief.

**WHEREFORE**, Plaintiff Theresa Lentini-Lopez demands judgment against Defendant First Horizon Bank for her individual reliance damages or other appropriate equitable relief, costs, and all further relief the Court deems just and proper.

**COUNT VIII — DECLARATORY JUDGMENT**

**28 U.S.C. §§ 2201–2202**

**Home1st Against First Horizon**

164.- Home1st realleges paragraphs 1 through 92 as if fully set forth herein.

165.- An actual and immediate controversy exists concerning Home1st's and First Horizon's present rights and obligations under Chapter 670 and the Banking Agreements.

166.- First Horizon contends that the disputed transactions were effective against Home1st because security credentials were used, Home1st maintained "Approve Own" permissions, and the Banking Agreements shift the losses to Home1st.

167.- Home1st contends that the transactions were unauthorized; that First Horizon did not offer or apply a commercially reasonable security procedure; that First Horizon did not act in good faith or comply with the procedure and Home1st's instructions; that First Horizon received actual notice of compromised security procedures and fraudulent transactions; and that First Horizon failed to act after a reasonable opportunity.

168.- The controversy affects present financial rights, including responsibility for the unauthorized losses, related debits, fees and charges, any claimed deficiency, and First Horizon's ability to collect, offset, report, or enforce those amounts.

169.- The requested declaration will resolve concrete and continuing adverse legal interests concerning the parties' rights to the disputed account entries, the enforceability of the disputed payment orders, First Horizon's asserted security-procedure defenses, any resulting deficiency, and First Horizon's ability to collect, offset, report, or otherwise enforce amounts attributable to the disputed transactions.

170.- Home1st seeks declarations that:

(a) the Twenty-Five Thousand Dollar and 00/100 ($25,000.00) wire payment order and the outgoing ACH credit payment orders were unauthorized and ineffective against Home1st unless First Horizon proves every requirement of section 670.202, Florida Statutes;

(b) First Horizon may not rely on compromised security procedures after receiving notice and a reasonable opportunity to act;

(c) First Horizon may not enforce contractual provisions to excuse its bad faith, willful misconduct, gross negligence, or nonwaivable statutory duties;

(d) First Horizon is responsible for refunding or crediting unauthorized losses, fees, charges, and any resulting deficiency to the extent established; and

(e) First Horizon may not collect, offset, adversely report, or enforce an alleged deficiency attributable to the disputed transactions except as permitted after adjudication of the parties' rights.

**WHEREFORE**, Plaintiff Home1st Lending, LLC requests a declaratory judgment under 28 U.S.C. §§ 2201–2202, supplemental relief, costs, and all further relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable as a matter of right, subject to the Court's determination of the scope and enforceability of any asserted jury-trial waiver.

**[Space left blank intentionally]**

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant and award:

**A**.- refund or reimbursement of unauthorized-transfer losses;

**B**.- actual and compensatory damages recoverable under applicable law;

**C**.- reliance damages and appropriate equitable relief;

**D**.- declaratory relief;

**E**.- removal or credit of related debits, fees, charges, or deficiencies;

**F**.- prejudgment and post-judgment interest;

**G**.- taxable costs; and

**H**.- all further relief the Court deems just and proper.

Respectfully Submitted,

Saint's Law Firm, PLLC

/s/ Widner Saint-Cyr
Florida Bar No. 1048593
605 E. Robinson Street, Ste 250
Orlando, FL 32801
Saint@saintslawfirm.com
240-487-8358
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 12, 2026, a true and correct copy of the foregoing was filed through the Court's CM/ECF system, which will provide electronic notice to all counsel of record.

Respectfully Submitted,

Saint's Law Firm, PLLC

/s/ Widner Saint-Cyr
Florida Bar No. 1048593
605 E. Robinson Street, Ste 250
Orlando, FL 32801
Saint@saintslawfirm.com
240-487-8358
*Attorney for Plaintiff*