FIRST HORIZON BANK℠

# Treasury Management Services Master Agreement

EXHIBIT
A

# What changed?

Amendments were made to the following:

- **Table of Contents**
  Updated Table of Contents removing a deleted service.
- **General Terms and Conditions**
  Updated the address for any written notices to the Bank.
- **Automated Clearing House (ACH) Transaction Service**
  Updated Service Terms based on new functionality for Notifications of Change.
- **ACH Tokenization Service**
  Deleted Service Terms. Service no longer available.
- **Lockbox Service**
  Updated Service Terms based upon new functionality for clients enrolling in the eCapture Module.

©2024 First Horizon Bank. Member FDIC.

# Treasury Management Services Master Agreement

## Table of Contents

INTRODUCTION ..... 4
GENERAL TERMS AND CONDITIONS ..... 5
SERVICE TERMS AND CONDITIONS ..... 12
ACCOUNT RECONCILIATION SERVICE ..... 13
AUTOMATED CLEARING HOUSE (ACH) TRANSACTION SERVICE ..... 14
ACH DEBIT BLOCK AND FILTERS ..... 18
ACH POSITIVE PAY SERVICE ..... 18
BUSINESS BILL PAY SERVICE ..... 19
BUSINESS INVESTMENT ACCOUNT SERVICE ..... 20
CASH PROCESSING SERVICE ..... 22
CHECK PRINT SERVICE ..... 23
CLEARPATH FAST PAYMENTS℠ SERVICE ..... 24
CONTROLLED DISBURSEMENT SERVICE ..... 27
DIGITAL BANKING SERVICE ..... 28
ELECTRONIC BILL PAYMENT SERVICE ..... 29
ELECTRONIC LOCKBOX SERVICE ..... 30
E-PAYMENTS ROUTING DIRECTORY SERVICE ..... 31
IMAGE CASH LETTER SERVICE ..... 32
IMAGE DELIVERY SERVICE ..... 35
INFORMATION REPORTING SERVICE ..... 35
INTEGRATED ACCOUNTS PAYABLE SERVICE ..... 36
LINE OF CREDIT SWEEP SERVICE ..... 37
LIQUIDITY SWEEP SERVICE ..... 38
LOCKBOX SERVICE ..... 39
MOBILE REMOTE DEPOSIT CAPTURE SERVICE ..... 44
POSITIVE PAY SERVICE ..... 45
REMOTE DEPOSIT CAPTURE SERVICE ..... 47
REVERSE POSITIVE PAY SERVICE ..... 50
STATEWIDE DEPOSIT SERVICE ..... 51
SWIFT MESSAGING SERVICE ..... 51
WIRE TRANSFER SERVICE ..... 51
ZERO BALANCE ACCOUNT SERVICE ..... 55

©2024 First Horizon Bank. Member FDIC.

# Treasury Management Services Master Agreement

## Introduction

Thank you for choosing First Horizon Bank ("First Horizon") for your treasury management service needs. We appreciate the opportunity to serve you. Should you have any questions about this agreement, please contact your Treasury Management Sales Officer.

This Treasury Management Services Master Agreement ("Agreement") sets forth the terms and conditions of the treasury management services offered by First Horizon. The Agreement is comprised of the General Terms and Conditions that apply to all treasury management services, and the Service Terms and Conditions that apply to the applicable services. By enrolling in or using any service provided by First Horizon, you hereby accept and agree to the terms and conditions set forth under this Agreement.

Please review this Agreement carefully and retain it for your records. As you add services in the future, they will also be covered by the terms and conditions contained in this Agreement. First Horizon may change the terms and conditions of services provided under this Agreement. Your continued use of the services constitutes your acceptance of the change. As new services are added to First Horizon's treasury management product suite, this Agreement may be updated to include the terms and conditions for that new service or you will be provided separate terms and conditions prior to the enrollment in that service.

©2024 First Horizon Bank. Member FDIC.

# General Terms and Conditions

The following terms and conditions are applicable to all Services provided to Client hereunder:

## 1. Definitions

The following definitions apply when the following terms are used in this Agreement:

“Account” means any deposit or other eligible account maintained by Client with Bank which is used or affected in connection with the use of any Service.

“Account Agreement” means any and all agreements, disclosures or other documents between Client and Bank which govern any of Client’s Account(s), each as may be amended.

“Bank” means and refers to First Horizon Bank and its successors and assigns.

“Business Day” means a day on which Bank is open to the public for carrying on substantially all of Bank’s business for a particular Service, and generally excludes Saturday, Sunday and holidays.

“Client” means the business entity and any parent company, subsidiary, affiliate or commonly owned entity for which Bank provides a Service.

“Security Administrator” means the individual(s) designated by Client with the authority to administer the Services with a broad range of responsibilities with respect to Client’s secure use of the Services.

“Service(s)” means any treasury management product or service provided by Bank.

“Service Document(s)” means any enrollment form, implementation document, instructional materials, manuals or documents relating to the use of any Service.

“Service Terms” means and refers to the terms and conditions for a particular Service as set forth in this Agreement.

## 2. Enrollment in Services

In order to enroll for and use a Service, Client may be required to complete Service Documents or provide other information and specifications. By enrolling in a Service, Client accepts and agrees to the terms and conditions of this Agreement. In any event, Client agrees that the use of a Service shall, without any further action or execution of any documentation on the part of Client, constitute Client’s acceptance of this Agreement and all terms and conditions governing the use of such Service. The terms of any Service Document provided to Client shall supplement and are incorporated into the terms of this Agreement and constitute part of the Service Terms. In the event of a conflict between the General Terms and Condition of the Agreement and those of any Service Term, the terms of the Service Term shall govern and control with respect to the Service at issue.

## 3. Client Accounts

Client will at all times maintain one or more Accounts for Bank to provide the Services. Client acknowledges that all Accounts are subject to the Account Agreement and any other written agreements applicable to those Accounts. This Agreement supplements, but does not replace, the Account Agreement and any other agreement you might have executed with respect to any Account. Inconsistencies between this Agreement and the Account Agreement shall be controlled and governed by this Agreement.

## 4. Fees

Client agrees to pay all fees, charges, and assessments imposed by Bank for use of the Services, as set forth in the pricing pro forma, account statement, or as otherwise disclosed to Client. Bank may change or add new fees for Services from time to time. If Client continues to use a Service after the change becomes effective, Client will be bound by such change. Bank, in its discretion, may collect any fees, charges, penalties, assessments, taxes, and commissions due from Client by debiting any Client Account via the Account Analysis billing process or by charging Client’s Account. If Client elects Account Analysis, fees for Services used by Client may be offset by applying an earnings credit to Client’s service charges to determine a single monthly net service charge. In addition, Client shall be solely responsible for its own costs and expenses incurred for equipment, transmission charges, software, and other costs and expenses incident to any Services.

## 5. Service Limitations and Restrictions

Bank reserves the right to establish, in its discretion, limitations and restrictions with respect to Service transaction amounts, frequency of Service transactions and the types of Accounts that are eligible for Services. Client agrees not to exceed any transaction limitations established by Bank from time to time. Bank will communicate decisions regarding such transaction limitations to Client, to the extent not restricted by applicable laws.

## 6. Security Procedures

**6.1 Commercially Reasonable Security Procedures.** In connection with providing access to a Service, Bank and Client have established certain processes or procedures for the purposes of verifying that communications, orders, instructions, or inquiries regarding a Service transaction or other Service activity are those of Client, and/or for the purpose of authenticating Client or its Authorized Users (as defined below) in connection with Client's use of the Services, and/or for the purpose of authorizing transactions and other activity through the use of the Services (the "Security Procedures"). The Security Procedures may involve a security code, password, personal identification number, user identification technology, certificate, or other means, or method of authentication, identification or verification (the "Security Credentials"). Client's implementation and use of any Security Procedures, including any amended or modified Security Procedures, shall constitute Client's acceptance of such Security Procedures as a commercially reasonable means of preventing unauthorized activity and adequate for the purposes intended. If Client selects certain Security Procedures to use in connection with a Service and those Security Procedures provide less protection against unauthorized transactions or activity than other Security Procedures offered by Bank in connection with such Service, the Security Procedures selected by Client shall be deemed commercially reasonable to the same extent as the Security Procedures offered by Bank that provide greater protection.

**6.2 Reliance on Security Procedures.** Client authorizes Bank to follow any and all instructions entered and transactions initiated using applicable Security Procedures. Client agrees that the initiation of a transaction using applicable Security Procedures constitutes sufficient authorization for Bank to execute such transaction notwithstanding any particular signature requirements identified on any signature card or other documents relating to Client's Account. Client acknowledges and agrees that Client shall be bound by any and all transactions and activity effected through the Service made in accordance with existing Security Procedures, until or unless Bank has received notification that existing Security Procedures have been compromised and Bank has had a reasonable opportunity to act upon such notice. Client further acknowledges that the Security Procedures are designed to verify the authenticity of instructions received by Bank and to control access to a Service and are not designed to detect errors in the content or transmission of instructions or information.

**6.3 Security Administrator.** As part of the enrollment process for certain Services (including Digital Banking, Lockbox and Remote Deposit Capture Services), Client must designate one or more Security Administrators, and Client agrees that there will be at least one Security Administrator at all times. Bank strongly recommends dual administration be set up for back-up purposes and to perform initiator and approver type duties. Client acknowledges that the responsibilities of Security Administrator include, but are not limited to: (i) assigning and maintaining all Security Credentials for all Authorized Users for applicable Services; (ii) designating Authorized Users, (iii) adding or removing eligible Accounts from Authorized User profiles; (iv) establishing limits, if any, on each Authorized User's authority to access specific information and/or conduct transactions; (v) promptly removing access for terminated employees or for employees no longer authorized to access or to perform specific duties, (vi) ensuring the proper implementation of Security Procedures by Authorized Users, (vii) reviewing Authorized User access periodically to ensure access to the applicable Services is restricted to users who need it in the performance of their job functions and (viii) properly securing Client's equipment and network systems to prevent inappropriate use. Bank may act on the instruction of Security Administrator until Bank shall have received written notice to the contrary. Bank shall be given a reasonable time to act on such written notice re-assigning the person designated as Security Administrator.

**6.4 Authorized Users.** The Security Administrator(s) shall have the authority to designate person(s) authorized to use a Service and to access any Account (each an "Authorized User" and collectively "Authorized Users"). Each Authorized User is authorized to conduct any transaction within the scope of this Agreement, unless such authority is limited by the Security Administrator or as otherwise expressly provided in the applicable Service Terms. Client acknowledges and agrees that any person knowing or in possession of Client's Security Credentials shall be treated as an Authorized User by Bank. Any Authorized User shall continue to be an Authorized User unless and until Client has notified Bank, as set forth herein, that such person or entity is no longer an Authorized User and until Bank has had a reasonable opportunity to act upon such notice.

**6.5 Security Credential Protection.** Client agrees to keep all Security Credentials strictly confidential and establish and maintain all procedures necessary to ensure that the Security Credentials will be maintained in the strictest confidence.

Client agrees to immediately notify Bank if Client becomes aware of any of the following: (a) any loss, theft or suspected loss or theft of the Security Credentials of Security Administrator or any Authorized User; (b) any unauthorized use of the Security Credentials, or of the Digital Banking Service; (c) any failure by Bank to act on appropriate instructions received from Client in connection with the Digital Banking Service, which instructions or requests have been received and/or transmitted through the Digital Banking Service; or (d) any receipt and/or confirmation of instructions or requests which Client did not place, or any similarly inaccurate or conflicting report or information received.

**6.6 Client's Obligation upon Security Breach.** In the event of any security incident related to Client, Client agrees to assist Bank in determining the manner and source of such incident. Such assistance shall include, but shall not be limited to, providing Bank or Bank's agent access to Client's systems or devices. Client further agrees to provide to Bank any reports or analysis of Client's systems related to the incident performed by Client, Client's agents or law enforcement agencies to the extent legally permissible. Client agrees to take all reasonable remediation steps and provide any certifications or reports as requested by Bank in order to gain full access and use of the Services.

## 7. Client's Internal Security Controls

Client is solely responsible for maintaining the physical, electronic, procedural, administrative and technical security of data and systems in Client's possession or under Client's control. Bank is not responsible for any computer viruses (including, without limitation, programs commonly referred to as malware, keystroke loggers and/or spyware), problems or malfunctions resulting from any computer viruses, or any related problems that may be associated with the use of an online system. Client is solely responsible for maintaining and applying anti-virus software, security patches, firewalls, and other security measures with respect to Client's hardware, software or operating systems, and for protecting, securing and backing up any data and information stored in or on Client's operating systems.

## 8. Representations and Warranties

Client represents and warrants to Bank, as of the date that the Agreement is accepted by Client and at each time any Service is utilized that: (i) Client is validly existing and in good standing under the laws of the jurisdiction of its organization, and is duly qualified to do business in all applicable jurisdictions; (ii) Client has all requisite power and authority to execute and deliver, and to perform its obligations under this Agreement on behalf of itself and of its affiliates and subsidiaries, if and as applicable, and to abide by the terms hereof; (iii) the person who accepts this Agreement, and any person who accepts, completes or executes any Service Document, has been duly authorized to do so; (iv) any information provided by Client to Bank in respect of Client's business affairs and financial condition is accurate and complete and truthfully reflects the business and financial condition of Client as of the period(s) covered by such information; (v) any and all information and data provided by Client to Bank in respect of any Service is accurate, complete, and without error; and (vi) Client is not a "consumer" and Client will use each Service solely for its own internal business purposes, and not for personal, family or household purposes.

## 9. Affiliated Business Entities

This Section applies only in the event that Client desires to group accounts that are owned by affiliated business entities under one master profile to have access to Services. The terms of this Agreement shall apply to all Services provided to each enrolled account. Client represents and warrants that any such affiliated business entity added to the Services has given Client express authorization to act on such affiliated entity's behalf to enroll in and use any Service. Client acknowledges that each person who has access to act on Client's behalf with respect to a Service is also authorized to act on behalf of each affiliated entity whose accounts are included in that Service.

Upon request by Bank, Client shall provide all corporate and organization documentation regarding each affiliated business entity added to the Services and all documentation evidencing Client's authorization to act on behalf of such affiliated entity. Client agrees to notify Bank immediately if any such authority is revoked or amended. In the event Client has provided authorization for affiliated business entities through a separate written agreement between Client and Bank, then said separate agreement shall prevail and this Section shall not apply. Client agrees that Bank shall be entitled to rely upon Client's warranty and Client shall hold Bank harmless and indemnify Bank from any liabilities, costs, losses, or causes of action related to or arising from accounts owned by affiliated business entities that are added to the Services.

## 10. Client's Obligations

**10. 1 Financial Records.** Client understands that Bank may, from time to time, request Client's audited and consolidated financial statements (or if unavailable, statements certified by Client's chief financial officer as true and fairly representing Client's financial condition as of the dates thereof), and Client agrees to provide Bank with such statements within thirty (30) days following receipt of such request.

**10.2 Compliance with Law.** Client agrees to comply with (i) all applicable laws and regulations in connection with Client's use of the Services, (ii) any applicable operating rules and regulations imposed by any processing networks, funds transfer systems, or clearinghouses in which Bank participates and/or which process Service transactions, including, but not limited to the operating rules of the National Automated Clearing House Association ("Nacha"); (iii) Office of Foreign Assets Control ("OFAC") sanction laws, (iv) the United States Foreign Corrupt Practices Act of 1977, as amended, and (v) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act of 2001), as amended and all rules and regulations promulgated thereunder.

**10.3 Prohibited Uses.** Client agrees not to use or attempt to use any Service (i) to engage in any illegal purpose or activity or to violate any applicable law, rule or regulation, (ii) to breach any contract or agreement by which Client is bound, or (iii) to engage in any online gambling transaction, whether or not gambling is legal in any applicable jurisdiction, or (iv) to engage in any transaction or activity that is not specifically authorized or permitted. Client acknowledges and agrees that Bank has no obligation to monitor Client's use of the Services for transactions and activity that is impermissible or prohibited under the terms of this Agreement.

## 11. Electronic Records and Signatures

Client agrees and consents to enter into this Agreement and accept any other agreements, documents or information electronically and otherwise to transact a Service with Bank electronically. Client agrees that Client's electronic consent using the method required by Bank to accept service terms, conditions, and/or disclosures constitutes Client's electronic signature and signifies Client's intent to be bound. Client agrees that Bank's record of any such information, data, or records is the best evidence of the information set forth therein. Bank reserves the right to furnish to Client, and the right to require Client to furnish to Bank, writings or paper copies of information or records relating to any Service, in lieu of and/or in addition to electronic records thereof, at any time in Bank's discretion.

## 12. Confidential Information

Client acknowledges that this Agreement, all Service Documents, Security Procedures and all documents, materials, pricing, data and/or information, in whatever form or format, which relate to any Service ("Confidential Information") contains valuable, confidential, proprietary and protectable information that belongs to Bank, or its third-party service providers. Client shall keep all Confidential Information confidential and shall not disclose or otherwise make any Confidential Information available to any person other than Client's employees who are actively and directly participating in the use of the Services or any agents who need to know such information in order for Client to use the Services. Client shall cause any employee or agent who has access to Confidential Information to observe and comply with the terms of Client's confidentiality obligations. Client's obligations of confidentiality as set forth herein shall continue after termination of the Agreement or any specific Service.

Bank agrees that transaction, data and other information related to Services and any information provided by Client at the request of Bank will be maintained as confidential and will not be disclosed by Bank to any other person or entity except: (i) as necessary to perform such Service or in performance of any Bank obligation in this Agreement, including, but not limited to, disclosure to Bank's third-party providers; (ii) pursuant to a requirement or request of a governmental authority, court order or other legal or administrative process; and/or (iii) as required or authorized by law. Bank will maintain an information security program in compliance with federal law, which is designed to ensure the security, integrity and confidentiality of customer information, protect against any anticipated threats or hazards to the security or integrity of such information, and protect against unauthorized access to or use of such information. Moreover, Bank will comply with all applicable laws and its current data privacy policy with respect to information obtained pursuant to this Agreement or in the performance of the Services.

## 13. Monitoring and Backup

Client agrees that Bank may record, retain, and/or monitor any information, data, or communications, including, without limitation, telephone conversations, made in connection with this Agreement or any Services without further notice or consent. All such information, data, and communications shall be and remain the property of Bank. Notwithstanding the foregoing, Bank shall have no obligation to store, retain or back up any information, data or communications and Client acknowledges and agrees that Client is responsible for the maintenance and storage of Client's own data and other information created through Client's use of any Service.

## 14. Disclaimers of Warranties, Limitations of Liability & Indemnification

**14.1 DISCLAIMER OF WARRANTIES.** BANK MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY KIND IN CONNECTION WITH THE SERVICES PROVIDED UNDER THIS AGREEMENT, OR ANY SOFTWARE, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Client further acknowledges and agrees that no advice, statement, or information, whether oral or written, obtained by Client from

©2024 First Horizon Bank. Member FDIC.

Bank, or through or from Client's use of any Service shall create any warranty, representation, promise, or agreement on the part of Bank not expressly stated in this Agreement.

**14.2 Limitation of Liability.** Bank's duties and responsibilities are limited to those described in this Agreement, the Account Agreement and any other agreements related to a Service. Bank will exercise ordinary care and perform each Service in accordance with reasonable commercial standards applicable to Bank's business, and in compliance with all applicable laws, regulations and this Agreement. To the fullest extent permitted by law, and except as otherwise expressly provided herein (and only to the extent so provided), the liability of Bank in connection with the Services will be limited to actual damages sustained by Client and only to the extent such damages are a direct result of Bank's gross negligence, willful misconduct or bad faith. In no event shall Bank be liable to Client for any incidental, special, indirect, punitive, exemplary, or consequential damages, including, without limitation, lost profits, loss of use, loss of data or attorneys' fees, in connection with the Services, regardless of whether Bank was advised, had reason to know, or in fact knew of the possibility thereof. These limitations will apply to all causes of action, whether arising from breach in contract, tort, strict liability, or otherwise.

**14.3 Indemnification.** Except for those losses caused directly by Bank's gross negligence or intentional acts, Client agrees to indemnify, defend, and hold Bank harmless from and against any and all losses, costs, suits, damages, claims, liabilities, and expenses, including, without limitation, reasonable attorneys' fees, arising from or related to the performance by Bank of the obligations of Bank in providing the Services. The provisions of this section will survive the termination of this Agreement.

**14.4 Force Majeure.** Bank shall not be responsible for any non-performance or delay in performance of any of Bank's obligations or responsibilities hereunder nor shall Bank be liable to Client for any losses, costs, expenses, liabilities, claims or damages whatsoever, if such delay or non-performance was caused by Bank complying with any applicable law or rule, maintenance events on Bank's systems or the Services, or as a result of an Act of God, war, pandemic, epidemic, strike, lockout, riot, equipment or computer failure or malfunction, electrical power disruption or shortage, or communication, telephone or internet failure or malfunction, adverse weather conditions or any other reason outside Bank's reasonable control.

## 15. Termination and Suspension of Services or Transactions

**15.1 Termination and Suspension.** Except as otherwise provided in any of the Service Terms, any Service or this Agreement as a whole may be terminated at any time by either Bank or Client by giving not less than thirty (30) days prior written notice of such termination to the other party. Notwithstanding the foregoing, Bank may terminate or suspend any or all Service(s) effective immediately and without prior notice to Client if: (i) the Client fails to comply with any terms of this Agreement, including but not limited to the failure to pay any fees, charges or expenses when due; (ii) Client has a voluntary or involuntary petition in bankruptcy filed with respect to it, makes an assignment for the benefit of creditors or a receiver or similar authority is charged with administering its assets; (iii) if in Bank's opinion, there has been a material adverse change in Client's financial or business condition or Client's ability to perform its obligations under this Agreement; (iv) required to do so pursuant to any law, regulation or supervisory/regulatory agency, or (v) the Account necessary to provide a Service is closed in accordance with the Account Agreement, or is made subject to levy, garnishment, attachment or similar process or is overdrawn. No termination of this Agreement shall impair or affect the rights, obligations or remedies of either party which may have arisen or accrued prior to the effective date of such termination.

**15.2 Bank's Right to Delay or Refuse to Process Transactions.** Bank reserves the right, in its sole and absolute discretion, to otherwise delay and/or refuse to process any item, transaction or instruction with respect to any Service that (i) does not comply with the terms of and conditions of this Agreement and/or any Service Document (ii) is not complete, correct or current, (iii) is greater in frequency, amount or number than is permitted for the relevant Account or Service, (iv) relates to an Account that has been closed or exceeds the amount of available funds in the relevant Account or would reduce the balance of the available funds below any required minimum balance, (v) Bank, in good faith, believes such transaction or instruction is not genuine or authorized, conflicts with another instruction, or relates to funds or an Account over which there is a dispute, (vi) Bank suspects a possible breach of a Security Procedure or relates to an Account or Service that Bank suspects is being used for, or is the target of, fraudulent or illegal activity, or (vii) might cause Bank to violate applicable law or otherwise expose Bank to liability.

## 16. Notice

**16.1 Notices to Bank.** All notices, demands, requests, or other communications which may be or are required to be given, served, or sent by Client to Bank pursuant to this Agreement or with respect to any Service shall be in writing and shall be delivered by personal or hand delivery, nationally recognized express overnight delivery service (with charges therefore prepaid), or certified or registered mail, return receipt requested (with postage therefor prepaid). Notices shall be deemed

©2024 First Horizon Bank. Member FDIC.

received upon receipt, if hand delivered or deposited with a nationally recognized express delivery service, or the third Business Day after the notice has been deposited with the United States Postal Service. Client shall transmit notices to the following address:

Treasury Management Services
First Horizon Bank
165 Madison Avenue, 6th Floor
Memphis, TN 38103

**16.2 Notices to Client.** Client agrees that Bank may deliver notices to Client in writing or electronically (through email or through notices sent via the Online Banking Service) by using the physical address, mailing address, or email address provided by Client or the address which Bank reasonably believes to be the correct contact information for Client based upon Bank's records, or by providing the notice with an Account statement or through a particular Service. Any notice Bank sends you will be effective when sent or when Bank otherwise makes the notice available through a Service.

## 17. Equipment and Software

Bank may supply Client with certain software owned or licensed by Bank to be used by Client in connection with the performance of the Services. Client agrees that any software provided under this Agreement shall not be modified, altered, ended, recompiled, disassembled, reverse engineered or used for any purpose other than those directly connected to the performance of the Services.

Notwithstanding any other provision of this Agreement, Bank shall defend with counsel of its own choice and at its own expense any claim brought against Client that any software supplied by Bank infringes upon any United States copyright, and Bank shall pay any costs, damages, and reasonable attorney's fees finally awarded against Client on any such action, provided that (a) Client promptly notifies Bank of any claim and reasonably cooperates with Bank in the handling of such claim, and (b) Bank shall have sole control of the defense or settlement of such claim.

Client agrees not to remove, and shall include on any copy made, any proprietary rights or copyright notice placed on or within any software owned or licensed by Bank. Client also agrees to execute any license agreement required by Bank with respect to any software provided in connection with the performance of the Services. In the event of any conflict between the provisions of this Section and any such license agreement, the terms of the license agreement shall control.

All software, specifications, tapes or other media, programs and procedures supplied by Bank and used in connection with the performance of the Services, will be and remain the sole property of Bank. Client shall return such materials to Bank promptly upon request, and shall be responsible for any damages to any such materials incurred in shipping and usage other than normal wear and tear.

## 18. Governing Law

This Agreement shall be construed in accordance with and governed by federal law and the internal laws of the state in which the Account(s) resides (without regard to conflict of law principles).

## 19. Jurisdiction and Venue; Waiver of Jury Trial

Any suit, action or proceeding based on any matter arising out of or in connection with this Agreement or any transaction contemplated hereby may be brought in any federal or state court located in the County and State in which the applicable Account resides, and each of the parties hereby consents to the jurisdiction of such courts. TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, EACH PARTY HEREBY WAIVES THE RIGHT TO A JURY TRIAL IN ANY ACTION OR LEGAL PROCEEDING BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY SERVICES.

## 20. Miscellaneous Terms and Conditions

**20.1 Amendments.** Bank shall have the right to modify, amend, change, or supplement the terms of this Agreement, including any Service Term, at any time in Bank's discretion upon written or electronic notice to Client as set forth herein. Client agrees that a summary of any change in terms is sufficient notice. Any changes made by Bank shall be effective as provided in Bank's notice. Client agrees that Bank may in its discretion add to, modify, and/or delete administrative and operational features and elements applicable to the use of the Services and/or make any changes that are in Client's favor without notice to Client. If Client does not agree to any change or amendment, Client must discontinue its use of the Services. By using any Service after any such change or amendment, Client agrees to and consents to that change or amendment. Client may in no way alter, modify, amend, or supplement this Agreement or any other document or agreement constituting a part of this Agreement, without Bank's prior express written agreement and consent in each instance.

**20.2 Entire Agreement.** This Agreement constitutes the entire understanding to date of the parties hereto regarding the Services and supersedes all prior and contemporaneous oral and written agreements of the parties thereto with respect to the Services, except that the Agreement supplements, but does not replace, other agreements, terms and conditions governing Client's Account(s) and/or any other services used by Client in relation to any such Account. In the event of a conflict between the terms of this Agreement and those of any other agreement, the express terms of this Agreement shall control with respect to the Services.

**20.3 Assignment.** Client may not assign or transfer this Agreement, in whole or in part, without Bank's prior written acknowledgment and consent, which may be granted or withheld in Bank's absolute discretion. Bank may assign this Agreement and/or any or all of Bank's rights hereunder, or delegate any or all of Bank's responsibilities or duties hereunder, to any third party or parties in Bank's discretion and without notice to Client.

**20.4 Severability.** If any provision of this Agreement shalt be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby, including, but not limited to, any transactions with respect to Services selected by Client, it being the intention of the parties that the Agreement be given its broadest possible effect. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders unenforceable any provision hereof, and to the extent that such waiver is not permitted by applicable law, the parties intend that such provision be interpreted as modified to the minimum extent necessary to render such provision enforceable.

**20.5 Interpretation.** The parties agree that the parties have carefully reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities be resolved against the drafting party shall not be employed in the interpretation of this Agreement. The section headings contained in this Agreement are for reference purposes only and shall not affect the interpretation of this Agreement.

**20.6 No Third-Party Rights.** Unless otherwise provided, the provisions of this Agreement are for the exclusive benefit of the parties hereof; provided, however, that with respect to any software licensed by Bank from a third party, such third party shall be a third-party beneficiary to this Agreement solely for the purposes of enforcing Client's representations and covenants as they apply to the third party's software.

**20.7 Waiver.** A failure or delay on the part of Bank in exercising any right, power or remedy under this Agreement shall not operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any further exercise thereof or the exercise of any other right, power or remedy. Where this Agreement or applicable law permits Bank to take action, or not to take action, in Bank's discretion on any matter, any action or inaction on Bank's part with respect to such action or inaction shall not obligate Bank to repeat such action or inaction with respect to similar matters that may subsequently arise.

**20.8 Construction.** This Agreement shall be interpreted and construed in an impartial manner without regard to such factors as the party which prepared the instrument or drafted any provision thereof. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders where the context so requires. The use of the singular form shall include the plural, and the use of the plural shall include the singular, where the context so requires.

**20.9 Successors and Assigns.** All covenants and agreements contained in this Agreement made by or on behalf of the respective parties to such agreements shall bind their respective successors and assigns and shall inure to the benefit of their respective successors and assigns.

# Service Terms and Conditions

©2024 First Horizon Bank. Member FDIC.

# Account Reconciliation Service

These Terms and Conditions provide information on the use of the Account Reconciliation ("ARP") Service described below.

## 1. Description of Service

The ARP Service allows Client to facilitate the reconciliation of designated Account(s) by exchanging files to Bank with information regarding checks issued and checks deposited in such Account during the applicable statement cycles (each a "Reconciliation Period"). Client may also elect to receive partial account reconciliation reporting, which lists debits and checks paid during a Reconciliation Period or a deposit account reconciliation reporting which lists deposits to designated Account(s) during a Reconciliation Period.

## 2. Full Reconciliation Services

Bank shall match daily the Client's cumulative "Check Issue File" with Bank's own records of checks paid. At the end of the Reconciliation Period, Bank will provide all the reconciliation reports to the Client, along with an electronic output file, if requested.

**2.1 Check Issue Files.** Client shall transmit to Bank Check Issue Files for checks issued on designated Account(s). Each Check Issue File shall include a listing of the check number and account number which was MICR-encoded on each check, and the dollar amount of each check, for each check issued by Client, or on Client's behalf, on the Account(s) since Client's most recent Check Issue File was transmitted to Bank. Client will use a secure method of file delivery that is mutually agreeable to both parties. Check Issue Files received by Bank by 6:30 p.m. CT on a Business Day will be processed the same day. Check Issue Files received by Bank after 6:30 p.m. CT will be processed the next Business Day. Bank reserves the right to revise the cut-off time for Check Issue Files as set forth above.

**2.2 Bank Processing of Check Issue Files.** On the evening of each Business Day, Bank shall process the Check Issue File generated from the transmittal of the most recent Check Issue File and add the new check issue information (check number, account number, and dollar amount) to the existing history of checks issued on the Account(s), and checks paid on the Account(s), which history is maintained in Bank's account reconciliation system. When checks on the Account(s) are presented to Bank for payment, Bank shall compare the check number, account number, and dollar amount on the checks that are presented with the check number, account number, and dollar amount of checks described in the account reconciliation system data in order to identify any checks for which such data on the checks does not entirely match such data in the account reconciliation system ("Suspect Items"). Bank will research and correct Suspect Items if possible. Any Suspect Item that cannot be corrected by Bank will be presented to Client for decision. If Client sends a daily file (and the last file of the month is sent on the first Business Day of the following month), all the files will be included on the reconciliation. Any files sent after the first Business Day of the following month will be included in the next reconciliation unless Client informs Bank in writing that its last file is sent by a specific day of each month.

**2.3 Accuracy and Timeliness of Information.** Client represents and warrants that all Check Issue Files provided to Bank by Client will be accurate and complete. Client accepts full responsibility for the accuracy of the Check Issue File. Bank will use reasonable efforts to provide the reports requested through the ARP Service in a prompt fashion, but shall not be liable for temporary failure to provide timely information. In such event, Client shall be responsible for carrying out banking business through alternative delivery channels.

## 3. Partial Reconciliation Services

If requested during implementation, Bank will provide a report listing all the checks paid for the Reconciliation Period. An electronic output file will also be provided to the Client, if requested.

## 4. Deposit Reconciliation Services

If requested during implementation, Bank will provide a report listing all the deposits posted for the Reconciliation Period. An electronic output file will also be provided to the Client, if requested.

## 5. Security Procedures

Bank shall issue to Client a password to enable Client to transmit Check Issue File to Bank's computer system, and Bank shall issue one or more personal identification number(s) ("PIN(s)") to be used by Client in order to verify to Bank the authenticity of the Check Issue File. Client shall maintain the confidentiality of the password and PIN(s) and shall immediately notify Bank in writing in the event the confidentiality thereof has been compromised or Client believes it may be compromised. Bank shall be entitled to conclusively presume, and rely upon the presumption, that all information contained in the Check Issue File received by Bank which includes a PIN assigned to Client constitutes accurate information describing checks that have been validly issued by Client. Bank reserves the right to implement any additional security procedure at any time, or on a

©2024 First Horizon Bank. Member FDIC. 

case-by-case basis, but the absence of any additional verification procedure, or any failure to follow any additional verification procedure, shall not affect the foregoing presumption.

### 6. Testing
Client understands that a four-week lead time for testing is required to begin Full Reconciliation ARP Services. Partial and Deposit Reconciliation ARP Services take one week to be established. All services will start at the beginning of the next Reconciliation Period after the testing periods described above.

### 7. Documents
Client's use of this ARP Service depends upon all documents being magnetically pre-numbered ("encoded") in the proper location and in accordance with Bank specifications. Client agrees to receive any reports from Bank in the specified format and medium, on the scheduled day(s) and at the place(s) as agreed to by the parties.

### 8. Image Viewer
Through the use of the Image Delivery Service, or through any other agreed-upon method, Client may view images of all items (paid checks, deposits and items deposited). Bank will provide these images on a schedule as requested by Client in implementation.

---

## Automated Clearing House (ACH) Transaction Service

These Terms and Conditions provide information on the use of the Automated Clearing House ("ACH") Transaction Service described below.

### 1. Description of Service
Client desires to transfer or receive daily funds from time to time by requesting that Bank transmit debit and credit entries through the ACH network, referred to herein as "Transactions." Bank may from time to time agree to accept Transaction requests, and in such case the Transaction shall be governed by the terms and conditions set forth herein, and, except as specifically modified by this Agreement or these Service Terms, Client's Account(s) shall be subject to the terms and conditions of the Account Agreement and any other written agreements affecting Client's Account(s). Further descriptions of services provided, processes and security procedures are described in the Service Documents.

### 2. Compliance with Rules
Client acknowledges it has a copy or has access to a copy of the Operating Rules of the National Automated Clearing House Association (the "Nacha Rules"). The Nacha Rules are available through Nacha at its website: https://www.nacha.org. Client agrees to comply with and be subject to the Nacha Rules as amended from time to time. In the event that Bank determines, in its sole discretion, that there has been a breach of the Nacha Rules, Bank may, in its sole discretion suspend all Transactions or lower Client's ACH limits, without advance notice.

### 3. Authorized Transaction Requests
Under any of the following circumstances, Bank shall be conclusively entitled to deem each Transaction request to be authorized by, and binding upon, Client: (i) if the Transaction request is made by Client or its actual or apparent agent; or (ii) if the Transaction request is issued in the name of Client and verified pursuant to the Security Procedures; or (iii) if Bank reasonably believes that the Transaction request was given or authorized by a representative of Client; or (iv) in the event Client utilizes the services of a third party to make Transaction requests in connection with payroll processing, cash concentration, or other functions, provided the Transaction request is issued in the name of Client and Bank reasonably believes that the Transaction request was given or authorized by a representative of such third party or was verified pursuant to a security procedure agreed upon between such third party on Client's behalf and Bank; (v) if Client utilizes the ACH Services by instructing Bank to accept telephonic, electronic or other Transaction request to send debit entries to deposit account(s) of Client customer(s) for credit to Client (or to revoke same), Bank may treat such requests as authorized by Client if the request is accompanied by the account number(s) or code(s) Client has assigned to its customer(s); or (vi) if a Transaction request qualifies for Same Day ACH processing in accordance with Nacha Rules and is received by Bank prior to established deadlines, and the Transaction request specifies an effective entry date that is on or before the current banking date, the Transaction will be processed as a same-day transaction and subject to additional fees and charges.

## 4. Types of Entries; Format of Transmissions

Client may only initiate entry types (standard Entry Class or "SEC" Codes) that Bank has expressly authorized. All authorized SEC Codes are set forth in the Service Documentation and subject to change from time to time. Client will transmit entries to Bank in the form of computer readable information via a mutually agreed-upon medium and in the format specified within the Nacha Rules.

## 5. Client Warranties

As to each Transaction request authorized (or deemed to have been authorized pursuant to Section 3 hereof ) by Client, Client warrants to Bank each of the following: (i) that the Transaction request is authorized in accordance with the valid authorization (which remains in full force and effect) of the account holder(s) of the account which is to be debited or credited in connection with the Transaction; (ii) such authorization has been obtained either: (A) in the form of a writing signed by the account holder(s), or (B) in the form of an authorization statement furnished to the account holder(s) by Client, either in advance or at the time a particular transaction is authorized, which includes provisions as to the method for revocation thereof, and the account holder has furnished authorization to Client for the Transaction and Client has authenticated such authorization by means of a digital signature or code authentication procedure; (iii) that a copy or record of such authorization shall be retained by Client throughout the authorization period and for at least two years thereafter, and a copy of the authorization record shall be furnished by Client promptly upon request by Bank and/or the account holder; (iv) that the account holder shall be promptly notified by Client in the event an entry previously made may be and is (in accordance with Nacha Rules) reversed at Client's request; (v) that each Transaction request is in the correct amount and conforms to all applicable laws and regulations, and Client is bound without limitation to the Nacha Rules and with all procedures established by Bank in connection with the ACH Service; (vi) that none of the files are "pass-through" files, i.e. a balanced file without settlement entries occurring through an account at Bank; (vii) that none of the Transaction requests relate in any way to high-risk activities, processing for which is prohibited by Bank, including online payment processors, certain credit repair services, mail order telephone order (MOTO) companies, online gambling operations, businesses located offshore or adult entertainment businesses; and (viii) that Bank's initiation or execution of each Transaction request in accordance with its terms shall not give rise to any claim or defense which may be asserted by any account holder or other person against Bank. Client warrants and agrees that not only has it complied with and will comply with all rules and laws governing ACH transactions, but it will not originate transactions that violate any laws of the United States including those giving rise to OFAC sanctions.

## 6. Additional Client Warranties for Selected Standard Entry Classes

Client also makes the additional warranties to Bank that Bank makes to each RDFI and ACH Operator under the Rules for the respective SEC codes for Entries originated by Client. Client indemnifies and holds Bank harmless from any liability arising out of Client's breach of these warranties.

## 7. Financials and Right to Audit

Client agrees that it will provide financial information on itself on at least an annual basis and agrees that Bank may, with reasonable notice to Client, audit Client's compliance with Nacha Rules and all other terms herein.

## 8. Client Indemnification

Client hereby agrees to indemnify and hold harmless Bank, its affiliates, and the directors, officers, employees, and agents of each of them from and against any and all liability, loss, claims, demands, expenses (including without limitation attorneys' fees and litigation costs), or fines arising in connection with breach of any of the warranties set forth above and in the General Terms and Conditions or any breach of the Nacha Rules, including without limitation any damages or expenses sustained by Bank based upon an indemnity agreement between Bank and another financial institution or other third party, or arising in connection with any action or inaction by Bank in accordance with Client's instructions.

## 9. Holds or Other Credit Mitigation

Client acknowledges that Bank shall have the right to implement holds or other reasonable credit mitigation processes if (i) in the opinion of Bank, credit quality has become impaired; (ii) Client generates higher than the industry average level of returns (as defined by Nacha); or (iii) Client improperly uses SEC Codes. Client further acknowledges that Bank in its discretion may require pre-funding for ACH credits, holds for future debit returns and/or reserve accounts. Upon termination of the ACH Services, Bank may require originators of debit entries to maintain certain balances for a reasonable period of time after ceasing debit originations.

## 10. Exposure Limits

Bank may establish and change (with or without prior notice) aggregate and individual dollar limits or exposure limits for a Client. Bank may refuse to process any Transaction in excess of the exposure limits at Bank's sole discretion. Upon request, Bank will tell Client of any exposure limit in place. Client shall promptly notify Bank if Client anticipates a significant increase

or decrease in the dollar amount of any of its Transactions. Bank may, on an annual or more frequent basis, review Client's exposure limits and make any adjustments that Bank may deem appropriate, in Bank's sole discretion.

## 11. Provisional Settlement; Returns

Client acknowledges that ACH debit entries may be returned by the receiving institution for insufficient funds or other reasons. In addition, the Nacha Rules provide that consumers have a lengthy period of time in which to cause ACH debit entries to be returned or charged back for reason of alleged lack of authorization. Any credit or consideration given by Bank to Client with respect to any Transaction request shall be deemed provisional, and Bank shall be entitled to revoke same without prior notice in the event the Transaction is returned, rejected, revoked or charged back to Bank. In the event a Transaction is returned or charged back for reason of alleged lack of authorization, Client may promptly submit to Bank such proof of authorization as Client may have with a request that Bank forward such proof to the receiving institution for its consideration. However, Bank's chargeback to Client of the disputed Transaction will remain final unless the receiving institution determines to accept the charge based on Client's proof of authorization. In the event an entry is returned for correction, Client agrees to make said correction before transmitting subsequent live entry to the receiver. Client agrees not to originate a Transaction where authorization has been revoked. In the event a return entry or Notification of Change (NOC) sent to Client is in error, Client will notify Bank within one business day of entry receipt.

## 12. Execution of Transfer Request

Bank shall have no obligation to accept and execute a Transaction request, despite any custom or practice to the contrary, and shall be entitled to make a decision on a case-by-case basis for each request. Bank is authorized, but shall have no obligation, to execute a Transaction request even though same may bring about or increase Client overdrafts, and no custom or practice of creating overdrafts shall obligate Bank to create others or to provide notice to Client of any change in such custom or practice. Bank may reject or delay origination of any Transaction at any time without prior notice, despite any custom or practice to the contrary, for, among other reasons, Bank's belief that the Transaction may cause Bank to violate the Nacha Rules, any regulatory or internal risk control program, or any applicable law or regulation.

## 13. Investment Advisor Disclaimer

Client understands that Bank is not an investment advisor and is not acting as a fiduciary to Client with respect to any Transaction, including International ACH Transactions. Client bears the sole risk of any and all market fluctuations in any currency traded or fees associated with these trades. Bank may pass through to Client any such charges imputed.

## 14. General

Client acknowledges and agrees as follows: (i) Except as otherwise specifically provided herein, any notice required in connection with the ACH Services may be given orally, in writing, or by electronic transmission pursuant to facilities established between the parties, if applicable; (ii) Any receiving, paying, or drawee institution receiving a Transaction initiated or executed hereunder may debit or credit an account based solely on the account number, without reference to any discrepancy in the account name, and Client shall be solely responsible for any error resulting from its failure to furnish correct and complete information with each Transaction request, including without limitation the correct account number(s); (iii) No attempt by Client to revoke or amend any Transaction request will be binding on Bank unless Bank actually receives complete and accurate notice thereof by such means as Bank may instruct and Bank has a reasonable opportunity to act thereon prior to release of the Transaction by Bank; (iv) Client agrees Bank is authorized to investigate, obtain and exchange reports and information regarding Client with credit agencies and others Bank believes to have a legitimate business need for such reports; (v) Client shall notify Bank immediately, and promptly confirm such notice in writing, upon discovery that the security thereof has been or may have been compromised, or that a Transaction has been conducted in error or without Client's authorization; (vi) Client shall retain data on file adequate to permit remaking of entries for five (5) business days following the date of their transmittal to Bank as provided herein and shall provide such data to Bank upon request; and (vii) Client acknowledges that Bank may, from time to time, need to temporarily suspend processing of a Transaction for greater scrutiny or verification against the Office of Foreign Assets Control (OFAC) Specially Designated Nationals list, and that this action may affect settlement and/or availability.

## 15. Limitation of Liability

Notwithstanding anything to the contrary in the General Terms and Conditions, Bank's liability with respect to loss of Client funds by reason of Bank's error shall not exceed the amount of funds transferred by Bank in error, reduced by the sum of (i) the amount of any benefit Client derived by reason of such error, and (ii) the amount of any recovery which Bank could have effected had Client promptly notified Bank of such error on the date Client discovered, or reasonably should have discovered, same. Except as provided herein, Bank shall not be liable for damages, losses, expenses, demands, or claims of any type or amount, regardless of whether the cause of action is asserted in tort, in contract, as a breach of statutory or other legal duty, or otherwise.

©2024 First Horizon Bank. Member FDIC.

## 16. Notifications of Change

If Bank, on your behalf, receives a Notification of Change ("NOC") for any Transaction, Bank will provide Client notice of the NOC by online service or email. The Nacha Rules require the Originator to make the requested changes within six (6) banking days of the receipt of the NOC or prior to the initiation of another Transaction. Client agrees to make the required change(s) prior to submitting any further entries to the applicable receiver's account. In the event that Client should transmit a new Transaction to a receiver for which a NOC has been received, Client instructs Bank to make the requested correction to the entry before submitting to the applicable receiver's account. Client hereby agrees to indemnify and hold harmless Bank, its affiliates, and the directors, officers, employees, and agents of each of them from and against any and all liability, loss, claims, demands, expenses (including without limitation attorneys' fees and litigation costs) that might result from Client failing to update its customer payment-related data, or Bank's action on behalf of Client to update its customer pay-related data.

## 17. ACH Third-Party Sender

**17.1 Registration.** Prior to originating any ACH transaction on behalf of another party, Client shall provide Bank with all requested information for purposes of Bank registering Client as a Third-Party Sender with Nacha. Client shall promptly notify Bank of any changes to the information provided in connection with the Third-Party Sender registration.

**17.2 Third-Party Sender Rules.** Client as a Third-Party Sender agrees to be bound by the Nacha Rules as in effect from time to time, and that for Entries for which Client is the Originator, Client will not initiate such Entries in violation of the laws of the United States. For each Entry for which Client is not the Originator, Client agrees that it will not transmit to Bank any Entries that violate the laws of the United States and that it has entered into an agreement with the Originator that satisfies the requirements of the Nacha Rules, and includes, among other things, the following: (i) Client has been authorized by each Originator to send Entries to Bank and Client authorizes Bank to process each Entry on behalf of the Originator; (ii) Client's customer assumes the responsibilities of an Originator under the Nacha Rules and agrees to be bound by the Nacha Rules; (iii) Entries may not be initiated that violate the laws of the United States, including without limitation the regulations issued by the Office of Foreign Assets Control; (iv) Client may at any time refuse to process an Entry for that customer, including enforcing restrictions on the types of Entries that may be originated; (v) Client may terminate or suspend such agreement for any breach of the Nacha Rules by its customers; and (vi) the right of Client to audit its customers' compliance with such agreement and the Nacha Rules. Client further agrees that in the event they breach the Nacha Rules or these Service Terms in any way Bank may suspend or terminate the ACH Service immediately without advance notice.

**17.3 Transmittal of Entries.** Client, as a Third-Party Sender, shall transmit credit and debit Entries to Bank in a format and other requirements as Bank may require. Client agrees that its ability to originate Entries on behalf of other parties is subject to ACH exposure limits in accordance with the Nacha Rules and as Bank may establish. Client further agrees that it will comply with the requirements and standards for approval of a new Originator as Bank may require, including providing all required information prior to submitting any transaction for a new Originator. Client agrees to provide any information Bank deems reasonably necessary to identify each Originator for which Client transmits Entries and/or to audit the Client's compliance with this Section 17. Such information will be provided to Bank upon request within two business days of the receipt of the request. Client agrees to provide Bank access to files and records of all Originators, and authority to conduct periodic audits of these files to ensure the Client's compliance with Bank's policies.

**17.4 Obligations of Client as a Third-Party Sender Under the Nacha Rules.** Except for any entry initiated by Client as an Originator, in addition to any other duties, responsibilities, warranties, representations and liabilities under this Section 17, for each and every Entry transmitted on behalf of another person, Client represents and warrants to Bank and agrees that Client shall: (i) perform all duties, including but not limited to, the duty to identify Originators, or any Originator acting in the capacity of a downstream or "nested" third-party sender; (ii) assume all of the responsibilities, including but not limited to, of ODFI and Originator; (iii) make all of the warranties, including but not limited to, the warranties of ODFIs, including, but not limited to, monitoring the origination and return activity of its Originators across multiple Settlement Dates, enforcing restrictions on the types of Entries that may be originated through its Originators, and enforcing, with respect to its Originators, exposure limits, and the warranties of Originators under the Nacha Rules; (iv) make all of the representations; and (v) assume all of the liabilities, including but not limited to, liability for indemnification for failure of an Originator to perform its obligations as an Originator, or a Third-Party Sender in accordance with the Nacha Rules.

**17.5 Third-Party Sender Representations and Agreements.** With respect to each and every Entry transmitted by Client on behalf of another person, Client represents and warrants to Bank and agrees that (i) each person shown as a Receiver on an Entry received by Bank from Client has authorized the initiation of such Entry and the crediting or debiting of its Account in the amount and on the Effective Date shown on such Entry, (ii) such authorization is operative at the time of transmittal or

crediting or debiting by Bank as provided herein, (iii) Entries transmitted to Bank by Client are limited to those types of credit and debit Entries as approved by Bank, (iv) Client shall perform its obligations under these Service Terms in accordance with all applicable laws, regulations and orders, including but not limited to the sanctions, laws, regulations and orders administered by OFAC, laws, regulations and orders administered by FinCEN, and any state laws, regulations or orders applicable to the providers of ACH payment services, and (v) Client shall be bound by and comply with the provisions of the Nacha Rules (among other provisions of the Nacha Rules) making payment of an Entry by an RDFI to the receiver provisional upon receipt until receipt is final settlement for such Entry. Client specifically acknowledges that it has received notice of the Nacha Rule regarding provisional payment and of the fact that, if such settlement is not received, the RDFI shall be entitled to a refund from the Receiver of the amount credited and Client shall not be deemed to have paid the Receiver the amount of the Entry. Client agrees to provide notice of this Nacha Rule to the Originator.

**17.6 Indemnification.** Client shall indemnify Bank against any loss, liability or expense (including attorney's fees and costs) resulting from or arising out of any breach of any of the warranties, representations, obligations or agreements set forth in this Section 17.

**17.7 Compliance Audit and Assessments as a Third-Party Sender.** Client agrees to conduct no less frequently than annually an audit and assessment of its compliance with the Nacha Rules, all required security procedures, and any applicable state or federal laws. Client shall provide the findings from all required assessments and audits to Bank on an annual basis. Client grants to Bank the authority to conduct periodic site visits to assess Client's compliance with the Nacha Rules, all required security procedures, and any applicable state or federal laws. Client agrees to provide Bank access to files and records of all Originators, and authority to conduct periodic audits of these files to ensure Client's compliance with Bank's policies.

## ACH Debit Block and Filters

These Terms and Conditions provide information on the use of the ACH Debit Block and Filters Service described below.

### 1. Description of Service

Client may elect to block and/or filter certain debit entries through the ACH network in a designated Account, referred to herein as "Transactions." A debit entry block will block the posting of all incoming Transactions to a designated Account. A debit entry filter will block all incoming Transactions, except from specified Originators. Client shall be responsible for notifying Bank at least three (3) Business Days ahead of any Transaction to establish a debit filter. In addition to any other limitations of liability, Bank shall not be liable to Client for any damages caused by a Transaction being blocked, which includes any damages or losses relating to delays in posting, any losses, late fees, collection charges, holds on an account, or loss of good will, or harm to Client's reputation, with its suppliers, vendors, business partners, or other persons or entities.

## ACH Positive Pay Service

These Terms and Conditions provide information on the use of the ACH Positive Pay Service described below.

### 1. Description of Service

The ACH Positive Pay Service gives Client the ability to authorize certain electronic ACH debits through the Digital Banking Service to pay as one-time entries or as recurring entries based on certain criteria before such electronic debits are posted to a designated Account(s) for payment. Bank then can compare such information with ACH debit entries which are presented for payment and identify potentially suspect items which might be forgeries or unauthorized items. If an ACH debit entry does not meet Client's criteria, the transaction will be blocked and each blocked entry will be presented to Client for a decision on such transaction.

### 2. Presentments and Approvals

ACH debits are received with an effective date, which reflects the date upon which the applicable Account would be debited if approved for payment. In most cases, items are received one (1) Business Day in advance of the effective date and will be available for Client to review. Alerts of items for your review will be sent via the designated information provided in the implementation process. Items presented which have not been approved for payment will be returned by default after 3:00 p.m. ET, unless Client and Bank agree to a different default setting.

©2024 First Horizon Bank. Member FDIC.

### 3. Clients Using Both ACH Positive Pay and Positive Pay

ACH Positive Pay is a pre-posting solution. Items will be presented through the Digital Banking Service prior to being charged to the applicable Account. Positive Pay reviews items after posting, and allows for checks converted to ACH with an entry class code of "ARC" (Accounts Receivable Entry), "POP" (Point-of-Purchase Entry), "BOC" (Back Office Conversion), or future ACH entry class codes that represent check conversion to be compared against the Client's Issue File (as defined in the Positive Pay Service terms), with items not matching information in Client's Issue File (account number, check number and check amount) being referred to Client. Therefore, if a client enrolls for both services, it will be possible to review the same ACH entry from both processes.

---

## Business Bill Pay Service

These Terms and Conditions provide information on the use of the Business Bill Pay Service described below.

### 1. Description of Service

The Business Bill Pay Service allows Client to (i) initiate and authorize payments from a designated Account to an individual or business (a "Payee"); (ii) set up recurring payments; and (iii) view payment history under the Business Bill Pay Service. In order to access the Business Bill Pay Service, Client must be enrolled in and agree to the terms and conditions of the Digital Banking Service.

### 2. Payments

Client may use the Business Bill Pay Service to make one-time or future or recurring payments to Payees. Client agrees to follow the applicable Service instructions provided in order to schedule and initiate payments. For each scheduled payment, the Business Bill Pay Service will designate the earliest possible payment date. When scheduling a payment, Client must schedule a payment date that is no later than the due date on the applicable bill. The payment will be made either by (i) transferring funds electronically from the designated Account to the Payee or (ii) preparing a paper check to the Payee and mailing it via first-class mail. Client acknowledges and agrees that the submission of payment instructions under the Business Bill Pay Service authorizes Bank to withdraw funds from the designated Account and make the payment as directed. For any payments made (either payments made electronically or by check), funds are debited from the designated Account the same day that the payment is processed through the Business Bill Pay Service regardless of when Payee receives the payment. Bank shall make that payment unless Bank has some reason not to do so, for example if the designated Account has insufficient funds (including funds available under any discretionary overdraft line of credit or other overdraft protection). Client is responsible for any non-sufficient funds or overdraft charges, as set forth in the Account Agreement. Bank will automatically execute bill payments according to Client's instructions and will continue until such instructions are canceled.

### 3. Payment Information

Client agrees to provide such information as Bank may request in order to process payment transactions initiated through the Business Bill Pay Service. This information may include the name and address of the Payee or Payee's bank account number. Client is responsible for ensuring that the information provided is current, accurate, and complete, and Client assumes responsibility for any transaction error that results from stale, inaccurate, or incomplete information furnished or entered into Business Bill Pay Service by Client. Payee information may be amended once set up by following the applicable instructions in the Business Bill Pay Service. Bank shall have a reasonable opportunity to process any amended information, and such amended information may not be applied to transactions already in process. Client acknowledges and agrees that Bank may edit or alter data or data formats according to the Payee's directives and/or in order to process payment transactions more efficiently.

### 4. Payee Participation; Payment Refusal

Bank makes no representation or warranty that a specified Payee will participate or be able to receive payments initiated through the Business Bill Pay Service. Client should be aware that some Payees do not accept electronic payments or other payments through the Business Bill Pay Service. Bank reserves the right to select, in Bank's sole discretion, the method by which to remit funds on your behalf to a Payee. When Bank receives such notice of refused electronic payment, Bank will prepare and mail a paper check to the Payee. Bank further reserves the right, to the fullest extent permitted by law, to refuse to pay any Payee to whom Client may direct a payment. In the event that Bank is unable to, or declines to, process or complete payments to a Payee, Bank will notify Client that payment must be made through other means. Client acknowledges and agrees that Bank will not be liable in the event any Payee does not, cannot or refuses to accept payments initiated through the Business Bill Pay Service, or in the event any payment submitted to a Payee is returned, or in the event Bank exercises our right to decline to complete payments to such Payee.

### 5. Payment Timing

Client should take into account delays that arise in processing and/or mailing paper checks. The Business Bill Pay Service

provides “Deliver By” or “Arrives By” dates. These dates are estimates only, and delivery of the scheduled payment is not guaranteed by the dates provided. For payments made electronically, funds are debited from the designated Account the same day that the payment is processed. Each Payee may have additional delays in processing a payment. In addition, payments made by paper check may not be received by the Payee until a few days later. Therefore, to avoid incurring any finance or other charge imposed by the Payee, Client must schedule a payment sufficiently in advance of the payment due date.

### 6. Payment Processing

In general, Client may schedule bill payments for the current business day or any date in the future, and Bank will process your payment on the date scheduled. Payments will be processed twice each Business Day (excludes Saturdays, Sundays and holidays) at 8 a.m. ET and at 3 p.m. ET. If Client schedules a payment to be processed before 8 a.m. ET for payment that day, it will be processed at 8 a.m. ET; subsequently, if Client schedules a payment to be processed after that time, it is processed at 3 p.m. ET that same day. If Client schedules a payment to be processed after 3 p.m. ET, it will be processed the next business day at 8 a.m. ET.

### 7. Recurring Payments

Recurring payments must be for the same amount each month, and these will be sent on the same calendar day of each month. If such day does not fall on a business day, the payment will be processed in accordance with your selected time preference during the establishment of the recurring payment in the Business Bill Pay Service.

### 8. Late Payments

Client is responsible for ensuring that bills are paid on time. Client is responsible for any late fees or finance charges because a payment was not made in a timely manner. Bank is not responsible for any delay or adverse consequence from the choice of payment methods, from delays in the delivery of mail or from the improper handling or transmission of payments by any third party. Bank is also not responsible for the failure of a Payee to accept, process or properly post a payment in a timely manner. Bank has no obligation to notify you if a payment is incomplete because there are insufficient funds in the designated Account. In all cases, Client must either make alternate arrangements for the payment or must reschedule the payment through the Business Bill Pay Service.

### 9. No Duty to Monitor

Bank has no duty to monitor payments made through the Business Bill Pay Service.

### 10. Cancellation of Payment

To cancel a scheduled bill payment, Client must cancel the payment online before the time it is scheduled to be processed.

### 11. Stop Payment Requests

**11.1 Electronic Payments:** Once an electronic payment has been processed and the designated Account debited, an electronic payment cannot be stopped or canceled.

**11.2 Paper Check Payments:** Client may request that Bank stop payment on a paper draft drawn against a designated Account if bank has not accepted, certified, made final payment on or otherwise become accountable for the item. If the paper draft has not cleared, Bank will process the stop-payment request. To be effective, the stop-payment request must precisely identify the name of the Payee, the account number, the amount and scheduled date of the payment, and the Payee ID number from the Business Bill Pay Service “Payment History” Screen. Client may be required to confirm the stop payment request in writing and mail it to us within 14 days of the request. Client will incur stop-payment charges as provided for in the Account Agreement.

---

## Business Investment Account Service

These Terms and Conditions provide information on the use of the Business Investment Account (“BIA”) Service described below.

### 1. Description of Service

On each Business Day, Bank shall automatically transfer excess funds above a minimum balance (the “Target Balance”) between designated Account(s) (the “Designated Checking Account(s)”) and a repurchase agreement account held by Bank in the name of Client (the “Investment Account”) pursuant to the terms and conditions of these Service Terms.

### 2. Service Setup

Client shall identify the Designated Checking Account(s) and specify the Target Balance with Bank during implementation of the BIA Service. Client may change the Designated Checking Account(s) and/or Target Balance upon written notice to Bank, which shall be effective after a reasonable time for Bank to implement such change.

## 3. Transfers to Repurchase Account

Following posting of all credits, debits, and other charges in the Designated Checking Account(s) on each Business Day, if the ending collected balance is greater than the Target Balance, Bank will automatically transfer funds from the Designated Checking Account(s) to the Investment Account in the amount by which such ending collected balance on such banking day exceeds the Target Balance (the "Repo Funds"). Client acknowledges that Bank may establish (and change from time to time) (i) a minimum balance to be maintained in the Designated Checking Account, (ii) a minimum and maximum balance required or permitted in the Investment Account, and (iii) other terms and conditions affecting this BIA Service. For purposes of these Service Terms, the term "collected balance" means those funds which Bank deems available to Client in the Designated Checking Account for purposes of pricing and account analysis. Client acknowledges that such "collected balance" may not coincide with the Designated Checking Account's ledger balance, nor the time by which Bank actually receives provisional or final credit for checks and similar items deposited to the Designated Checking Account.

## 4. Daily Repurchase Agreements

Upon transfer of the Repo Funds to the Investment Account, Client authorizes and directs Bank to purchase, for Client's account, an undivided fractional ownership interest in Bank-owned securities (the "Underlying Securities") with a market value equal to the Repo Funds transferred. The purchase of the Underlying Securities shall be evidenced by a confirmation delivered by Bank to Customer, which shall describe the Underlying Securities, including the issuer, CUSIP or other identifying number, maturity date, coupon rate, market value and par value of such security. Bank simultaneously agrees to repurchase the Underlying Securities from Client for the repurchase price of: (i) the amount of the Repo Funds for/with which Client purchased the Underlying Securities, regardless of any fluctuations in the market value of the Underlying Securities at the beginning of the next Business Day, and (ii) interest as set forth in Section 5 ("Daily Repurchase Agreement"). Upon the repurchase of the Underlying Securities by Bank, Bank will automatically transfer the portion of the repurchase price equal to the Repo Funds to the Designated Checking Account. Bank shall have no obligation to make payment of the repurchase price pursuant to any Daily Repurchase Agreement by any other means than a transfer to the Designated Checking Account.

**4.1 Substitution and Segregation of Underlying Securities.** Client appoints Bank and its designees as Client's agent for purposes of transferring the Underlying Securities or taking such other steps as are reasonably necessary to carry out the BIA Service on behalf of Client. During the term of each Daily Repurchase Agreement term, Bank shall hold the related Underlying Securities in its name, as agent for Client. Bank shall segregate all such customer securities from the assets of Bank and keep them free of any lien, charge or claim of any third party granted or created by Bank. The Underlying Securities may be held in bulk together with other securities being held for the benefit of other BIA Service clients of Bank. Bank shall maintain records showing the ownership of the Underlying Securities by Client and the other customers of the BIA Service. Bank is not permitted to substitute other securities for the Underlying Securities disclosed to Client for any Daily Repurchase Agreement.

**4.2 No FDIC Insurance.** The Daily Repurchase Agreements are not deposits and are not insured by the Federal Deposit Insurance Corporation. Client will not share in any loss or profit occasioned by fluctuations in the value of the Underlying Securities or Bank's receipt of income or liquidation proceeds of the Underlying Securities. Bank expects to pay the repurchase price under each Daily Repurchase Agreement from its general funds. If Bank were to fail, no payments under or relating to Daily Repurchase Agreements would be made to Client by the government, and the government has not guaranteed Bank's obligation to pay the repurchase price. In the event of Bank's failure:

**i. Designated Checking Account.** Funds transferred from the Designated Checking Account to the Investment Account are internal transfers, and under the FDIC's rules, the FDIC generally will determine the end-of-day balance of the Designated Checking Account eligible for deposit insurance coverage in accordance with Bank's normal posting procedures. Provided that the value of the Underlying Securities at least equals the dollar amount of funds transferred to the Investment Account and invested in Daily Repurchase Agreements, Client's swept funds will be fully protected in the event of Bank's failure.

**ii. Daily Repurchase Agreement Investments; Client's Control and Right to Direct.** If Bank were to fail, the treatment of funds invested in a Daily Repurchase Agreement will depend on the nature of actions taken by the FDIC. If another financial institution acquired Bank or a portion of Bank's business including the BIA Service, the Daily Repurchase Agreement and the Bank's obligations hereunder would also be transferred to the acquiring institution, and the funds invested in the Daily Repurchase Agreement normally would be swept back into the Designated Checking Account on the Business Day following failure in accordance with the procedures described above.

In the alternative, if Bank were liquidated by the FDIC, the FDIC should recognize the Client's ownership of the Underlying Securities, and its rights under the Daily Repurchase Agreement as a "qualified financial contract." Upon any default by Bank under any Daily Repurchase Agreement, including Bank's failure, Bank, as Client's agent, will comply

with and effect any order given by Client in relation to the Underlying Securities, including any order to transfer the Underlying Securities to customer or to sell the Underlying Securities and apply the proceeds in satisfaction of Bank's obligations.

Although Bank and Client intend that each Daily Repurchase Agreement be a sale and purchase, and not a loan, in the event that any Daily Repurchase Agreement is deemed to be a loan, Bank will be deemed to have granted to Client a fully collateralized security interest in the related Underlying Securities and all related income and other proceeds for the performance by Bank of its obligations under each Daily Repurchase Agreement.

### 5. Interest

The per annum amount of interest included in the repurchase price of a Daily Repurchase Agreement shall be disclosed in the confirmation provided as described in Section 4. Such interest rate shall be determined by Bank, in its sole discretion, from time to time. Client acknowledges that Bank may establish varying interest rates for varying denominations of Daily Repurchase Agreements under the BIA Service. The interest included in the repurchase price will bear interest, compounded daily, at the same rate, and Bank shall credit all accrued interest to the Investment Account on the last Business Day of each month, which will then automatically be transferred to the Designated Checking Account(s) on the following Business Day. Any accumulated interest shall not be available for reinvestment by Client until such interest has been transferred to a Designated Checking Account. Client acknowledges that (except coincidentally) the interest rate(s) will not be the rate(s) payable on the Underlying Securities and may not equal the rate established by Bank for repurchase agreement transactions which are not made pursuant to this BIA Service.

### 6. Documentation

In addition to the confirmations for each Daily Repurchase Agreement, Bank will send Client a monthly account statement reflecting transactions in Client's Investment Account and the interest earned for such month. All matters reflected in such statements, including interest earned, shall be deemed binding upon Client unless Client gives Bank written notice to the contrary promptly, and in any event no later than thirty days after the statement date.

### 7. Assignment; Setoff

The Investment Account and all Daily Repurchase Agreements entered into hereunder are non-negotiable and non-assignable and shall not be transferable by Client in any manner. Client can access the Investment Account only through its Designated Checking Account linked to the BIA Service, and Bank shall have no obligation to honor any withdrawal, transfer or similar order drawn directly on the Investment Account or any Daily Repurchase Agreement. Client authorizes Bank to apply or set off at any time, and without further notice, any Daily Repurchase Agreement and the proceeds thereof to or against all indebtedness, whether now existing or hereafter created and whether direct or indirect, which at any time may be owed by Client to Bank.

---

## Cash Processing Service

These Terms and Conditions provide information on the use of the Cash Processing Service described below.

### 1. Description of Service

The Cash Processing Service includes the following cash processing services: "General Cash Vault," "National Vault," "Remote Cash Deposit," and "Change Order Processing" to be provided by Bank to Client. In connection with the use of the Cash Processing Services, cash, currency and/or other valuables may be held in a vault (or safe) and/or transferred via armored courier or other means to Bank for deposit into Client's Account(s); or ordered by the Client and/or transferred via armored courier or other means to Client when funds are available in Client's Account(s).

### 2. Use of Courier

In connection with any Cash Processing Services described herein, Client may use the services of an armored car courier or other such service ("Courier"). Client shall choose its own Courier, subject to Bank's approval (an "Armored Courier"), and Client agrees that such agent is an independent contractor and not an agent, employee or other representative of Bank. Disputes between Client and Courier with regard to Services described herein shall be solely between those two parties. Neither Bank nor its employees or agents shall supervise, direct or control the performance of a Courier under the Cash Processing Service. Bank does not arrange for any deliveries on behalf of Client with a Courier and Bank is not liable for the actions and/or inactions of any Courier. A shipment by Client to Bank via Courier shall be deemed received by Bank at the time of the Courier's delivery of such shipment to Bank's authorized processing facility. A shipment by Bank to Client shall be deemed received by Client at the time of Bank's delivery of such shipment to the Courier.

### 3. General Cash Vault Services

Should Client choose to utilize General Cash Vault, Client will cause delivery of currency, coin or other items for deposit to Client's designated Account(s) by Courier or otherwise, to be delivered in locked and securely sealed bags furnished by Client. Client authorizes Bank to open these bags when delivered to Bank's Cash Vault area. Bank is also authorized to inventory the contents of each bag and to deposit them on Client's behalf into Client's designated Account(s), whether or not Client or its agent is present. No relationship of debtor or creditor shall arise as to any money, securities or property of any kind placed in the bag(s) until the duly authorized Bank representative has opened the bag(s), inventoried the contents and deposited them, as evidenced by the issuance of a duplicate deposit slip or other form of proper receipt or inventory in the amount ascertained by Bank. The relationship between Client and Bank as to the contents in the bags shall be that of gratuitous bailment of such property until Bank has placed the contents on deposit as herein indicated, and Bank's liability shall be only that of a gratuitous bailee while the property is in Bank's custody prior to deposit. If any discrepancy exists between the amount deposited for credit and the amount shown on the deposit ticket or memorandum contained in or accompanying any bag, Client agrees to be bound by Bank's count. Bank shall notify Client of any discrepancy, on the terms, in the manner, and within the time frame specified by Client and agreed to by Bank.

### 4. National Vault

Should Client choose to use National Vault, Client will contract with a Courier to transport currency, coin or other valuables in locked or securely sealed bags to an agreed-upon vault area, and Courier will be authorized to open the bags, verify amounts enclosed and provide Bank a transmission file, upon which Bank may rely, so deposit may be made into Client's designated Account(s). When Bank has received the aforementioned transmission file from Courier approved by Bank, Bank will make funds available to Client. If any discrepancy exists between the amount deposited for credit and the amount shown on the deposit ticket or memorandum contained in or accompanying any bag, Client agrees to be bound by Courier's count. Courier will notify Bank and Bank shall notify Client on the terms, in the manner, and within the time frame specified by Client and agreed to by Bank of any discrepancy. National Vault service may also be utilized for Change Order Processing as described below, whereby Client places its change order via Courier's website. Courier will notify Bank prior to filling the order so that verification of funds available for withdrawal can occur and, assuming the availability of funds, Courier will fill the order.

### 5. Remote Cash Deposit

Should Client choose to use Remote Cash Deposit, Client will contract with a Courier approved by Bank to provide a safe on Client's premises, into which currency may be deposited. Once funds are deposited into the safe, they are electronically counted via equipment owned by Courier, and a transmission is sent from Courier to Bank for same-day deposit into Client's designated Account(s). Bank shall rely on the transmission from Courier and any dispute regarding same shall be resolved between Courier and Client. Courier shall make a daily report available to Client regarding deposits made via this Remote Cash Deposit service. Remote Cash Deposit may also be utilized for Change Order Processing as described below, whereby Client places its change order via Courier's website. Courier will notify Bank prior to filling the order so that verification of all can occur and, assuming the availability of funds, Courier will fill the order.

### 6. Change Order Processing

Client may contact Bank and request coin and/or currency amounts by specific denominations, in minimum quantities as Bank and Client agree. When a change order request is made, Client's available balance will be verified to ensure availability of funds. If funds are available, Bank will fill the order and send the coin and/or currency to Client in locked or securely sealed bags via Courier, with whom Client has contracted, or will convey the currency and/or coin in person to a duly qualified representative of Client, mutually agreed to and approved by both Client and Bank. If Change Order Processing is done via National Vault or Remote Cash Deposit, as described above, Courier will be responsible for verifying funds with Bank and transmitting information to Bank once the order is processed. In the case of a discrepancy regarding a change order shipment, Client shall notify Bank and Courier promptly within 48 hours by telephone of any discrepancy.

---

## Check Print Service

These Terms and Conditions provide information on the use of the Check Print Service described below.

### 1. Description of Service

The Check Print Service enables Client to transmit data files to Bank electronically, which contain specific payee information ("Payment Instructions") for the processing, printing and mailing of one or more checks to Client's payees.

## 2. Processing of Files

Bank will print and remit checks based on Client's Payment Instructions, and checks will be issued against Client's designated Account(s). Check data files must be in a format acceptable to Bank. Bank's standard process is that acceptably formatted files received before 10:00 p.m. CT on a Business Day will be processed and mailed the following Business Day. Upon acceptance by Bank, checks may be issued and mailed the same day if Client specifically requests same-day delivery and the check data file is received by Bank before the same-day cutoff time on a Business Day as established by Bank. Client understands that same-day processing fees will apply.

## 3. Bank Liability for Service

Bank will use its best efforts to print and remit checks based on Client's Payment Instructions. However, Bank shall incur no liability if it is unable to complete any payments initiated through the Check Print Service because of the existence of any one or more of the following occurrences: (i) Bank's processing center is not working properly and Client has been advised by Bank about the disruption in Services before Client's transmittal of a data file; (ii) the payee mishandles or delays a payment sent by Bank on Client's behalf; (iii) Client has not provided Bank with the correct Payment Instructions (i.e., correct payee name, address, and account information for the payee); (iv) Client's Payment Instructions and the payment may violate laws or regulations of the United States, including those giving rise to OFAC sanctions. Provided none of the foregoing exceptions are applicable, if Bank causes an incorrect amount of funds to be removed from a designated Account(s) or causes funds from an Account to be directed to a payee which does not comply with the corresponding Payment Instructions, Bank shall be responsible for returning the improperly transferred funds to such Account and for directing to the proper payee any previously misdirected transactions.

## 4. Client Obligations

Client will designate and maintain one or more non-interest-bearing Account(s) at Bank and agree to have such Account(s) debited for the amount of each check issued on Client's behalf. Prior to commencement of the Check Print Service, Client will furnish to Bank such data, authorizations, and other information, forms and documents as Bank may request and Client shall do so in sufficient time to enable Bank to perform its preparation and testing functions. All data and information furnished to Bank by Client, its agents and employees shall be in a form acceptable to Bank.

## 5. Positive Pay Services

The Check Print Service includes a "positive pay" service for which an electronic listing of all new checks processed and printed on behalf of Client ("Issue File") are compared with checks which are presented for payment to identify potentially suspect items which might be forgeries or unauthorized items. Client must be enrolled in the Positive Pay Service and agree to adhere to the terms and conditions provided in the Positive Payment Service Terms.

## 6. Authorized Transactions

Under any of the following circumstances, Bank shall be conclusively entitled to deem the Payment Instructions to be authorized by, and binding upon, Client: (i) if the Payment Instructions and the electronic transmission of a file are made by Client or its actual or apparent agent, or (ii) if Bank reasonably believes the Payment Instructions and the electronic transmission of a file were sent in accordance with the Security Procedures in place for the Check Print Service.

---

# ClearPath Fast Payments℠ Service

These Terms and Conditions provide information on the use of the ClearPath Fast Payments Service described below (the "ClearPath Fast Payments Service"). For purposes of the ClearPath Fast Payments Service Terms, Client may also be referred to herein as "you" or "your."

## 1. Description of Service

The ClearPath Fast Payments Service enables Client to send payments to its payees and can allow the payee to choose the method of payment, which may include: Check, e-Check, ACH and/or Instant Deposit Payment (as defined below). Client may choose which methods to offer to payees and can add or remove any payment method from time to time. Some payment methods will only be available if Client enrolls in other Services, such as the Positive Pay Service. Client shall designate eligible Accounts(s) in the Service Documentation that payment shall be initiated from, subject to any prefunding account requirements for Instant Deposit Payments as set forth below. In addition, Client shall designate a deposit account in the Service Documentation in which fees for use of the ClearPath Fast Payments Service shall be debited from.

©2024 First Horizon Bank. Member FDIC.

## 2. Payor Portal

The ClearPath Fast Payment Service is provided by Bank through its vendor, Interchecks Technologies, LLC ("Interchecks") and will be available through an online portal made available by Interchecks or through an API integration with Interchecks (the "Payer Portal"). The Payer Portal may be used to make payments, perform Client services, retrieve reports, and access disbursement analytics. Access to the ClearPath Fast Payments Service through the Payer Portal shall only be used by Security Administrator and any Authorized Users designated by Security Administrator. The first time a Security Administrator or any Authorized User logs into the Payment Portal, such individual will be presented and will be required to accept Interchecks Service Terms and Conditions, which sets forth additional terms and conditions of the ClearPath Fast Payments Service. Client agrees that any Security Administrator and/or Authorized User has the corporate authority to agree to the Interchecks Service Terms and Conditions on behalf of the Client. Client acknowledges that Client shall be responsible for ensuring that all Security Administrators and Authorized Users comply with the terms of these Service Terms and the Interchecks Service Terms and Conditions.

## 3. Sending Funds

Client may initiate a payment to an individual or business (a "Payee") by submitting a request (each a "Payment Request") through the Payer Portal. To submit a Payment Request, Client is required to provide the dollar amount for the payment and certain Payee information, which must include the Payee's e-mail address, but may also include, reference ID, memo, first and/or last name or corporate name (as applicable) of the Payee, and/or mailing address. Client agrees to follow the applicable service instructions to schedule and initiate each Payment Request. By submitting a Payment Request, Client unconditionally authorizes the deduction of the payment amount from the designated Account on behalf of Client. This amount may be deducted immediately upon Bank's receipt of the Payment Request. Payee will receive notice of a pending payment and the Payee must then enroll with Interchecks, provide its account information to receive funds, accept the payment and select payment method, if more than one payment method is made available.

## 4. Payment Methods

Client may grant Payees the availability to select the method in which a payment is made. Once a Payment Request is made by Client, the Payee will receive an email notification instructing them on how to enroll to receive the payment. Payee must enroll with Interchecks to receive any payment. If the Payee does not enroll or otherwise ignores the payment notification, the Payment Request will fail. Client will receive notification if a Payment Request fails but will not be notified if the receiving institution delays credit to the Payee's account.

**4.1. Instant Deposit Payment.** Client may make payments that provide near immediate funds (an "Instant Deposit Payment") available to Payees.

**i.** Client shall be required to open a new disbursement Account that is solely for use for Instant Deposit Payments and per transaction fees related to each Instant Deposit Payment.

**ii.** Instant Deposit Payments are typically completed within minutes of transmission of the acceptance of payment by Payee, unless the payment fails or is delayed as described herein. Once an Instant Deposit Payment is made, funds are in the control of the receiving financial institution. If an Instant Deposit Payment does not post, the Payee will need to work with their financial institution to find and post those distributed funds.

**iii.** Instant Deposit Payments are irrevocable and cannot be reversed.

**4.2. Check Payment.** Once a Payment Request by check has been authorized, the check will be printed and mailed from a processing facility the next Business Day. Checks are sent by USPS First Class Mail, and the Payee should receive the check within 5 to 7 business days thereafter. If Client elects the Check Payment Method as a payment option, Client must enroll in the Positive Pay Service with payee name verification. With the Positive Pay Service, Client must provide Bank the "Check Issue File" containing all Payment Requests to be paid by check. Bank will validate all checks presented for payment against Client's account against the checks listed in the Check Issue File. Items presented for payment that do not match the checks listed in the Check Issue File will be presented to Client for a "pay" or "return" decision in accordance with the terms of the Positive Pay Service.

**4.3. e-Check Payment.** Once a Payment Request by e-check has been authorized, the check will be electronically delivered to the email address designated by Client the next business day. If Client elects the e-Check Payment Method as a payment option, Client must enroll in the Positive Pay Service with ACH verification. With the Positive Pay Service, Client must provide Bank a Check Issue File containing all Payment Requests to be paid by e-check. Bank will validate all checks presented for payment against Client's account against the checks listed in the Check Issue File. Items that do not match any of the

checks listed in the Check Issue File will be presented to Client for a "pay" or "return" decision in accordance with the terms of the Positive Pay Service.

**4.4. ACH Payment Method.** Once a Payment Request by ACH has been authorized through the ClearPath Fast Payments Service, Client payment data will be converted by a third-party processor and delivered to a third-party sender for ACH origination in accordance with Nacha Rules. Payment initiation request must be received by Bank prior to established deadlines and the Payment Request must be prior to the effective banking date. If Client elects the ACH Payment method as a payment option, Client must enroll in the ACH Positive Pay Service. The ACH Positive Pay Service gives Client the ability to authorize certain electronic ACH debits through the Digital Banking Service to pay as one-time entries or as recurring entries based on certain criteria before such electronic debits are posted to a designated Account(s) for payment. If an ACH debit entry does not meet Client's criteria, the transaction will be blocked and each blocked entry will be presented to Client for a decision on such transaction in accordance with the terms of the ACH Positive Pay Service.

## 5. Payment Limits and Payee's Availabity of Funds

The ClearPath Fast Payments Service is typically available 24 hours a day, 7 days a week, including weekends and state and federal holidays; however, the ClearPath Fast Payments Service may be unavailable from time to time, including due to scheduled or unscheduled maintenance. The completion of a payment to a Payee will depend on the method of payment selected by the Payee, if more than one payment method is available. Interchecks, processing networks or any third-party service provider may enforce a maximum payment per transaction per payee and per month per payee, which is subject to change at their sole discretion. Bank reserves the right to establish lower transaction limits than the service limits and may block any attempted Payment Requests that exceed the limit(s). Bank may adjust any such limit at any time in Bank's sole discretion. Regardless of the payment method used, funds transferred through the ClearPath Fast Payments Service will be available for withdrawal by Payee subject to availability schedule and policies of the receiving institution. The transmission networks may delay the transmission of the funds.

## 6. Risks Associated with the Service

The ClearPath Fast Payments Service should only be used to make payments to Payees that Client knows. It is Client's sole responsibility to verify the identity, legitimacy and contact information of the Payee and verify that the Payee's email address is current, valid and in control of the Payee prior to submitting any Payment Request. If Client sends payment to a Payee that is not known to Client, or whose identity and legitimacy of the person requesting payment was not verified, Client may lose the full amount of the Payment Request.

Bank does not provide buyer protection with respect to payments made through the ClearPath Fast Payments Service. That means that Client cannot reverse or dispute a Payment Request on the basis that Client is dissatisfied with the goods or services provided by the Payee; including that the Payee has failed to deliver goods or perform services, whether at all or in a timely manner; or because Client wishes to return purchased goods or cancel a pre-paid service. Any dispute between Client and a Payee must be resolved directly between Client and the Payee. Bank shall have no responsibility for and shall not be liable to Client in connection with, any dispute between Client and a Payee. By submitting a Payment Request, Client irrevocably and unconditionally authorizes Bank to initiate a payment using the Payee information.

## 7. Failed Payment Request

A Payment Request may fail if: (i) there are insufficient funds available in the Account associated with the payment method; (ii) Bank or the Payee's financial institution suspects or determines that the Payment Request does not comply with these Service Terms, the applicable payment system rules, and applicable law; (iii) the Payee rejects, declines or otherwise ignores the Payment Request; (iv) the Payment Request exceeds network limit(s); (v) the Payee's account at the receiving institution is closed, invalid, ineligible to receive Payment Request, or being monitored for suspected fraudulent or other illegal activity; (vi) any Account of Client is suspected for fraudulent or other illegal activity; (vii) Bank or Payee's financial institution otherwise declines to process the Payment Request for risk-management, legal, or regulatory reasons; or (viii) the ClearPath Fast Payments Service is unavailable. In addition, completion of a Payment Request may be delayed if the Payment Request is subject to review by Bank or Payee's financial institution for fraud, regulatory or compliance purposes.

## 8. Prohibited payments

Client agrees not to use the ClearPath Fast Payments Service to make any of the following types of payments (each, a "Prohibited Payment"): (i) payments that violate or appear to violate any local, state, or federal law or regulation; (ii) payments to accounts domiciled outside the United States; (iii) payments transmitted solely for the purpose of determining whether the Payee's information is valid (a "Test Payment"), provided, a Test Payment may be allowed if you have a bona fide need to do so in order to determine the validity of Payee's information provided to you by a

Payee that wishes to receive a payment from you; or (iv) any other payment that violates these Service Terms. Client acknowledges that the ClearPath Fast Payments Service may be used solely for the purpose of making payments on its own behalf and only to Payees that are residents of or domiciled in the United States of America.

### 9. Fees

A schedule of fees shall be made available to Client in the Payer Portal and an invoice notification will be emailed to Client on the first calendar day of each month at the billing email address designated on the Service Documentation or such other email address provided by Client. Transaction fees for Instant Deposit Payments will be collected at the initiation of any payment. All other fees shall be debited from Client's designated billing account by Interchecks on the fifth (5th) day of the month unless this day occurs on a weekend or holiday at which time the debit will occur on the following Business Day. Interchecks will promptly notify Client if Interchecks is unable to collect all or any portion of the fees from Client. Client further agrees that failure to pay any such fees when due will constitute a breach of the Service Terms for which Bank, immediately and without notice, may cease to permit new disbursement transactions, terminate the ClearPath Fast Payments Service, or pursue any other remedies available under these Service Terms, the Master Agreement, or any applicable Account Agreement. ClearPath Fast Payments Service fees should be reconciled monthly with the receipt of the fee statement prior to the debit for fees from Client's designated billing account. In addition to any fees and charges that Bank may assess Client, Client authorizes Interchecks to send credit, debit and appropriate adjustment entries, electronically or by any other commercially accepted method to the designated billing account. This authorizes the financial institution holding any such account to post all such entries initiated by Interchecks for the ClearPath Fast Payments Service. This authorization will be in effect until Bank receives a written termination notice from Client and has a reasonable opportunity to act on it. In addition to the fees described above, Client agrees to pay all fees, charges, and assessments imposed by Bank for the use of additional Services required when selecting certain payment methods.

### 10. Bank's Denial Rights

Bank reserves the right to decline to provide ClearPath Fast Payments Services and, in its sole discretion, to suspend or deactivate access of one or more of Client's Authorized Users. Additionally, Bank reserves the right to deny or refuse to provide ClearPath Fast Payments Services (each or any a "Denial") to prevent a loss to Bank or its contractors in certain circumstance, including but not limited to: (a) Denial is requested by law enforcement or a regulatory agency; (b) there has been a security breach or unauthorized access related to a user of Client; (c) Bank deems Denial necessary, in its sole and absolute discretion, for risk management purposes or to prevent any liability for Bank or its contractors; (d) a user of Client is believed to have engaged in fraudulent acts, violations of law, or violations of the Agreement under which access to the ClearPath Fast Payments Services was provided; (e) Bank believes that to provide continuing access to the ClearPath Fast Payments Services is otherwise legally risky or commercially unreasonable under the circumstances; or (f) Bank believes that to provide the ClearPath Fast Payments Services would be illegal. Denials made by Bank pursuant to this section will continue as long as necessary and will not create any liability from Bank to Client.

---

## Controlled Disbursement Service

These Terms and Conditions provide information on the use of the Controlled Disbursement Service described below.

### 1. Description of Service

Bank will provide Client the Controlled Disbursement Service to assist Client in controlling its disbursement of funds by providing information in advance of disbursement requirements.

### 2. Controlled Disbursement Account(s)

Client will establish and maintain a Controlled Disbursement Account (the "CDA") at Bank against which Client will draw its checks. Client may establish additional CDA(s) upon Client's request and Bank's consent. Except as expressly modified by these Service Terms, each Account shall be subject to the terms and conditions of the Account Agreement and any other written agreement affecting Client's Account(s).

### 3. Payment of Checks

On each Business Day, Bank will make available to Client information as to the total amount of checks drawn against the CDA(s) which are presented for payment to Bank by the Federal Reserve Bank on that day. Bank will have no obligation to pay any check should Client fail to make sufficient funds available to cover such disbursements. Client acknowledges that Bank relies upon information provided by a third party (the Federal Reserve Bank) and makes no warranties with respect to the accuracy of such information. Any errors or differences due to information provided by the Federal Reserve Bank or non-check entries to the CDA will be handled as an adjustment item in a timely manner.

### 4. Funding of Disbursement Account

As designated by Client during the implementation of the Controlled Disbursement Service, Client will fund the CDA by one of the options described below:

**4.1 Zero Balance CDA(s).** Client shall fund the CDA(s) by maintaining sufficient collected and immediately available funds in a designated "Master Funding Account" to cover all debits for daily disbursements and any adjustments on each Business Day. Bank is authorized to automatically debit the designated Master Funding Account on each Business Day to fund daily disbursements and adjustments on the CDA(s).

**4.2 Wire Transfer.** Client shall fund the CDA(s) by causing funds to be transferred via Fedwire to Bank for credit to Client's CDA(s) in amounts sufficient to cover all debits for daily disbursements and any adjustments on each Business Day. Client guarantees that such funds transfers shall be received by Bank no later than 3:00 p.m. Central Time each Business Day.

### 5. Overdrafts

In the event Client fails to fund all disbursements, Bank is authorized, but shall have no obligation, to debit any Client Account(s) to cover all disbursements even though such debits may bring about or increase overdraft(s). No custom or practice of paying overdrafts shall be deemed to obligate Bank to pay other overdrafts or to otherwise extend credit to Client or to provide notice to Client of any change in such custom or practice.

### 6. Notification

Client shall have the option of receiving information regarding daily disbursement clearings and adjustments by enrolling in Bank's Digital Banking Services or through reporting as otherwise agreed by Bank. Bank will endeavor to make such data available each Business Day on a regular, timely basis but cannot guarantee the exact or average time.

### 7. Termination

Termination of the Service as permitted in the General Terms & Conditions shall not revoke Bank's authority to charge Client's Account(s) for all checks presented and honored and Client is responsible for curing any overdrafts and or charges associated with such Account.

---

## Digital Banking Service

These Terms and Conditions provide information on the use of the First Horizon TreasuryConnect℠ and the First Horizon BusinessConnect℠ Service ("Digital Banking Service") described below. The term "Digital Banking Service" also refers to clients enrolled in Business Banking Online, and any references to the "Digital Banking Agreement" shall also mean the Business Banking Online Agreement.

### 1. Description of Service

By accessing either the TreasuryConnect or BusinessConnect service, each individual must accept online the Digital Banking Agreement, which sets forth additional terms and conditions of the Digital Banking Services. Client may perform any or all of the Services that Bank has made available for Client's use through the Digital Banking Service. Bank reserves the right to reject Client's service elections or refuse or limit Client's access to or use any party of the Digital Banking Service for any reason and in Bank's sole discretion. Bank may, in its sole and exclusive discretion introduce new features of the Digital Banking Service but is not required to notify Client of the availability of any such new features.

### 2. User Access

The Digital Banking Service shall only be used by Security Administrator and the Authorized Users identified by Security Administrator. Client agrees to take all necessary steps to ensure that the Digital Banking Service is used in accordance with these Service Terms and the Digital Banking Agreement.

**2.1 Authorized Users and Digital Banking Agreement.** The first time a Security Administrator or any Authorized User logs into the Digital Banking Services, such individual will be presented and will be required to accept the Digital Banking Agreement, which sets forth additional terms and conditions of the Digital Banking Services. Client agrees that any Authorized User and/or Security Administrator has the corporate authority to agree to the Digital Banking Agreement on behalf of the Client. Client acknowledges that Client shall be responsible for ensuring that all Security Administrators and Authorized Users comply with the terms of the Digital Banking Agreement.

©2024 First Horizon Bank. Member FDIC. 

**2.2 Bank's Deactivation of Authorized Users.** Client acknowledges that Bank may suspend or delete any Authorized User without notice to Client upon inactivity of the Digital Banking Service.

## Electronic Bill Payment Service

These Terms and Conditions provide information on the use of the Electronic Bill Payment Service described below.

### 1 .Description of Service

The Electronic Bill Payment Service allows customers of Client to make payments through various channels. Client desires to utilize electronic payment processing services provided by Bank through its Digital Banking Service in accordance with information provided and services selected by Client during implementation. Each request for such processing as herein referenced shall be called a "Transaction Request." The Transaction Request shall be via: (i) web page/browser internet link for transaction of ACH and Credit Card payments; (ii) Interactive Voice Response System ("IVR") telephone connection; or (iii) API Web Services for transaction processing of ACH and Credit Card payments. Each electronic payment processed by Bank in response to a Transfer Request shall be called a "Transaction."

### 2. Client Responsibilities for Telephonic Data Entry

In the event Client performs a single debit entry of payment data via an agent via an oral telephone conversation which results in an ACH Debit transaction to a consumer's account, Client shall be required to record the telephone conversation (with any and all required consents) and store for a minimum of two (2) years or mail an advisory to the receiver prior to the receiver's account being debited. Client must provide the following details during the telephone conversation: (i) date consumer's account will be debited; (ii) amount of debit entry to consumer's account; (iii) verification of consumer's name; (iv) telephone number that consumer may call for questions during normal business hours; (v) confirmation of date of consumer's oral authorization; and (vi) confirmation conveyed to consumer that authorization obtained from consumer will be used to originate an ACH debit entry to consumer's account. Recurring debit transactions require both the recording mentioned above and mailing of an advice to the receiver.

### 3. Client Responsibilities for Web Data Entry

In the event Client accepts payment instructions via the internet, Client accepts responsibility for compliance with Nacha Rules related to security and access controls and, if Client accepts credit card payments on its website, Client accepts responsibility for compliance with Payment Card Industry (PCI) standards regarding security and access controls.

### 4. Authorized Transaction Requests

Under any of the following circumstances, Bank shall be conclusively entitled to deem each Transaction Request to be authorized by, and binding upon, Client: (i) if the Transaction Request is made by Client, its authorized user and/or its actual or apparent agent; or (ii) if the Transaction Request is issued in the name of Client and verified pursuant to a Security Procedure agreed upon between Bank and Client; or (iii) if Bank reasonably believes that the Transaction Request was given or authorized by a representative of Client; or (iv) in the event Client utilizes the services of a third party to make Transaction Requests for electronic processing functions, provided the Transaction Request is issued in the name of Client and Bank reasonably believes that the Transaction Request was given or authorized by a representative of such third party or was verified pursuant to a security procedure agreed upon between such third party on Client's behalf and Bank.

### 5. Client Warranties and Indemnities

As to each Transaction Request by Client, Client shall be deemed to warrant to Bank each of the following: (i) that the Transaction Request is authorized in accordance with the valid authorization (which remains in full force and effect) of the account holder(s) of the Account connected with the Transaction; (ii) such authorization has been obtained either: (A) in the form of a writing signed by the account holder(s); or (B) in the form of an authorization statement furnished to the account holder(s) by Client, either in advance or at the time a particular transaction is authorized, which includes provisions as to the method for revocation thereof, and the account holder has furnished authorization to Client for the Transaction and Client has authenticated such authorization by means of a digital signature or code authentication or record of such authorization shall be retained by Client throughout the authorization period and for at least two (2) years thereafter, and a copy of the authorization record shall be furnished by Client promptly upon request by Bank and/or the account holder; (iv) that each Transaction Request is in the correct amount and conforms to all applicable laws, regulations, and rules (including without limitation Nacha Rules, and any rules incorporated by reference therein, in the case of ACH transactions), and with all procedures established by Bank in connection with the services contemplated by this Agreement; (v) that none of the Transaction Requests relate in any way to high-risk activities, processing for which is prohibited by Bank, including online payment processors, certain credit repair services, mail

order telephone order (MOTO) companies, online gambling operations, businesses located offshore or adult entertainment businesses; (vi) that Client has complied with all laws, regulations and rules that may be applicable pertaining to security, access controls, security standards and access standards as required under this Agreement and these Service Terms; and (vii) that Bank's initiation or execution of each Transaction Request in accordance with its terms shall not give rise to any claim or defense which may be asserted by any account holder or other person against Bank. Client warrants and agrees that not only has it complied with and will comply with all rules and laws governing such transactions as herein described, but it will not originate Transactions that violate any laws of the United States including those giving rise to OFAC sanctions. Client further agrees that it will provide financial information on itself on at least an annual basis and agrees that Bank may, with reasonable notice to Client, audit Client's compliance with applicable laws and regulations and all other terms of these Service Terms.

### 6. Execution of Transfer Request

Bank shall have no obligation to accept and execute a Transaction Request, despite any custom or practice to the contrary, and shall be entitled to make a decision on a case-by-case basis for each Transaction Request. Bank may reject or delay origination of any Transaction at any time without prior notice, despite any custom or practice to the contrary, for, among other reasons, Bank's belief that the Transaction may cause Bank to violate any regulatory or internal risk control program or any applicable law or regulation.

### 7. Compensation for Services

Client shall compensate Bank for services provided hereunder as agreed upon between Bank and Client. Bank reserves the right to modify its fees and charges for such services upon notice to Client, and Client's continued utilization of the services shall constitute Client's consent to the modified fees and charges.

### 8. General

Client and Bank acknowledge and agree as follows: (i) Except as otherwise specifically provided herein, any notice required in connection with this Agreement or the services provided hereunder may be given orally, in writing, or by electronic transmission pursuant to facilities established between the parties, if applicable; (ii) Client acknowledges that any receiver, payer, or institution receiving a Transaction initiated or executed hereunder may debit or credit an account based solely on the account number, without reference to any discrepancy in the account name, and Client shall be solely responsible for any error resulting from its failure to furnish correct and complete information with each Transaction request, including without limitation the correct account number(s); (iii) Client agrees to be bound by any and all laws, regulations and rules in effect with regard to Services and Transactions herein described; (iv) no attempt by Client to revoke any Transaction Request will be binding on Bank unless Bank actually receives complete and accurate notice thereof by such means as Bank may instruct and Bank has a reasonable opportunity to act thereon prior to release of the Transaction by Bank; and (v) Client agrees Bank is authorized to investigate, obtain and exchange reports and information regarding Client and individuals signing on behalf of Client, with credit agencies and others Bank believes to have a legitimate business need for such reports.

---

## Electronic Lockbox Service

These Terms and Conditions provide information on the use of the Electronic Lockbox ("Electronic Lockbox") Service described below.

### 1. Description of Service

The Electronic Lockbox Service provides Client with the ability to receive payments electronically that are initiated by Client's customers through an online banking application or through a bill payment service provider (each a "Payment Provider") and Client is able to assign or reject payments prior to receiving the data and funds into the designated checking Account. The payment details will be consolidated and made available to Client via an online portal. Payment funds are transmitted via ACH to the designated checking Account. In order to use the Electronic Lockbox Service, Client must enroll in the Electronic Lockbox Service by completing all required Service Documentation.

### 2. Payment Data

Bank agrees to capture, combine and reformat electronic payment and remittance data originated by Client's customers through online banking or bill payment services at other financial institutions ("Payment Data"). Client expressly authorizes Bank and its service provider to accept and process the Payment Data and payment funds, such that the receipt of such Payment Data and payment funds by Bank or its service provider shall be deemed to be the same as receipt of such Payment Data and payment funds by Client itself.

### 3. Client Responsibilities

Client will designate a checking Account for the Electronic Lockbox Service through the Service Documentation and will provide Bank with the information required for Bank to create the functionality of the Electronic Lockbox Service. Client is solely responsible for providing Bank with updated information with respect to the customer information required by Bank to provide the Electronic Lockbox Service, and for any damages incurred as a result of failure to update such information in a timely manner. Client is solely responsible for (i) obtaining and maintaining all system interface (e.g., hardware/software, communication) access to enable Client to receive the Electronic Lockbox Service; (ii) obtaining appropriate contractual and other required authorizations from, and, as necessary, providing appropriate notices to, Client's customers; and (iii) complying with all contractual and other obligations of Client owed to Client's customers. Client is also responsible for ensuring the accuracy of all data and information, instructions, and representations supplied in connection with the Electronic Lockbox Service. Bank is not responsible for detecting any errors in the Payment Data.

Client agrees that it shall use the online portal to assign or reject all Payment Data within two (2) business days after Bank transmits remittance data to Client. Client agrees to cooperate with Bank in resolving any incorrect, incomplete or invalid data. After two (2) business days, any non-assigned payments may be automatically rejected and returned to Client's customer. Client further agrees that Bank will, and Client directs Bank to, initiate an ACH debit to Client's Account for the amount of all invalid remittances which fail to be resolved according to the provisions of this Section.

### 4. Bank Responsibilities

Bank shall deliver or provide access to Payment Data, according to the format, schedule and via the method of electronic transmission agreed upon by the parties. Any changes to the formats or methods shall only be made upon mutually acceptable terms and conditions and at Bank's then-current rates. Requests by Client for additional records and information are subject to the mutual agreement of the parties and Client will be responsible for Bank's costs in creating and delivering such additional records. Bank's obligation to perform any Electronic Lockbox Service is subject to Client's timely performance of all activities on which Bank's performance depends. Bank will credit the designated Account in an amount equal to the payment received and debit the Account in an amount equal to any returns or reversals.

### 5. Payment Provider Reliance

Client acknowledges that Bank's ability to process payments under the Electronic Lockbox Service in a timely and accurate manner is dependent upon data being provided by a third-party payment provider of Client's customers. Bank shall not be liable to Client for any delays or failure to complete any aspect of the Electronic Lockbox Service in the event the Payment Provider networks or communications system is terminated or interrupted for any reason. Bank assumes no responsibility for the accuracy, timeliness or the completeness of the Payment Data delivered from the Payment Provider to Bank.

### 6. Settlement

If the Payment Data contains valid remittance account numbers, funds will be credited to Client's Account on the next business day following receipt of the Payment Data. Each credit so posted is subject to receipt of good and available funds. Prior to the credit to Client's account, Client agrees that Client's funds may be commingled with funds of third parties.

---

## E-Payments Routing Directory Service

These Terms and Conditions provide information on the use of the E-Payment Routing Directory Service described below.

### 1. Description of Service

As part of the E-Payment Routing Directory Service, Bank will provide you with a download code ("Code") to automate access to the Federal Reserve Banks' E-Payments Routing Directory (the "Directory") and/or Composite Receiver File ("CRF") with a script or program.

### 2. Use of Code

The information in the Directory and CRF may not be sold, relicensed or otherwise used for commercial gain. Client agrees to keep the Code confidential and not further distribute the Code. Client will use the Code solely for the purpose of downloading the Directory or CRF, either manually or with an automated program in order to facilitate the efficient processing and settling of transactions. Client will use the Code only for so long as Client maintains a banking relationship with Bank for payment processing.

### 3. Limitation of Liability

Client understands, acknowledges and agrees that Bank and the Federal Reserve Banks are not responsible for the accuracy of a routing number or any other data contained in the Directory or CRF. The information in the Directory and CRF may change after the effective date of the publication, list or file. NOTWITHSTANDING ANY STATEMENT TO THE CONTRARY IN THE GENERAL TERMS AND CONDITIONS, BANK AND THE FEDERAL RESERVE BANKS PROVIDE NO WARRANTY, EXPRESS OR IMPLIED, AS TO

THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, TITLE, QUALITY, OR NONINFRINGEMENT OF ANY INFORMATION CONTAINED IN THE DIRECTORY OR CRF. ALL INFORMATION, DATA, AND MATERIALS IN THE DIRECTORY OR CRF ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTY OF ANY KIND.

BANK AND THE FEDERAL RESERVE BANKS ARE NOT LIABLE FOR ANY DIRECT OR INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OR FOR ANY OTHER KIND OF DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, LOSS OF REVENUES, BUSINESS INTERRUPTION, LOSS OF INFORMATION AND ATTORNEYS' FEES) THAT ARE IN ANY WAY DUE TO, RESULTING FROM, OR ARISING IN CONNECTION WITH THE USE OR PERFORMANCE OF, OR INABILITY TO USE, INFORMATION AVAILABLE FROM THE DIRECTORY OR CRF, REGARDLESS OF WHETHER BANK OR FEDERAL RESERVE BANKS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE, INCLUDING LIABILITY FOR ANY VIRUSES THAT MIGHT INFECT A USER'S COMPUTER SYSTEM.

### 4. Fees

Bank reserves the right to, without notice, increase or otherwise change the fees or the fee structure for the administrative costs associated with the issuance of a Code or the ability to view or download the Directory or CRF.

### 5. Termination

Client understands, acknowledges and agrees that Bank, without prior notice, may terminate your use of the Code at any time, with or without cause.

---

## Image Cash Letter Service

These Terms and Conditions provide information on the use of the Image Cash Letter Service described below.

### 1. Description of Service

By using Bank's Image Cash Letter Service, Client may transmit an image cash letter or X9.37 file ("ICL") through a secure network designated by Bank. Using the transmitted ICL file, Bank may create a "Substitute Check" as that term is defined under federal law, other electronic representation of items for collection through the local Federal Reserve or other clearinghouses, or directly to the paying institution, collectively referred to herein as "Transactions."

### 2. Transactions

Eligible "Transactions" are generally checks that are acceptable for processing in accordance with the Check Clearing for the 21st Century Act, or as Bank may otherwise specify or describe in any attachments or procedures for use of Bank's Image Cash Letter Service. Using Client's existing item processing system to create a qualified ICL file, and the necessary data communication for transmitting, Client will create an ICL for transmission to Bank. Upon the successful receipt and processing of the ICL file, Bank will credit the applicable Account for the sum total of the balanced ICL file. Bank may from time to time agree to accept Transactions from Client, or its actual or apparent agent in the event the Client utilizes the lockbox services of a third party for the collection and processing for the deposit of checks and other items, and in such case the Transactions shall be governed by the terms and conditions set forth herein or incorporated herein by reference, and except as specifically modified by these Service Terms, Client's Account(s) shall be subject to the terms and conditions of the Account Agreement and any other written agreements affecting Client's Account(s).

### 3. File Confirmation

Upon receipt of the transmitted ICL file, Bank will send to Client an e-mail file confirmation ("Confirmation") which acknowledges the safe receipt of the file. Client should implement adequate controls to validate Confirmation for all ICL files transmitted. It is incumbent on the Client to notify Bank if they do not receive Confirmation within two (2) hours of the ICL file transmission to Bank.

### 4. Rejected Files

An ICL file may be rejected due to Client's transmission errors, including but not limited to, format issues, duplicity, an unbalanced file, or exceeding deposit thresholds. Bank will notify Client's designated personnel within two (2) hours of receipt of an ICL file, if the file is rejected and could not be processed. It will be incumbent on the Client to transmit a corrected ICL file.

### 5. Rejected Transactions

Bank will perform preliminary edits on the ICL file before it is processed for deposit. Bank will automatically insert an adjustment ticket for all deposited items within the ICL file that fail to validate against our preliminary edits, including but not limited to, for duplicity, encoding error, or for compliance with the 21st Century Act and Universal Companion Document ("UCD") standards for electronic presentment. Bank will provide Client a notification of all unprocessable items. Client understands that

©2024 First Horizon Bank. Member FDIC.

the appearance of the original check and the use of certain background colors, decorative images and choices in ink on the original check may affect the ability to produce a readable digital image of the check or the creation of a Substitute Check that meets legal equivalence requirements which may require the original check to be processed for collection.

### 6. Ineligible Items

Unless Bank specifically agrees otherwise in writing, Client may not transmit an ICL file to deposit: (i) checks payable to a third party without verification or guarantee of third-party endorsers; (ii) demand drafts or remotely created checks (checks lacking the original signature of the drawer); (iii) checks that are irregular in any way (e.g., where the numerical and written amounts are different); (iv) checks that have previously been returned stop payment or account closed; (v) checks that are postdated or more than six (6) months old; (vi) checks drawn on a foreign bank or payable in a foreign currency; (vii) checks payable to "Cash"; or (viii) any Substitute Check that has not been handled in the collection process. Bank's processing of any deposit items within an ICL as described above shall not obligate us to continue that practice, and Bank may stop doing so without cause or prior notice. Bank may refuse any deposit within an ICL file, with or without cause, or may elect to take a check on a collection basis only.

### 7. Returned Checks

Any returned checks delivered by Bank to Client will be in the form of a Substitute Check. For further collection purposes, Client must redeposit the Substitute Check and not the original for subsequent collection will only be permitted if the returned check is for poor image quality.

### 8. Authorized Transactions

Bank shall be conclusively entitled to deem the ICLs to be authorized by, and binding upon, Client: (i) if the ICL and the electronic transmission of a file are made by Client or its actual or apparent agent, or (ii) if Bank reasonably believes the ICL and the electronic transmission of a file were sent by an authorized representative of Client pursuant by way of compliance with the correct Security Credentials or (iii) if Client utilizes the services of a third party for lockbox or other similar services to facilitate the processing of Transactions and Bank reasonably believes that the Transactions and transmission of a file by such third party are sent on behalf of Client, provided that the Transactions and the electronic transmission of a file are in the name of Client. Acceptable transaction types will be in accordance with the Check 21 law, which excludes Series EE bonds, foreign checks and items in carriers.

### 9. Transaction Processing

An ICL file can contain one or more cash letters for deposit to the Client's Account(s) with Bank. Cash letters must contain check detail records and the associated image records. ICLs must be sent to Bank prior to the agreed-upon processing deadline. An ICL has been sent to Bank only when the entire file has been transmitted and delivered to Bank in an agreed-upon format that satisfies image quality standards. Based on the size of the file, there may be a significant delay between the start and the completion of the file transmission. As a result, every effort should be made to send ICL files as early as possible. Files that are received by Bank after a deposit deadline will be considered deposited for the next deposit deadline period. For purposes of determining when an item has been delivered and received, Bank's records shall be determinative. Processing fees and funds availability will be assessed based on the deposit deadline that is met. Problems with hardware, software, or data transmission may on occasion delay or prevent Bank from receiving files or other data electronically. Accordingly, Client should have a contingency plan to send any ICL files or other data by other means should such a circumstance arise.

### 10. Representations and Warranties of Client

As to the ICLs transmitted to Bank, Client represents and warrants to Bank that: (i) the preparation and presentment of the ICL complies with these Service Terms; (ii) Client has good title to each check and no defense of any party to the check is good against Client; (iii) the digital image of each Substitute Check or electronic item in an accompanying cash letter transmitted to Bank is a sufficient copy that is a true, correct and accurate image that represents all the information on the front and back of the original check or electronic item at the time the original check was truncated so that a Substitute Check created from the image will satisfy legal equivalence requirements and the image has not been altered in any manner by Client or any third party acting on behalf of Client, (iv) Client, or any third party acting on behalf of Client, has reviewed and confirmed that the transmission of MICR line information for each cash item is identical in all respects to the original item listed in the accompanying cash letter and that the encoded check amount is accurate, (v) Client understands that any message text or other information Client, or any third party Client may be acting on behalf of, elects to add to the image transmitted to Bank may cause the depository bank's endorsement not to be legible which may result in the delayed return of a Substitute Check or electronic representation of the item if it is not paid, (vi) the original item, or a paper or electronic representation, has not previously been deposited for collection with Bank or any other financial institution, and no depositary bank, drawee, drawer, or endorser will be asked to pay an item that it already has paid, (vii) Client has no knowledge or notice of information to indicate that items included in an ICL are fraudulent; (viii) Client's warranties to Bank for Transactions apply to the same extent as if Client had deposited an original

paper check with Bank; (ix) Client assumes all encoding, transfer presentment and other warranties of Bank; (x) Client will ensure that the identification of previous truncating and reconverting Banks are preserved and that the Substitute Checks meet the requirements for legal equivalency under Federal Reserve Regulation CC when redepositing Substitute Checks.

## 11. Provisional Settlement; Returns

Client acknowledges that items included in an ICL may be returned by the receiving institution for insufficient funds or other reasons, including claims or returns that the Substitute Check or electronic representation does not meet legal equivalence requirements under federal or other applicable law. In addition, Client acknowledges that Bank will have no responsibility for the delayed return of a Substitute Check that includes any message text or other information added by Client or any other party in the depository bank endorsement area. Any credit or consideration given by Bank to Client with respect to any ICL shall be deemed provisional, and Bank shall be entitled to revoke same without prior notice in the event one or more items within an ICL are rejected or returned to Bank for any reason.

## 12. Retention of Original Checks

Client will retain the original items, or in the event Client utilizes the services of a third party, the third party will retain the original items, or keep records sufficient to permit it to identify its depositor or endorser on a cash item in case the item is lost or destroyed and charged back until final settlement of all items in each ICL and for such additional period as may be required in the event of a disputed truncated or Substitute Check, including claims that the Substitute Check or electronic representation does not satisfy legal equivalence requirements, so that the original check can be processed for collection. Client, or such third party acting on behalf of Client, agrees to take reasonable efforts to safeguard any original items until the checks are destroyed.

## 13. Equipment

Client may select terminals and other equipment (“Equipment”) for use in processing ICLs either from a vendor referred by Bank or from another vendor of Client’s choosing. Bank reserves the right to revoke its consent to the use of any Equipment at any time. Notwithstanding any consent or recommendation by Bank to Client regarding Equipment, the selection and use of any thereof shall be strictly at the Client’s risk. Bank shall not be responsible to Client for any equipment provided by a third-party vendor, nor have liability for the malfunction of any equipment used by Client for the processing of ICLs. Client further agrees if there is any upgrade or change to the Equipment, Software or third-party services used to create the ICL file, Client shall notify Bank in writing at least thirty (30) days in advance of such proposed upgrade or change and afford Bank reasonable time to respond and perform any appropriate testing to confirm that such upgrade or change will not create processing problems or additional costs.

## 14. Software

Bank may select software and related user materials (“Software”) for use in the Image Cash Letter Service and the processing of ICLs. Client acknowledges that any Software supplied by Bank for use in ICLs, including, but not limited to, any Software created or modified by Bank to be specific to Client’s environment is the property of Bank and that Bank claims and reserves all rights and benefits therein afforded under copyright and other laws. Client’s license of and permission to use the Software is non-exclusive and nontransferable, and it extends only to Client’s own use of such Software for the purpose of processing ICLs as set forth in these Service Terms. Bank’s Software may not be used to process transactions with or through any other party without the express written consent of Bank. Client further acknowledges that Bank’s Software contains confidential information and trade secrets, which Bank has entrusted to Client in confidence. Client shall protect Bank’s property and its interest in the trade secrets contained in the Software by controlling access to the Software, permitting none of its employees nor any other person not an employee or agent of Bank to examine, alter, attach, add to, modify, decode, reverse engineer, transcribe, extract or reproduce, in whole or in part, the Software in any way. Without limiting the generality of the foregoing, Client specifically agrees that it will not delete, mask or obscure any proprietary notices, which Bank places on any Software.

## 15. Examinations and Inspections

Bank or its agent shall have the right, upon reasonable advance notice and during normal business hours, to examine the records of Client and Client’s internal processes and controls related to these Service Terms, including but not limited to, Client’s accounts receivable cycle and data security policy. If Client utilizes the lockbox services of a third party, Bank’s right of inspection shall extend to the examination of such third party’s internal processes and controls relating to these Service Terms. In the event Bank’s examination and inspection identifies weaknesses in Client’s internal processes or controls related to the use of the ICL services, Client agrees to implement any commercially reasonable recommendations by Bank to cure such deficiency.

## 16. Limitation of Remedies

Notwithstanding anything to the contrary in the General Terms and Conditions, Bank’s liability to Client is to correct any data in which (and to the extent that) errors have been made by Bank’s personnel, or by malfunction of Bank’s Software or Equipment which are not due to the Client’s error, acts or omissions. However, the expense to Bank of correcting such data shall constitute

Bank's only responsibility in connection with such errors or in connection with any other performance or nonperformance by Bank under these Service Terms. In the event that Bank undertakes to correct any error caused by a third party acting on behalf of Client, Bank shall not have any liability with respect thereto. Bank shall have no responsibility or liability whatsoever for errors or omissions caused by any Client or third party providing services, software or equipment to Client in the transmission of ICLs.

### 17. Liability for Taxes

Client is liable for the payment of any taxes, however designated, levied on its possession or use of equipment or services Bank has provided, including, without limitation, state and local sales, use, value-added and property taxes.

## Image Delivery Service

These Terms and Conditions provide information on the use of the Image Delivery Service described below.

### 1. Description of Service

Bank will provide Client scanned images of all statements, paid checks, deposited items, canceled checks, and/or other processed items through: (i) CD-ROM delivered to Client's address; (ii) secure file transfer protocol (FTP) data transmission that securely exchanges files at various levels of security as established by Client and Bank; and/or (iii) image download through the Digital Banking Service.

### 2. Service Setup and Image Delivery

During implementation of the Image Delivery Service, Client shall designate which delivery method is to be utilized and Client and Bank shall establish Security Procedures related to the method of delivery. Client has determined that the Security Procedure(s) Client has elected in implementation and use of the Image Delivery Service meets Client's requirements with regard to the size, type and frequency of image files required and are commercially reasonable. Bank will provide image viewer software on CD-ROM or via software download that will allow Client to view images.

### 3. Imaged Items

Client acknowledges that scanning technology is subject to error, such as distortions and unclear images. Client agrees to notify Bank promptly of any error or problems related to Image Delivery Service and Bank will attempt to reprocess the information, but assumes no liability for the inability to produce better copies.

## Information Reporting Service

These Terms and Conditions provide information on the use of the Information Reporting Service described below.

### 1. Description of Service

By using the Information Reporting Service, Client may obtain direct electronic access to one or more Services through use of compatible computer equipment, communications software, and secured data file delivery channels. Information Reporting encompasses services referred to as E-Reports (Facsimile and Email), BAI File Transmissions, and Electronic Data Interchange (EDI). These services may provide access to: (i) certain deposit account information; (ii) certain account transaction origination services, and/or (iii) certain trust or other fiduciary account information services.

### 2. Service Setup

During service implementation, Client shall designate Accounts and Services to receive reporting. Additional reporting or transmission options may be available as further described in Service Documentation and/or as agreed to between the parties. Client and Bank shall presently and from time to time in the future designate which of the listed services shall be applicable to Client. Client acknowledges that Information Reporting Services are merely a method of delivering bank information regarding Accounts or other banking services.

### 3. Obligations of Bank

Bank will utilize the services of a public data communications network in providing Information Reporting Services. Bank will provide Client instructions or procedures concerning the manner in which Client may access such communications network and Bank's computer systems. Bank will furnish Client Security Credentials for access to Information Reporting Services. Except as otherwise specified in the written procedures furnished to Client, Bank will use commercially reasonable efforts to

make Information Reporting available each Banking Day by the times specified in Service Documentation. Bank will provide such support services in connection with Information Reporting as Bank deems appropriate.

### 4. Information Furnished by Client

Insofar as the provision of Information Reporting Service requires that data, information, or materials be furnished by Client to Bank, or requires other acts to be performed by Client or its employees, Client hereby agrees to furnish same and to perform all such acts within such times and in such form or manner as is consistent with the instructions and procedures furnished to Client by Bank.

---

## Integrated Accounts Payable Service

These Terms and Conditions provide information on the use of the Integrated Accounts Payable ("IAP") Service described below.

### 1. Description of Services

The IAP Service allows Client to send payment data files to Bank for conversion to one or more of Bank's standard payment service methods: ACH, Wire Transfer, card payment system, or Check Print Services (each a "Payment Method"). Particular terms and conditions of each Payment Method are described in separate Service Terms which Client must select and agree to in order to process payments through a designated Payment Method.

### 2. Service Setup

Prior to commencement of the IAP Service, Client will furnish to Bank such data, authorizations, and other information, forms and documents as Bank may request and Client shall do so in sufficient time to enable Bank to perform its preparation and testing functions. All data and information furnished to Bank by Client, its agents and employees shall be in a form acceptable to Bank, and the parties shall agree on the method for file transmission. Once Bank approves and accepts the format of Client's payment data file, no change may be made to the format of the payment data file without Client obtaining Bank's prior review and written approval with respect to any change in any aspect of the payment data file.

### 3. Payment Data File Processing

By using the IAP Service, Client may transmit a payment data file from its accounts payable system through a secure data file delivery to Bank for processing through a designated Payment Method. For each data file delivery, Client may elect to receive an email acknowledgment confirming Bank's receipt of the file transmission. Payment data files may be transmitted at any time, but Bank's processing of all data files is subject to the applicable schedule then in effect for each selected Payment Method. Client acknowledges that Bank may need, from time to time, to temporarily suspend the processing of a payment data file if the file contains any exception transaction(s) or is otherwise missing one or more critical data fields necessary for processing a payment through a designated Payment Method, or a payment data file or data may subsequently be suspended when the transaction is processed through the designated Payment Method. Any data files which are not acceptable shall not be processed. The Client will be notified through other processes within the application of the designated Payment Method.

### 4. Security Procedures

Client shall safekeep the user name and password security codes furnished for accessing the IAP Service and ensure that they are revealed only to the persons properly authorized by Client to utilize the IAP Service on Client's behalf ("Authorized Representative"). Client assumes full responsibility for the use and protection of the username and password security codes, and it shall be conclusively presumed that all persons who obtain access to the IAP Service are Authorized Representative(s) of the Client. Client assumes all responsibility for each transaction executed by Bank in accordance with information received by Bank through the IAP Service and initiated by Client's username and password security codes provided to Client, whether or not such transactions were initiated by an Authorized Representative of Client. Client warrants that all such information shall be true, correct, and complete and agrees that Bank has the right to act thereon without further confirmation or verification.

### 5. Accuracy and Timeliness of Information

To the extent the performance of IAP Service requires data or information furnished by Client to Bank, or requires other acts to be performed by Client, Client hereby agrees to furnish same and to perform all such acts within such times and in such form or manner as is consistent with the instructions and procedures furnished to Client by Bank.

### 6. Bank Obligations

Bank's duties and responsibilities are limited to those described in these Service Terms, related Payment Method Service

Terms, this Agreement, and Account Agreements. Bank shall provide Client instructions or procedures concerning the manner in which Client may access the IAP Service.

## Line of Credit Sweep Service

These Terms and Conditions provide information on the use of the Line of Credit Sweep Service (listed as Loan Sweep in the Enrollment Form) described below.

### 1. Description of Service

The Line of Credit Sweep Service allows Client to maintain a specified target balance in a designed Account through automatic advances from an existing line of credit with Bank (the "Credit Facility") and/or pay down the outstanding principal balance of such Credit Facility from such Account.

### 2. Service Setup

Client may elect to use the Line of Credit Sweep Service to advance funds under a Credit Facility to a designated Account and/or make automated payments from an Account to a Credit Facility.

**2.1 Advances from Credit Facility.** Client authorizes Bank to advance funds under Client's Credit Facility and transfer such advances automatically to Client's designated Account in such amounts as may be needed from time to time to cover checks and other charges to the Account and to maintain in the Account a collected balance of not less than the minimum amount ("Target Balance") designated by Client from time to time. Bank reserves the right to change the amount of the Target Balance from time to time. In addition to the sweep from a Credit Facility, Client shall elect to set up automatic payment or not.

**i. Auto Repay.** Following posting of all checks and other charges in the designated Account each Business Day, in the event there is an excess collected balance above the Target Balance, Bank automatically will transfer and apply such excess funds to the reduction of any outstanding principal balance on the Credit Facility. If Client elects to make any payments on the Credit Facility by any means other than through this Line of Credit Sweep Service, Client understands that such payments shall be applied pursuant to the terms of the loan documents related to the Credit Facility and may not be processed for up to three (3) Business Days.

**ii. No Auto Repay.** Bank shall have no obligation to automatically transfer and apply any funds in the Account to payment of principal on the Credit Facility. Client shall be responsible for initiating any payment on the Credit Facility by other means.

**2.2 Repayment of Credit Facility Only.** Following posting of all checks and other charges in the designated Account each Business Day, in the event there is an excess collected balance above the Target Balance, Bank automatically will transfer and apply such excess funds to the reduction of any outstanding principal balance on the Credit Facility. Client expressly authorizes Bank to transfer funds automatically from Client's designated Account(s) to the designated Credit Facility, and subject to Client's agreement to maintain the Target Balance in such Account. Bank reserves the right to change the amount of the Target Balance from time to time.

### 3. Participation and Termination

Client acknowledges: (i) that participation in this Line of Credit Sweep Service is not a condition of Client's Credit Facility; (ii) that the Target Balance applicable to the designated Account is intended to compensate Bank, in part or in whole, for checking services and not as compensation for the Credit Facility or for transfers or advances under the Credit Facility; and (iii) that Client may terminate this Line of Credit Sweep Service and thereafter make request, in writing or in such other manner as Bank may choose to accept, for each advance or transfer.

### 4. Credit Facility

These Service Terms are not intended to and shall not amend or supersede any loan document related to the Credit Facility. Each advance or payment made pursuant to the Line of Credit Sweep Service shall be subject to all terms, conditions, provisions, and covenants of the Credit Facility promissory note and related documentation.

### 5. Delay or Termination of Advances

Bank may delay or discontinue, without notice, advances pursuant to this Line of Credit Sweep Service in the event of any one or more of the following circumstances: (i) any insufficiency of Client's available credit under the Credit Facility or any other circumstance which would excuse Bank from advancing funds under the Credit Facility, including any default under the Credit Facility loan

documents or maturity of the Credit Facility; (ii) Bank's receipt of notice of an act of insolvency, levy, garnishment, attachment or legal process affecting Client; (iii) act of God, fire, riot or civil disturbance, computer (hardware or software) or communications systems outage or malfunction; (iv) any cause beyond Bank's reasonable control; or (v) termination of the Checking Account or Credit Facility. Client acknowledges that this Line of Credit Sweep Service is an accommodation for Client's convenience.

# Liquidity Sweep Service

These Terms and Conditions provide information on the use of the Liquidity Sweep Service described below.

## 1. Description of Service

On each Business Day, Bank shall automatically transfer excess funds above a minimum collected balance (the "Target Balance") between a designated Account(s) (a "Designated Account(s)") into a separate interest-bearing deposit account held by Bank in the name of Client (a "Sweep Account").

## 2. Service Setup

Client shall identify the Designated Account and specify the Target Balance with Bank during implementation of the Liquidity Sweep Service. Client may change the Designated Account and/or Target Balance upon written notice to Bank, which shall be effective after a reasonable time for Bank to implement such change.

## 3. Liquidity Sweep

**3.1 Automatic Sweep of Funds.** Following posting of all credits, debits, and other charges in the Designated Account each Business Day, if the ending collected balance is greater than the Target Balance, Bank will automatically transfer funds from the Designated Account to the Sweep Account in the amount by which such ending collected balance on such banking day exceeds the Target Balance. Funds in the Sweep Account are transferred back to the Designated Account the next Business Day and considered a credit to the Designated Account thus allowing the funds to be used to authorize or pay debits and other charges in the Designated Account. Client acknowledges that Bank may establish (and change from time to time) (i) a minimum balance to be maintained in the Designated Checking Account, (ii) a minimum and maximum balance required or permitted in the Sweep Account, and (iii) other terms and conditions affecting this Liquidity Sweep Service. For purposes of these Service Terms, the term "collected funds" means those funds which Bank deems available to Client in the Designated Account for purposes of pricing and account analysis. Client acknowledges that such "collected funds" may not coincide with ledger balance, nor the time by which Bank actually receives provisional or final credit for checks and similar items deposited to the Designated Account.

**3.2 Statements.** Bank will provide periodic statements for the Designated Account and Sweep Accounts showing the amount withdrawn therefrom or deposited thereto in connection with each Sweep Transaction, and including any interest attributable to the Sweep Transactions.

**3.3 Interest Accrued on Transaction.** Bank shall pay interest on the Sweep Account based on the rate provided upon service implementation. The rate on the Sweep Account is a Bank managed rate and is subject to change based on balances and market conditions. Interest will accrue on each Business Day and will be credited to the Sweep Account at month end and then automatically transferred to Designated Account.

## 4. Client Acknowledgment

Client understands and acknowledges that: (i) funds swept out of the Designated Account and maintained in the Sweep Account will be insured by the FDIC only to the standard FDIC deposit limit per business relationship; and (ii) no communication (written or oral) received from Bank shall be deemed to be an assurance or guarantee as to the expected results of any Sweep Transaction.

## 5. Access to Funds

Client may access the funds within the Sweep Account only to the extent the funds may be accessed through the Designated Account.

# Lockbox Service

These Terms and Conditions provide information on the use of the Lockbox Service described below.

## 1. Description of Service

The Lockbox Service consists of remittance processing services and the deposit of checks into designated Accounts. Bank may provide optional data entry and image services to Client as mutually agreed to by the parties. Remittances set up in implementation can be (i) obtained from a designated post office box ("Box") owned or controlled by Bank; (ii) or received through one of Bank's banking centers ("Banking Centers"), or (iii) received through the eCapture Module described herein ("eCapture"), which enables Client to scan their checks through a remote deposit scanner.

## 2. Implementation of Service

**2.1 Lockbox Accounts.** Client shall establish and maintain one or more non-interest-bearing Account(s) (the "Lockbox Account(s)") for the deposit of remittance receipts.

**2.2 Remittance Documentation.** Prior to commencement of services, Client will furnish to Bank such data, authorizations, and other information, forms and documents as Bank may request and Client shall do so in sufficient time to enable Bank to perform its preparation and testing functions. All such data and information furnished to Bank by Client shall be in a form acceptable to Bank. Once Client formulates a remittance document and a return envelope approved by Bank, as applicable, no change may be made to either document without obtaining Bank's prior review and written approval with respect to any change in any aspect of the remittance documents or envelopes, including without limitation paper weight, color, size, ink, and location of information on a document. Client shall afford Bank reasonable time to respond to such change and to perform any appropriate testing to confirm that such change will not create processing problems or additional costs.

**2.3 Compliance with Remittance Specifications.** Client understands that the Lockbox Services will be performed generally by the use of automated equipment, that the equipment will not function properly to perform the Lockbox Services if Client fails to comply with such obligations and specifications required by Bank, and that any such failure may degrade quality and timeliness of the Lockbox Services, in addition to increasing expenses for Bank and per-item pricing for Client. Bank shall promptly notify Client of such failure to comply, and Client shall be given a reasonable period of time to correct such non-compliance.

**2.4 Online Services.** Client may access additional online Lockbox Services by also enrolling in the Digital Banking Service. Such online Lockbox Services, include but are not limited to, online image archive, Lockbox Exception Module, Low Volume Lockbox, eCapture and online reports ("Online Lockbox Services").

## 3. Service

**3.1 Post Office Box or Banking Center Delivery.** Upon commencement of the Lockbox Service, Bank will (i) provide a unique address for directing mailed remittance documents, either a Box or department number within a Box; or as agreed upon to a Banking Center (ii) collect the contents of the Box at such times as Bank may establish; (iii) open envelopes or other contents of the Box; (iv) remove and inspect the remittances, items and enclosures; and (v) and process or handle the remittances, items and enclosures as provided herein. An acceptable item (or "Check"), which will be processed is one which conforms with the following:

**i. Payee.** The name of the payee on the item shall be one of the names, or a reasonable variation thereof, identified by Client on such forms as Bank may require, but Client may authorize Bank to deposit all items addressed to Client's Box or otherwise received for processing through Bank's Banking Centers.

**ii. Date.** All undated Checks will be processed by Bank as hereinafter provided. Postdated checks will be deposited unless otherwise indicated on Bank's forms and agreed upon by Bank.

**iii. Amount.** Either a written or numerical amount shall be given; but if both are provided and they differ, Bank will use the amount supported by accompanying documents (Retail Lockbox only). If these conditions are not met, the item will be processed for the written amount.

**iv. Signature.** The item must bear the drawer's signature or indicate the drawer's name. If there is no signature, but the drawer's name is included on the item, Bank will affix a stamp impression requesting the drawee bank to contact the drawer for authority to pay the item.

**v. Alterations or Restrictions.** Checks bearing restrictive notations such as "Payment in Full," "Balance on Account," or "Final Settlement" will be deposited, unless otherwise agreed to by the parties.

**vi. Drafts.** All signed sight drafts or payable through drafts of one thickness of paper with MICR numbers will be handled in the same manner as other items. All other drafts will either be processed on a collection basis or forwarded to the Client as Bank deems appropriate.

**vii. Cash.** Client will instruct each remitter to pay by check, money order, cashier's check or debit or credit card only. Bank will process and deposit all cash received; however, Bank will assume no liability for cash mailed by Client's remitter beyond such cash as is actually received and receipted for by Bank.

**3.2 eCapture.** As further set forth below, Client may use the Lockbox eCapture feature to create a digitized image of each check and truncate the original Check for the electronic transmission of a file to Bank where the image may be used to create a "Substitute Check" as that term is defined under federal law, or other electronic representation that is processed for collection through the Federal Reserve or other clearinghouses, or directly to the paying institution. To access the Lockbox eCapture Module, Client must be enrolled in the Digital Banking Service.

## 4. Processing

Notwithstanding anything contained herein to the contrary, Bank's only obligation shall be to utilize ordinary care in processing and depositing Checks, and Bank shall have no liability for the processing or deposit of any item which does not conform to the foregoing standards. Checks shall be processed and deposited as received in the following manner:

**4.1 Coupons (Retail Lockbox only).** Client will provide its customers ("Customer") with Remittance Coupons ("Coupons") that comply with Bank's document specifications. Upon receipt, Bank will utilize Optical Character Recognition ("OCR") technology to compare the amount on the Coupon with the amount of the Check.

**4.2 Endorsements.** Bank will apply an endorsement to each Check reflecting credit to the named payee.

**4.3 Deposits.** Except for Checks eligible for Accounts Receivable Conversion as provided below, each Check shall be processed and deposited in the designated Account(s), at which time Client shall become a depositor of Bank with respect to those Checks, and the collection of such items shall be governed by the terms herein and the Account Agreement. Any inconsistencies between these Service Terms and the Account Agreement shall be controlled and governed by this Agreement and these Service Terms.

**4.4 Remittance Material Disposition.** All statements, invoices, correspondence and other papers accompanying Checks as well as copies of the processed Checks (applicable to Wholesale Lockbox only) and deposit ticket(s) shall be destroyed by Bank or delivered to Client in the customary manner of Bank, or in such other manner as may be agreed to by Bank and Client.

**4.5 Record Maintenance.** Bank will maintain an image record of each Check deposited. Such record will be retained by Bank in accordance with Bank's record retention schedule in order to reconstruct any specific deposit by means of duplicate photocopies should the need arise and as requested by Client (subject to the payment of Bank's then prevailing charge for such service).

**4.6 Stop File (Retail Lockbox only).** If applicable, Client will provide a stop file transmission to Bank in accordance with the time frames set up during implementation. Bank will rely on the stop file to compare, by means of computer processing, and determine Coupon(s) which Client desires to be forwarded to Client without deposit. Bank will have no obligation to make manual comparisons and Client understands that identification of Coupons on the stop file must be accurate and consistent with Bank's software. Bank has no obligation to avoid depositing of checks when either OCR coupons or a stop file is not in compliance with Bank's specifications. Bank will continue to rely on the most current stop file successfully received in the event Client fails to transmit a new stop file by the agreed upon time.

**4.7 Accounts Receivable Conversions ("ARC").** Client may elect to use the ARC service, which converts Checks received for deposit to an ACH transaction for collection whereby the amount of the check, routing number, account number and check serial number are transmitted to the financial institution. Client represents and warrants to Bank that Client has given notice to each of its Customers who make payments to the Box that payments received by check will be processed electronically and Customer has not given notice to Client to opt out of this process. In the event any Customer has opted out of the process, Client shall add Customer to the opt-out file transmitted to Bank as set forth below. Client further represents and warrants that, with regard to ACH transactions as contemplated by the ARC service, it agrees to abide by and is in compliance with the Nacha Rules as amended from time to time.

©2024 First Horizon Bank. Member FDIC.

**4.8 Opt-out Files (Retail Lockbox only).** If applicable, Client will provide an opt-out file transmission to Bank should the Client use the ARC service. Bank will rely on the opt-out file to compare, by means of computer processing, and determine what Checks are eligible for check conversion. Bank will have no obligation to make manual comparisons and Client understands that identification of Coupons on the opt-out file must be accurate and consistent with Bank's software. Bank has no obligation to avoid check truncation when either OCR coupons or the opt-out file is not in compliance with Bank's specifications. Bank will continue to rely on the most current opt-out file successfully received in the event Client fails to transmit a new opt-out file by the agreed-upon time.

**4.9 Unprocessable Items.** All items which are not acceptable shall not be processed, but shall be returned to the Client along with statements, invoices, correspondence, and other papers accompanying such item. Such items and papers shall be delivered in the customary manner of Bank or in such other manner as may be agreed to by the parties.

**4.10 Transmissions.** If applicable, Bank may provide Client data and image transmission files if requested by Client and agreed to by Bank.

**4.11 Lockbox Exception Module.** If enrolled in the Online Lockbox Services, the Lockbox Exception Module enables Client to review and decide exception transactions online. Client and Bank will establish mutually agreeable processing deadlines for exception transactions. With regard to exception transactions that have not been reviewed online and decided by Client in accordance with Bank's online instructions and within the established deadline, no funds will be deposited and the remittance transaction shall be delivered to Client in the customary manner of Bank, or in such other manner as may be agreed to by the parties.

**4.12 Daily Reports (Retail Lockbox only).** Daily reports shall be available online, or shall be delivered with optional image files to Client in the customary manner of Bank, or in such other manner as may be agreed to by the parties.

**4.13 Banking Centers.** For over-the-counter payment transactions received at a Banking Center, if such transactions are permitted by Bank, Client agrees to the following processing instructions to qualify payment transactions: (i) all payment transactions must be by check or cash and include a coupon with the check or cash; (ii) the payment transaction must be a balanced payment containing one check or the exact amount of cash per coupon; no multiple check or document transactions will be accepted; (iii) only "payments in full" will be accepted; (iv) payments subject to late fees will not be accepted; (v) payments received over the counter will be processed through Bank's lockbox operations area for deposit the next business day; (vi) payment transactions will be receipted at the time of presentment; (vii) remittance transactions will be made available the next business day through Bank's online lockbox image archive, if applicable; and (viii) the actual remittance documentation will be held for 120 days and then securely destroyed. Any additional business requirements to qualify payment transactions must be submitted in writing and agreed to by all parties.

**4.14 eCapture File Processing.** Bank will accept for deposit the digitized image of Checks through the Lockbox eCapture module. Through the Digital Banking Service, Client can monitor the status of the batch. A file may be suspended due to transmission errors, including but not limited to, duplicity or missing items. If an item is suspended or rejected, Bank may reject the entire file or reject any such item(s) and process the remainder of the file with an adjustment advisory to Client for the item(s) that could not be processed. Client acknowledges that the appearance of the original check and the use of certain background colors, decorative images and choices in ink on the original check may affect the ability to produce a readable digital image of the check or the creation of a Substitute Check that meets legal equivalence requirements which may require the original check to be processed for collection.

**4.15 Review of Transactions.** Client agrees to promptly review deposit transactions and other records Bank makes available to Client, whether in electronic or paper form, and to promptly report any discrepancy to Bank.

## 5. Return Items

Items deposited to the designated Account(s) which are returned unpaid because of "insufficient funds" or "uncollected funds," or the like, will be debited from such Account(s). Bank will charge the Client for the amount of the item by debiting the Account(s) and send the item with debit advice to the address stated for receipt of statement. If Client requests the redeposit option, Bank will redeposit item once, without notice of return to Client, and only with respect to items returned for reason of "insufficient funds" or "uncollected funds." The charge for returned items will be at Bank's then-prevailing rate. If alternative

return requirements are desired, such requirements shall be agreed to by the parties.

## 6. Items Mailed to Client

Remittances which are sent directly to Client may be forwarded to the Box and will then be handled in accordance with the Service Terms.

## 7. Foreign Currency

Canadian items are processed at face value with subsequent corrections to Client's Account(s) for exchange rate charges and fees. All other items drawn in foreign currency will be processed on a provisional or collection basis as available. Credit for items processed on a collections basis will be posted upon receipt of paid collections less all applicable fees and charges. In the event a Canadian or other provisional credit item is returned, credit will be reversed at Bank's buying rate for the currency of the item on the date the return is processed.

## 8. Fees

In addition to any fees or expenses provided in the Agreement, Bank reserves the right to assess without further notice a surcharge for excess OCR rejects if the rate of rejects exceeds four percent (4%) during a month.

## 9. Terms

Notwithstanding the termination provisions in the General Terms and Conditions, the Lockbox Service may be terminated by either party for convenience with written notice of termination furnished to the other party at least ninety (90) days in advance of the effective date of termination. Also, either party may terminate the Lockbox Service at any time in the event that the other party materially breaches its obligations herein. Written notice of termination, and the reasons therefore, shall be given in advance, along with a thirty (30)-day opportunity to cure such breach, except no cure period shall exist for a breach by Client regarding failure to make payment when due. Bank may immediately terminate the Lockbox Services upon written notice to Client in the event of Client's breach of any other agreement or obligation with Bank, or Client's insolvency or Bank's reasonable concern as to Client's financial prospects. In the event that Client shall fail to utilize the Lockbox Services described for a period of three (3) months, Bank may deem the Lockbox Services terminated. No termination of the Lockbox Services shall affect the rights or obligations of either party which may have arisen or accrued prior to such termination or expiration.

## 10. Low Volume Lockbox Services (Wholesale Lockbox Only)

Client may be eligible for the Low Volume Lockbox service, which is available through the Online Lockbox Services and designed for Clients that receive up to 200 monthly transactions. The service is restricted to a basic deposit-only lockbox process with imaging and online access to all remittance documentation and daily reports. No special processing or optional services will be available other than described in this Section. For the Low Volume Lockbox service, Client agrees to the following processing instructions to qualify payment transactions: (i) a transaction will be considered a Check with remittance documentation attached, or miscellaneous correspondence received with a Check; (ii) all transactions received through the lockbox will be imaged; (iii) remittance transactions and daily reports will be made available the next business day through the online lockbox image archive; (iv) payments will be processed each business day and deposited by 5 p.m. ET; (v) all remittance documentation will be imaged through the lockbox process, and Bank will securely store and destroy remittance documentation after thirty (30) days; and (vi) monthly transaction volume that exceeds the established 200 transaction threshold will be assessed a premium charge. Special pricing associated with the Low Volume Lockbox service is restricted to the processing requirements outlined herein. Any additional business requirements or services requested must be submitted in writing and agreed to by all parties and are subject to additional fees. At Client's election, monthly fees for the Low Volume Lockbox service can be directly charged to Client's Account.

## 11. Healthcare Provider Activities

**11.1 Business Associate Agreements.** (This section only applies to Clients who have protected health information). If Client is a "covered entity" as defined under the Health Insurance Portability and Accountability Act of 1996, as amended ("HIPAA"), Client shall notify Bank prior to the commencement of the Lockbox Services if the performance of such Services by Bank shall include the creation, receipt, use or disclosure of protected health information as defined in HIPAA, so that Bank may enter into a written business associate agreement with Client. Client further agrees that after the effective date of the Lockbox Services, if there is any change to the Lockbox Services that causes Bank to create, receive, use or disclose protected health information, Client shall notify Bank in writing at least thirty (30) days in advance of such proposed change so that Bank may determine if the requested change can be accommodated, and, if so, enter into a written business associate agreement with Client.

## 12. Lockbox eCapture

**12.1 Representations and Warranties Regarding Check Image Transactions.** For each digitized image of Checks transmit-

©2024 First Horizon Bank. Member FDIC.

ted to Bank through the Lockbox eCapture module, Client represents and warrants to Bank that: (i) the preparation and presentment of the imaged file comply with the terms and conditions set forth herein and in the Service Documentation; (ii) Client has good title to each check and no defense of any party to the check is good against Client; (iii) the digital image of the check transmitted to Bank is a sufficient copy that is a true, correct and accurate image that represents all the information on the front and back of the original check at the time the original check was truncated, subject to any electronic endorsement added to the check image by Client prior to transmission to Bank, so that a Substitute Check created from the image will satisfy legal equivalence requirements and the image has not been altered in any manner by Client or any third party acting on behalf of Client; (iv) the original check, or a paper or electronic representation, has not previously been deposited for collection with Bank or any other financial institution, and no depositary bank, drawee, drawer, or endorser will be asked to pay a check that it already has paid; (v) Client has no knowledge or notice of information to indicate that the transaction is fraudulent; (vi) Client's warranties to Bank apply to the same extent as if Client had deposited an original paper check with Bank; (vii) Client assumes all transfer, presentment and other warranties of Bank; and (viii) that Client will ensure that the identification of previous truncating and reconverting Banks are preserved and that the substitute checks meet the requirements for legal equivalency under Federal Reserve Regulation CC when redepositing substitute checks.

**12.2 Ineligible Items.** Client agrees that any check which is not acceptable to the terms of the Bank Depositor Agreement may be removed from the transaction during processing of the imaged file. Unless Bank specifically agrees otherwise in writing, Client may not use the Services to deposit: (i) checks payable to a third party; (ii) demand drafts or remotely created checks (checks lacking the original signature of the drawer); (iii) checks that are irregular in any way (e.g., where the numerical and written amounts are different); (iv) checks that have previously been returned stop payment or account closed; (v) checks that are postdated or more than six (6) months old; (vi) checks drawn on a foreign bank or payable in a foreign currency; (vii) checks payable to "Cash"; (viii) any substitute check that has not been handled in the collection process; Bank's processing of any of the checks described above shall not obligate Bank to continue that practice, and Bank may stop doing so without cause or prior notice. Bank may refuse any check for deposit, with or without cause, or may elect to take a check on a collection basis only.

**12.3 Retention of Original Checks.** Client agrees to retain the original check, until final settlement of the imaged check and for such additional period as may be required in the event of a disputed truncated or Substitute Check, including claims that the Substitute Check or electronic representation does not satisfy legal equivalence requirements, so that the original check can be processed for collection. Client, and any third party acting on behalf of Client, agrees to adopt commercially reasonable procedures to safeguard all original checks transmitted to Bank until the checks are destroyed.

**12.4 Equipment.** Client may select terminals and other equipment ("Equipment") for use in imaging checks through the eCapture module either from a vendor referred by Bank or from another vendor of Client's choosing, with approval by Bank (collectively, "Third Party Equipment"). Client acknowledges that Bank's referral or approval of any Third Party Equipment is intended solely for the benefit of Bank; and no such approval or consent shall be construed as a representation or warranty by Bank of the Third Party Equipment or that such equipment shall meet Client's needs. Bank reserves the right to revoke its consent to the use of any Third Party Equipment at any time. Notwithstanding any referral or approval of the Third Party Equipment by Bank, the use of any Third Party Equipment shall be strictly at the Client's risk. Bank shall not be responsible to Client for any Third Party Equipment, nor have liability for the malfunction of any Third Party Equipment used by Client for the processing of transactions. Client agrees to have trained personnel perform routine maintenance on scanners in accordance with the manufacturer's recommendations.

**12.5 Examination and Inspection.** Bank or its agent shall have the right, upon reasonable advance notice and during normal business hours, to examine the records of Client and Client's internal processes and controls related to these Service Terms, including but not limited to, Client's accounts receivable cycle and data security policy. In the event Bank's examination and inspection identifies weaknesses in Client's internal processes or controls related to the Lockbox eCapture Module, Client agrees to implement any commercially reasonable recommendations by Bank to cure such deficiency.

**12.6 Hours of Operation.** The Client can use the eCapture Module to transmit Check information 24 hours a day, seven days a week, except when the system is unavailable due to needed maintenance or system outages. Bank will use commercially reasonable means to notify Client of scheduled maintenances or system outages. Deposit information received by Bank on or after the processing cutoff hour (which Bank may change from time to time) or on a Saturday, Sunday, or holiday, may be deemed received by Bank as of the next Business Day. Bank is not responsible for the unavailability of the eCapture module or any damages that may result from its unavailability. If the eCapture module is not available for any reason or a check cannot be processed by means of the eCapture module, Client may deposit the check at any Banking Center.

**12.7 Limitation of Remedies.** Notwithstanding the provisions of Section 14 of the General Terms and Conditions, Bank's liability to Client is to correct any data in which (and to the extent that) errors have been made by Bank's personnel or bank provided software, which are not due to the Client's error, acts or omissions. However, the expense to Bank of correcting such data shall constitute Bank's only responsibility in connection with such errors or in connection with any other performance or nonperformance by Bank under these Service Terms. In the event that Bank undertakes to correct any error caused by a third party acting on behalf of Client or Equipment, Bank shall not have any liability with respect thereto. Bank shall have no responsibility or liability whatsoever for errors or omissions caused by any Client or third party providing services, software or equipment to Client for use in the eCapture service.

**12.8 Termination.** Upon termination of the Lockbox eCapture Module or Lockbox Service using the eCapture feature for any reason, Bank or its agent shall have the right to enter Client's premises to secure and retrieve all original checks or items which Client has previously transmitted the digital image of such check or item to Bank for deposit.

## Mobile Remote Deposit Capture Service

The following terms and conditions govern the Mobile Remote Deposit Capture ("Mobile RDC") Service described below.

### 1. Description of Service

The Mobile RDC Service allows an Authorized User to make deposits to a designated Client Account from the Authorized User's mobile devices by scanning checks and delivering the images and associated deposit information to Bank. Bank may refuse any check for deposit, with or without cause, or may elect to take a check on a collection basis only. To access the Mobile RDC Service, Client must be enrolled in the Digital Banking Service.

### 2. Authorized Transactions

Bank shall be conclusively entitled to deem any item transmitted to Bank through the Mobile RDC Service to be authorized by, and binding upon, Client: (i) if the item is made by Client or its actual or apparent agent, or (ii) if Bank reasonably believes the electronic transmission of the item was sent by an Authorized User by way of compliance with the correct Security Credentials.

### 3. Eligible Items

Client agrees that an Authorized User may only scan and deposit checks as that term is defined in Federal Reserve Regulation CC ("Reg. CC"). Client agrees that the image of the check transmitted to Bank shall be deemed an "item" within the meaning of Article 4 of the Uniform Commercial Code as adopted in the State in which Client's business deposit is located. Client agrees that Client will not use the Service to scan and deposit any checks or other items as shown below: (i) Checks or items payable to any person or entity other than Client, including a check payable to "Cash"; (ii) Checks or items containing obvious alteration to any of the fields on the front of the check or item, or which Client knows or suspects, or should know or suspect, are fraudulent or otherwise not authorized by the owner of the account on which the check or item is drawn; (iii) Checks or items previously converted to a substitute check, as defined in Reg. CC; (iv) Checks or items drawn on a foreign bank or payable in a foreign currency; (v) Checks or items that are demand drafts or remotely created checks (checks lacking the original signature of the drawer); (vi) Checks that have been previously returned stop payment or account closed; and (vii) Checks or items that are postdated or dated more than six months prior to the date of deposit. Bank's processing of any of the checks described above shall not obligate Bank to continue that practice, and Bank may stop doing so without cause or prior notice. Bank may refuse any check for deposit, with or without cause, or may elect to take a check on a collection basis only.

### 4. Image Quality

The image of a check or item transmitted to us using the Mobile RDC Service must be legible. The image quality of the items must comply with the requirements established from time to time by ANSI, the Board of Governors of the Federal Reserve Board, or any other regulatory agency, or other clearinghouses.

### 5. Endorsements

Client agrees to restrictively endorse (sign on the back) any item transmitted through the Service as follows: "For Mobile Deposit Only, to First Horizon Bank Account of" followed immediately by an authorized signer's endorsement (signature) or as otherwise instructed by Bank.

### 6. Receipt of Items

Bank reserves the right to reject any item transmitted through the Mobile RDC Service, at our discretion, without liability to Client. Bank is not responsible for items we do not receive or for images that are dropped during transmission. Client agrees to receive notices electronically relating to the Mobile RDC Service whether or not you have previously agreed to accept electronic

©2024 First Horizon Bank. Member FDIC.

disclosures. An image of an item shall be deemed received when Client or the Authorized User receives an electronic confirmation from Bank that the image was received. Receipt of such confirmation does not mean that the transmission was error free or complete.

### 7. Representations and Warranties; Indemnification

As to all items transmitted to Bank, Client represents and warrants that: (i) Client and any Authorized User will comply with the terms and conditions set forth in these Service Terms; (ii) only transmit eligible items; (iii) the digital image of the check transmitted to Bank is a sufficient copy that is a true, correct and accurate image that represents all the information on the front and back of the original check at the time the original check was transmitted; (iv) Client has good title to each check and item and no defense of any party to the check is good against Client; (v) the original check, or a paper or electronic representation, has not previously been deposited for collection with Bank or any other financial institution, and no depositary bank, drawee, or drawer will be asked to pay a check that it already has paid; (vi) Client has no knowledge or notice of information to indicate that the transaction is fraudulent. Client agrees to indemnify and hold Bank, its affiliates, directors, officers, employees, and agents harmless from and against all losses, liabilities, cost, damages and expenses (including reasonable attorneys' fees and cost of litigation) to which Bank may be subjected or which Bank may incur in connection with any claims which might arise from or out of Client's use of the Mobile RDC Service.

### 8. Provisional Settlement; Returns

Client acknowledges that all items transmitted to Bank through the Mobile RDC Service may be returned by the receiving institution for insufficient funds or other reasons, including claims or returns that the electronic representation of the item does not meet legal equivalence requirements under federal or other applicable law. In addition, Client acknowledges that Bank will have no responsibility for the return of any item due to improper endorsement or the delayed return of a substitute check that includes any message text or other information added by Client in the depository bank endorsement area. Any credit or consideration given by Bank to Client with respect to any item deposited shall be deemed provisional, and Bank shall be entitled to revoke same without prior notice in the event one or more transmitted items are rejected or returned to Bank for any reason.

### 9. Availability of Funds

Client agrees that items transmitted using the Mobile RDC Service are not subject to the funds availability requirements of Regulation CC. Funds deposited using the Mobile RDC Service will generally be made available in two (2) Business Days from the day of deposit. In some cases, Bank may not make the funds available in accordance with the general policy. If Client makes a deposit before 9 p.m. ET on a Business Day, Bank will consider that day to be the day of deposit. If Client transmits an item after 9 p.m. ET, or on a non-Business Day, Bank may consider that the deposit was made on the next Business Day.

### 10. Safeguard and Disposal of Transmitted Items

Client agrees to retain the original check, or a sufficient copy of the front and back of the item, until final settlement of the item should there be any dispute that the image does not satisfy legal equivalence requirements. Client, and any Authorized User acting on behalf of Client, agree to adopt commercially reasonable procedures to safeguard all original checks transmitted to Bank until the checks are destroyed by Client.

### 11. Deposit Limits

Deposits transmitted through the Mobile RDC Service are limited to a specified dollar amount per one (1)-day period as well as rolling thirty (30)-day period. This limit can be found within the Mobile RDC Service application. Bank reserves the right to change limits on the amount(s) and/or number of deposits that Client transmits using the Mobile RDC Service and may modify such limits from time to time.

### 12. Deposit Errors

Client agrees to notify Bank of any suspected errors regarding items deposited through the Mobile RDC Service right away, and in no event later than thirty (30) days after the applicable Account statement is sent or made available. Unless you notify us within thirty (30) days, such statement regarding all deposits made through the Mobile RDC Service shall be deemed correct, and client is prohibited from bringing a claim against Bank for such alleged error.

### 13. Termination

Notwithstanding the Termination provisions in the General Terms and Conditions, Bank may terminate the Mobile RDC Service at any time and for any reason. No termination of the Mobile RDC Service shall impair or affect the rights, obligations or remedies of either party which may have arisen or accrued prior to the effective date of such termination.

---

## Positive Pay Service

These Terms and Conditions provide information on the use of the Positive Pay Service described below.

©2024 First Horizon Bank. Member FDIC.

## 1. Description of Services

The Positive Pay Service allows Client to provide Bank with an electronic listing of all new checks issued by Client ("Check Issue File") for designated Accounts before such checks are presented to Bank for payment. Checks that match checks in the Check Issue File (Account Number, Check Number, Dollar Amount, and Payee Name if applicable) may be paid without decision of Client. Items that do not match the Check Issue File (Account Number, Check Number, Dollar Amount, and Payee Name if applicable) will be referred to Client for instruction to pay or return. The reporting and decision-making process regarding the Positive Pay Service may be provided through the Digital Banking Service, and the terms of the Digital Banking Service are incorporated herein by reference.

## 2. Check Issue Files

Client shall transmit to Bank Check Issue Files for checks issued on each designated Account(s), which shall include a listing of the check number and account number which was MICR-encoded on each check, and the dollar amount of each check, and Payee Name (if applicable) for each check issued by Client, or on Client's behalf, on the Account(s) since Client's most recent Check Issue File was transmitted to Bank. Client will use a secure method of file delivery that is mutually agreeable to both parties. Check Issue Files received by Bank by 7:30 p.m. ET on a Business Day will be processed the same day. Check Issue Files received by Bank after 7:30 p.m. ET will be processed the next Business Day. Check Issue Files should be sent to Bank the Business Day prior to issuing the checks.

## 3. Bank Processing of Check Issue Files

On the evening of each Business Day, Bank shall process the Check Issue File generated from the transmittal of the most recent Check Issue File and add the new check issue information (check number, account number, dollar amount, and if Client so elects, payee's name) to the existing history of checks issued on the Account(s), and checks paid on the Account(s), which history is maintained in Bank's account reconciliation system. When checks on the Account(s) are presented to Bank for payment, Bank shall compare the check number, account number, and dollar amount MICR-encoded on the checks, and Payee Name (if applicable) that are presented with the check number, account number, and dollar amount of checks described in the account reconciliation system data in order to identify any checks for which such data on the check does not entirely match such data in the account reconciliation system ("Suspect Items").

**3.1 Payee Name Verification.** Client may also elect to use payee name verification under which, in addition to check number, account number and dollar amount, the payee's name may be used for comparison of names on checks described in the account reconciliation system. Bank will be obligated to validate the payee name on checks if the payee name was included in the Check Issue File prior to check presentment for any period of time "payee name verification" is requested by the Client and provided by Bank. **If Client does not submit the payee name for verification, then the payee name will not be used as a means of identifying checks in the account reconciliation system. Bank shall have no obligation to take note of any information (other than payee's name, check number, account number and dollar amount) which may appear on the check.** Payee name verification will not be available for the verification of checks converted and electronically presented to Client's account via ACH described below as check images will not be available.

**3.2 ACH Verification.** In using this feature, Client authorizes verification of checks via conversion and electronic presentation to Client's account via ACH. Client authorizes Bank to validate corporate checks presented to Bank via ACH with an entry class code of "ARC" (Accounts Receivable Entry), "POP" (Point-of-Purchase Entry), "BOC" (Back Office Conversion), or future ACH entry class codes that represent check conversion, against the Client's Check Issue File as previously described, with items not matching information in Client's Check Issue File (account number, check number and check amount) being referred to Client.

**3.3 Suspect Items with Over-the-counter Presentments.** Client authorizes Bank to refuse payment of any Suspect Item (including any check validly issued and outstanding) which is presented for payment over the counter. To minimize the incidence of nonpayment of validly issued and outstanding checks, Client shall use its best efforts to refrain from delivering or sending checks to payees for one Business Day after Client transmits the Check Issue File to Bank by the deadline specified above.

**3.4 Suspect Items with Other Presentments.** For checks that are presented for payment by means other than over-the-counter payment, Bank shall notify Client by 9:00 a.m. CT on a Business Day, via email or by such alternate means as may be agreed by the parties in writing, that each such check which is a Suspect Item is available for review through the Digital Banking Service. Client shall log in to the Digital Banking Service, and complete its review and approval of each Suspect Item for which Client authorizes payment by 2:00 p.m. CT of the same Business Day. Unless Client otherwise elects a

default "pay" decision, Bank shall be entitled to return unpaid any Suspect Item for which Bank fails to receive such payment authorization notification from Client by the foregoing deadline, regardless of any practice or course of dealing, if any, to retain any Suspect Items past such notification deadline. Bank shall be entitled to pay any Suspect Item for which an Authorized User of Client under the Digital Banking Service or such other authorized representative of Client notifies Bank to make payment. Client shall add to its next Check Issue File all Suspect Items which are paid pursuant to the instructions of an Authorized User.

### 4. Check Print Layout Specifications

Bank provides Client with the check print layout specifications in order to obtain the best read rate for Payee Name capture. If Client fails to follow Bank's requirements and the acceptable read rate drops below 85%, then Bank may in its discretion impose higher fees. Before implementing such fees, Bank will notify Client and give Client thirty (30) days to correct the deficiency. Client understands that there may be delays in exception reporting if the acceptable read rate drops below the aforementioned 85%.

### 5. Limitation of Liability.

**5.1 Client Instructions.** Notwithstanding anything herein to the contrary,

**i.** If Bank honors a Suspect Item in accordance with the instructions by Client, Client acknowledges and agrees that such honor shall be rightful, and Client waives any right it may have to assert that the Suspect Item was not properly payable.

**ii.** If Bank dishonors a Suspect Item in accordance with instructions by Client, Client acknowledges and agrees that the dishonor shall be rightful, and Client waives any right it may have to assert that the dishonor was wrongful.

**5.2 Reasonable Care.** Client agrees that Bank exercises reasonable care whenever it rightfully pays or returns a Suspect Item consistent with the provisions of these Service Terms.

**5.3 Assignment of Claim.** If Client suffers Losses in connection with the Service, Bank assigns to Client any claim that Bank has against a depository or collecting bank to recover the loss, including any claim for breach of warranty under the applicable provisions of the UCC.

---

## Remote Deposit Capture Service

These Terms and Conditions provide information on the use of the Remote Deposit Capture ("RDC") Service described below.

### 1. Description of Service

Client may use the RDC Service to create a digitized image of each check and truncate the original check for the electronic transmission of a file to Bank where the image may be used to create a "Substitute Check" as that term is defined under federal law, or other electronic representation that is processed for collection through the Federal Reserve or other clearinghouses, or directly to the paying institution, collectively referred to herein as "Transactions." To access the RDC Service, Client must be enrolled in the Digital Banking Service.

Bank may accept Transactions from Client, or its actual or apparent agent in the event that Client utilizes the lockbox services of a third party for the collection and processing for deposit checks and other items, and in such case the Transactions shall be governed by this Agreement, and, except as specifically modified by these Service Terms, Client's Account(s) shall be subject to the terms and conditions of the Account Agreement. Additional services made available through Bank's remote deposit capture service may be described in attachments.

### 2. File Processing

Subject to the terms herein, Bank will accept for deposit a file containing the digitized image of checks through the RDC Service. Through the Digital Banking Service, Client can monitor the status of the file as either released or acknowledged. A file may be suspended due to transmission errors, including but not limited to, duplicity, missing items, or exceeding deposit thresholds. If an item is suspended or rejected, Bank may reject the entire file or reject any such item(s) and process the remainder of the file with an adjustment advisory to Client for the item(s) that could not be processed. Client acknowledges that the appearance of the original check and the use of certain background colors, decorative images and choices in ink on the original check may affect the ability to produce a readable digital image of the check or the creation of a Substitute Check that meets legal equivalence requirements which may require the original check to be processed for collection.

### 3. Authorized Transactions

Bank shall be conclusively entitled to deem the Transactions to be authorized by, and binding upon, Client: (i) if the Transactions

and the electronic transmission of a file are made by Client or its actual or apparent agent, or (ii) if Bank reasonably believes the Transactions and the electronic transmission of a file were sent by an authorized representative of Client pursuant by way of compliance with the correct Security Credentials, or (iii) if Client utilizes the services of a third party for lockbox or other similar services to facilitate the processing of Transactions and Bank reasonably believes that the Transactions and transmission of a file by such third party are sent on behalf of Client, provided that the Transactions and the electronic transmission of a file are in the name of Client.

## 4. Representations and Warranties of Client Regarding Check Image Transactions

As to the Transactions transmitted to Bank, Client represents and warrants to Bank that: (i) the preparation and presentment of the Transactions comply with the terms and conditions set forth herein and in the Service Documentation; (ii) Client has good title to each check and no defense of any party to the check is good against Client; (iii) the digital image of the check transmitted to Bank is a sufficient copy that is a true, correct and accurate image that represents all the information on the front and back of the original check at the time the original check was truncated, subject to any electronic endorsement added to the check image by Client prior to transmission to Bank, so that a Substitute Check created from the image will satisfy legal equivalence requirements and the image has not been altered in any manner by Client or any third party acting on behalf of Client; (iv) Client, or any third party acting on behalf of Client, has reviewed and confirmed that the transmission of MICR line information is identical in all respects to the original check and that the encoded check amount is accurate; (v) Client understands that any message text or other information Client elects to add to the check image transmitted to Bank may cause the depository bank's endorsement not to be legible which may result in the delayed return of the Substitute Check or electronic representation if it is not paid; (vi) the original check, or a paper or electronic representation, has not previously been deposited for collection with Bank or any other financial institution, and no depositary bank, drawee, drawer, or endorser will be asked to pay a check that it already has paid; (vii); Client has no knowledge or notice of information to indicate that the transaction is fraudulent; (viii) Client's warranties to Bank for Transactions apply to the same extent as if Client had deposited an original paper check with Bank; (ix) Client assumes all encoding, transfer, presentment and other warranties of Bank; and (x) that Client will ensure that the identification of previous truncating and reconverting Banks are preserved and that the substitute checks meet the requirements for legal equivalency under Federal Reserve Regulation CC when redepositing substitute checks.

## 5. Ineligible Items

Client agrees to scan and remotely deposit only checks and other items which are acceptable pursuant to the terms of the Deposit Agreement. Unless Bank specifically agrees otherwise in writing, Client may not use the Services to deposit: (i) checks payable to a third party; (ii) demand drafts or remotely created checks (checks lacking the original signature of the drawer); (iii) checks that are irregular in any way (e.g., where the numerical and written amounts are different); (iv) checks that have previously been returned stop payment or account closed; (v) checks that are postdated or more than six (6) months old; (vi) checks drawn on a foreign bank or payable in a foreign currency; (vii) checks payable to "Cash"; (viii) any substitute check that has not been handled in the collection process; or (ix) any check(s) that exceed any transaction limitation(s) that Bank establishes. Bank's processing of any of the checks described above shall not obligate Bank to continue that practice, and Bank may stop doing so without cause or prior notice. Bank may refuse any check for deposit, with or without cause, or may elect to take a check on a collection basis only.

## 6. Retention of Original Checks

Client agrees to retain the original check, or in the event Client utilizes the lockbox services of a third party or other similar services that the third party will retain the original check, until final settlement of the Transaction and for such additional period as may be required in the event of a disputed truncated or Substitute Check, including claims that the Substitute Check or electronic representation does not satisfy legal equivalence requirements, so that the original check can be processed for collection. Client, and any third party acting on behalf of Client, agrees to adopt commercially reasonable procedures to safeguard all original checks transmitted to Bank until the checks are destroyed.

## 7. Returned Checks

Any returned checks delivered by Bank to Client will be in the form of a Substitute Check. For further collection purposes, Client must redeposit the Substitute Check and not the original item. Rescanning the original item for subsequent collection will only be permitted if the returned reason is for poor image quality.

## 8. Provisional Settlement; Returns

Client acknowledges that Transactions may be returned by the receiving institution for insufficient funds or other reasons, including claims or returns that the Substitute Check or electronic representation does not meet legal equivalence requirements under federal or other applicable law. In addition, Client acknowledges that Bank will have no responsibility for the return of Transactions due to improper endorsement or any error associated with Client's use of an electronic endorsement added

to a check image transmitted to Bank, or the delayed return of a Substitute Check that includes any message text or other information added by Client in the depository bank endorsement area. Any credit or consideration given by Bank to Client with respect to any Transactions shall be deemed provisional, and Bank shall be entitled to revoke same without prior notice in the event one or more Transactions are rejected or returned to Bank for any reason.

## 9. Equipment

**9.1 Third Party Equipment.** Client may select terminals and other equipment ("Equipment") for use in processing Transactions either from a vendor referred by Bank or from another vendor of Client's choosing, with approval by Bank (collectively, "Third Party Equipment"). Client acknowledges that Bank's referral or approval of any Third Party Equipment is intended solely for the benefit of Bank; and no such approval or consent shall be construed as a representation or warranty by Bank of the Third Party Equipment or that such equipment shall meet Client's needs. Bank reserves the right to revoke its consent to the use of any Third Party Equipment at any time. Notwithstanding any referral or approval of the Third Party Equipment by Bank, the use of any Third Party Equipment shall be strictly at the Client's risk. Bank shall not be responsible to Client for any Third Party Equipment, nor have liability for the malfunction of any Third Party Equipment used by Client for the processing of Transactions. Client agrees to have trained personnel perform routine maintenance on scanners in accordance with the manufacturer's recommendations.

**9.2. Bank-provided Equipment.** Upon Client's election, Bank will provide Client with Equipment for the use in processing Transactions ("Bank Equipment"). Bank or its agent will instruct Client as to installation, operation and use of Bank Equipment. Client understands that any Bank Equipment furnished, other than sold to the Client, under the provisions of these Service Terms is the property of Bank and agrees not to remove any Bank Equipment from its original place of installation without the prior written consent of Bank. Client further agrees to protect Bank's ownership of Bank Equipment against all claims of creditors of Client.

**9.3 Use and Return of Bank Equipment.** Client and its employees and agents shall use and operate Bank Equipment in accordance with the terms of these Service Terms and any Service Documentation. Bank will maintain Bank Equipment in serviceable condition, providing service pursuant to the Service Documentation. Bank shall promptly, at its sole discretion, repair or replace all malfunctioning Bank Equipment, such repair and replacement to be at Client's expense. Bank will have the right during reasonable business hours to enter upon Client's premises for the purpose of confirming the existence, condition and proper maintenance of the Bank Equipment. Client agrees to surrender any Bank Equipment to Bank's employees or agents upon request, F.O.B. at the address specified for notice to Bank under this Agreement or as Bank may otherwise instruct, in the same condition as when the Bank Equipment was delivered to Client, normal wear and tear excepted. In the event Client terminates the RDC Services during the initial two (2)-year period of the RDC Services, Bank shall have the right to recoup costs for Bank Equipment and, if necessary, shall have the right of offset to recoup such costs. Client shall be liable to Bank for the value, as determined by Bank, of any the Bank Equipment that is not returned in such condition, together with any costs and expense incurred by Bank in obtaining possession of the Bank Equipment, including reasonable attorney fees.

**9.4 Bank Equipment Use for Transactions Only.** Bank Equipment is expressly for use in the transmittal of Transactions to Bank. Any reliance by Client on the Bank Equipment for applications outside those supported by Bank is not permitted and strictly at Client's risk.

**9.5 Indemnification and Hold Harmless.** Client agrees to indemnify Bank against any and all damages to or losses of Bank Equipment for any reason, including fire, theft, or other causes, and agrees to pay Bank the then-current replacement cost of the Bank Equipment and any applicable shipping expenses. In addition, Client agrees to hold Bank harmless from any and all damages that may occur during installation and or use of the Equipment.

## 10. Hours of Operation

The Client can use the RDC Service to transmit Check information 24 hours a day, seven days a week, except when the system is unavailable due to needed maintenance or system outages. Bank will use commercially reasonable means to notify Client of scheduled maintenances or system outages. Deposit information received by Bank on or after the Service cutoff hour (which Bank may change from time to time) or on a Saturday, Sunday, or holiday, may be deemed received by Bank as of the next Business Day. Bank is not responsible for the unavailability of the RDC Service or any damages that may result from its unavailability. If the RDC Service is not available for any reason or a check cannot be processed by means of the RDC Service, Client may deposit the check at any Banking Center.

## 11. Examinations and Inspections

Bank or its agent shall have the right, upon reasonable advance notice and during normal business hours, to examine the

©2024 First Horizon Bank. Member FDIC.

records of Client and Client's internal processes and controls related to these Service Terms, including but not limited to, Client's accounts receivable cycle and data security policy. In the event Bank's examination and inspection identifies weaknesses in Client's internal processes or controls related to the RDC Service, Client agrees to implement any commercially reasonable recommendations by Bank to cure such deficiency.

### 12. Limitation of Remedies

Notwithstanding the provisions of Section 14 of the General Terms and Conditions, Bank's liability to Client is to correct any data in which (and to the extent that) errors have been made by Bank's personnel, or by malfunction of Bank Equipment or bank provided software, which are not due to the Client's error, acts or omissions. However, the expense to Bank of correcting such data shall constitute Bank's only responsibility in connection with such errors or in connection with any other performance or nonperformance by Bank under these Service Terms. In the event that Bank undertakes to correct any error caused by a third party acting on behalf of Client or Third Party Equipment, Bank shall not have any liability with respect thereto. Bank shall have no responsibility or liability whatsoever for errors or omissions caused by any Client or third party providing services, software or equipment to Client for use in Transactions.

### 13. Termination

Upon termination of the RDC Service for any reason, Bank or its agent shall have the right to enter Client's premises to secure and retrieve all original checks or items which Client has previously transmitted the digital image of such check or item to Bank for deposit.

---

## Reverse Positive Pay Service

These Terms and Conditions provide information on the use of the Reverse Positive Pay Service described below.

### 1. Description of Services

In connection with the Reverse Positive Pay Service, Bank will periodically forward to Client, within the time frame and in the manner as Bank may describe in separate Service Documentation, image copies of checks, warrants or other items that have been presented for payment against Client's designated Account(s) for review and decisioning by Client.

### 2. Processing

Bank shall provide notice to Client by 9:00 a.m. CT on a Business Day, via email or by such alternate means as agreed by the parties in writing, of each check that is available for review through the Digital Banking Service. Client shall log in to the Digital Banking Service and complete its review and notify Bank whether the Client wants a check, warrant or other item to be paid or rejected for payment by 2:00 p.m. CT on a Business Day. Client shall provide Bank with standing instructions that Bank will implement in the event Bank does not hear from Client within the required time frame. Those instructions shall be either to "pay all" or "return all." Client agrees that in the event Client fails to place standing instructions on file with Bank or fails to provide timely instructions on a Business Day, Bank will adopt the "pay all" approach. Bank is entitled to conclusively rely on Client's "pay" or "return" instructions. Client shall appoint designated representatives as Authorized Users under the Digital Banking Service for purposes of furnishing payment authorizations to Bank. Bank will pay all items subject to the availability of funds on deposit and, in Bank's sole discretion, may overdraw the Account. Any items rejected under Client's standing instruction will be marked "Refer to Maker." Client agrees to respond promptly to any inquiries regarding those items. Client understands that Client may have liability for the payment of any item to a party, including Bank, who is a holder or holder in due course under applicable federal or state law.

### 3. Over-the-Counter Presentments

Client authorizes Bank to refuse payment of any check, warrant or other item validly issued and outstanding which is presented for payment over the counter. To minimize the incidence of nonpayment of validly issued and outstanding checks, warrants or other items, Client shall use its best efforts to disclose to all payees Bank's right to refuse payment for items presented over the counter.

### 4. Responsibility of Parties

Client agrees that Bank's duty to Client is to provide images of the check, warrant or other items. Bank shall have no responsibility or liability for payment of any item based upon Client's instructions or standing instructions; provided, however, if Client claims an item is not properly payable due solely to a forged endorsement or material alteration to the payee information, then the rights and responsibilities with regard to the forged endorsement or material alteration shall be determined under applicable law. Other than the duties specifically undertaken as described above, Client relieves Bank of all liability, including liability related to obligations arising under the applicable laws on negotiable instruments and bank deposits or collections, as amended from time

©2024 First Horizon Bank. Member FDIC.

to time, or otherwise concerning examination of checks, warrants, or other items presented for payment and Client holds Bank harmless from any and all claims made by anyone for loss or damage.

## Statewide Deposit Service

These Terms and Conditions provide information on the use of the Statewide Deposit Service described below.

### 1. Description of Services

The Statewide Deposit Service allows for individual store or office account numbers to be assigned to each location of Client. Transactions by Client at each location are then concentrated into a single "Master Account." The Statewide Deposit Service offers a way to make it easier and more convenient for Client to track deposits from multiple stores or office locations. A single monthly statement will be generated by Bank showing transactions separated by each store or office location.

### 2. Service Setup

Prior to commencement of the Statewide Deposit Service, Client will furnish to Bank such data, authorizations, and other information, forms and documents as Bank may request. All data and information furnished to Bank by Client, its agents and employees shall be in a form acceptable to Bank.

## SWIFT Messaging Service

These Terms and Conditions provide information on the use of the Swift Messaging Service described below.

### 1. Description of Services

The MT940 is a standard SWIFT (Society for Worldwide Interbank Financial Telecommunication) message for electronic banking statements and wire transfer reports sent through the SWIFT network. Through the Swift Messaging Service, Client may obtain direct electronic access to MT940 and other SWIFT reporting through use of compatible computer equipment and communications software.

### 2. Service Setup

During service implementation, Client shall designate Accounts to receive reporting. Additional reporting or transmission options may be available as further described in Service Documentation and/or as agreed to between the parties. Client acknowledges that the SWIFT Messaging Service is merely a method of delivering bank information regarding Accounts.

## Wire Transfer Service

These Terms and Conditions provide information on the use of the Wire Transfer Service described below.

### 1. Description of Service

The Wire Transfer Service enables Client to transfer funds by wire through Bank's Digital Banking Service or over the telephone. In these Service Terms, Transfer Requests means an instruction to Bank (including any communication which cancels or amends an instruction) to transfer funds from Client's Account to another account held at a third-party institution. Client agrees to comply with all applicable payment system rules, including the rules of the funds transfer system of the Federal Reserve Banks, and any other applicable laws and regulations.

### 2. Authorization

In order to use the Wire Transfer Service, Client must designate person(s) as Authorized Users who will initiate and verify all Transfer Requests and provide other instructions with respect to any Account. Such Authorized Users shall be responsible for complying with all Security Procedures established by the parties. Client hereby authorizes Bank to honor, execute and charge to Client's Account(s) any and all Transfer Requests (i) made by any person authorized to so act on Client's behalf; or (ii) made in conformance with the applicable Security Procedures set forth below. All such Transfer Requests shall be deemed authentic for the purposes of these Service Terms.

### 3. Authentication Procedures

**3.1 Telephone Transfer Requests.** To initiate telephone Transfer Requests, Client shall furnish to Bank the names of those

persons ("Authorized Representatives") designated by Client to authorize (and, where applicable, to verify) telephonic Transfer Requests. Bank will assign to each Authorized Representative a personal identification number (PIN), which is to be furnished to Bank when making telephonic Transfer Requests. Additionally, Client shall be able to place limitations on the transfer authority of any Authorized Representative. Client may request assignment of substitute PINs or other Security Credentials at any time in order to maintain the integrity of the authentication procedures. Client will furnish to Bank in writing the name of a Security Administrator to establish authorization limitations. Bank shall distribute PINs and other Security Credentials, as applicable, to the appropriate Authorized Representatives through secure email.

**3.2 Online Transfer Requests.** To initiate online Transfer Requests, Client must be enrolled in the Digital Banking Service. The Security Administrator(s) shall have the sole responsibility to designate Authorized Users to authorize (and, where applicable, to verify) online Transfer Requests. The Security Administrator may establish various privileges, entitlements and limits on any Authorized Users to authorize Transfer Requests.

**3.3 Reliance on Valid Security Credentials.** Bank has established certain Security Procedures for verification of Transfer Requests as set forth in these Service Terms and in Service Documents. Client agrees that the Security Procedures, including any applicable privileges, entitlements and limits placed on Authorized Representatives and Authorized Users that Client elects to use with the Wire Services are a commercially reasonable method of providing security against unauthorized wire transfers. Client agrees that Bank will be entitled to rely conclusively upon the authenticity of all telephonic Transfer Requests by an Authorized Representative or Authorized User using a valid PIN and the authenticity of all online Transfer Requests by an Authorized User using valid Security Credentials. Bank shall have no duty to obtain further verification of any Transfer Request, unless Client has selected additional verification procedures and as agreed to by Bank. Bank shall be entitled to rely upon the authority of those persons designated as Authorized Representative(s) or Authorized User(s) until such time as Bank actually receives written notice to the contrary and has a reasonable opportunity to act thereon.

**3.4 Repetitive Wires**. If Client desires to transfer funds on a repetitive basis and completes any Service Documentation for a Repetitive/Template Wire, Bank may assign a repetitive request number to Client, which shall be provided on all applicable repetitive Transfer Requests. Any Transfer Request referencing the repetitive request number will be considered a repetitive Transfer Request. Bank's implementation of any Transfer Request in accordance with these procedures shall in no event be deemed negligence.

**3.5 Additional Limits and Procedures.** In its discretion, Bank may impose additional limits and/or verification procedures for Transfer Requests, but it shall have no duty to do so, nor shall any duty be implied by course of dealing or otherwise.

**3.6 Dual Control.** As a default setting, Bank implements a dual-control Security Procedure for the administration of the Wire Transfer Service. If the Client opts out of dual control, Client acknowledges that they assume the risk relating to the misuse of the Wire Transfer Service, and Client releases Bank for all liability for any loss, claim, damage or harm which Client may suffer by virtue of the misuse of the Wire Transfer Service.

## 4. Execution of Transfer Requests

**4.1 Transmission of Transfer Requests.** Bank shall transmit Transfer Requests made in accordance with these Service Terms promptly and accurately. Bank will endeavor to transmit Transfer Requests on the Business Day received if received before Bank's applicable cutoff hour, or on such later date as may be specified in the Transfer Request, but Client agrees that Bank shall not incur liability for delay in transmitting a Transfer Request if Bank acted in good faith. Bank may transmit on any subsequent Business Day any Transfer Request received after the applicable cutoff hour, (or which for other reason cannot be implemented on the day received) without notice to, or further request, by Client.

**4.2 Amendment or Cancellation of Transfer Requests.** A Transfer Request may be canceled or amended by Client provided that the instruction is received by Bank at a time and in a manner affording Bank a reasonable opportunity to act prior to transmission or release of the transfer. In order to cancel or amend a Transfer Request, an Authorized Representative or Authorized User must provide such request using valid Security Credentials. Once a Transfer Request has been released, the transfer will be final and not subject to cancellation, amendment or reversal by Client, unless the beneficiary bank consents to such request. Bank will not be liable to Client for any damages resulting from the failure of the beneficiary or any intermediary bank to amend or recall a transfer.

**4.3 Notification Advices.** Each Business Day, Bank shall furnish, or otherwise make available to, Client notification advisories of all transfers transmitted or received by Bank.

**4.4 Incoming Wire Transfers.** Bank shall provide Clients who have arranged for the online wire transfer service with online access to information concerning incoming transfers.

**4.5 Drawdown Requests.** Subject to approval by Bank, Client may request Bank to honor a drawdown request (reverse wire) received by Bank via Fedwire from a different financial institution, which requests that Bank transfer funds from a designated Account to the account of a beneficiary. Client must complete all required forms related to a drawdown request, including any additional terms. Bank reserves the right to not honor a drawdown request.

**4.6 Additional Fees and Charges.** In addition to the fees and charges for Wire Transfer Service, Client shall also reimburse Bank for any actual expenses to execute, cancel or amend any Transfer Request or perform any related act that Client may request. Bank is not held responsible for fees taken by intermediary banks that may deduct its charges, if any, from the amount of the Transfer Request.

**4.7 International Wire Block.** Client may elect to establish an international wire block for Transfer Requests. If selected, all Transfer Requests shall then include the country as part of the beneficiary information. Client acknowledges and agrees that providing the beneficiary's country accurately is solely Client's responsibility.

**4.8 SWIFT Data.** Client acknowledges that access to SWIFT data supplied by Bank for use when initiating online Transfer Requests is the data and property of a third party from whom Bank has licensed rights to the data. Client's use of the data is non-exclusive and nontransferable, and it extends only to Client's use of such data for the purpose of processing Transfer Requests as set forth in this Agreement. Client is prohibited from downloading the data, integrating any data into a commercial directory or database product, or sub-licensing the data to any third party.

## 5. Client's Responsibilities

**5.1 Safeguarding of Security Credentials.** Client shall be responsible for safeguarding the confidentiality of all authorization and Security Credentials furnished to, or selected by, Client for use in connection with the Wire Transfer Service. Client understands that disclosure (whether intentional or unintentional) of such information may result in fraudulent transfers from Client's account(s) for which Bank will have no responsibility.

**5.2 Internal Controls.** Client shall establish appropriate procedures and controls for setting user limits for Transfer Requests. Client acknowledges that such limits may be set at the Authorized Representative or Authorized User, Account or company level for both telephone and online Transfer Requests. Transfer Requests by the same Authorized Representative or Authorized User initiating both telephonic and online Transfer Requests are not aggregated to determine if an Authorized Representative or Authorized User has exceeded individual user limits.

**5.3 Wire Templates.** Client shall be responsible for establishing procedures and controls for creation, maintenance and use of wire templates, if applicable, in the online Transfer Request module.

**5.4 Preparation of Transfer Requests.** Client shall furnish complete and accurate information for each Transfer Request. For online Transfer Requests, Client shall furnish such request in the precise manner and format prescribed in the Service Documentation, which includes the Wire Transfer "User Guide" made available to Client. Client further acknowledges that failure to comply strictly with the procedures in the User Guide or as otherwise put in place by Bank may delay or prevent implementation of Transfer Request(s) or result in transfers from Client's account(s) to unintended beneficiaries. Further,

**i.** Client acknowledges that any administrative messages or comments conveyed with a Transfer Request shall be for its own internal reference and shall not be binding on Bank or alter the pertinent details of such request.

**ii.** Client understands that where a Transfer Request identifies the beneficiary by reference to an identifying or account number and also by name, the destination bank to which the transfer order is transmitted may credit the payment based solely on the number and ignore any discrepancy in the name.

**5.5 Verification of Wire Transfer.** Bank shall have no duty to notify Client that any Transfer Request has not been, or will not be, released by Bank for transmission to the Federal Reserve wire system (the "Fed") or other money transfer system, including but not limited to SWIFT, due to incomplete or inaccurate information, inaccurate format, or any other reason. With respect to online Transfer Requests, Client may verify that a Transfer Request has been released by Bank for transmission through online banking. Any transmission notice which Bank may give from time to time shall not establish, by course of dealing or otherwise, any duty to notify with respect to other transactions.

Client acknowledges that Transfer Requests which are not made in the precise format prescribed in the User Guide may be released for transmission to the Fed or other money transfer system, even though such Transfer Requests may be rejected by the Fed or other money transfer system(s) due to Client's failure to comply with format requirements or for other reasons. Client will be notified of the Fed's or other money transfer system's rejection of any Transfer Request as promptly as practicable after Bank receives actual notice of such rejection.

**5.6 Sufficient Funds.** For each Transfer Request, Client must have sufficient funds on deposit with Bank. Bank shall have no obligation to honor any Transfer Request which would exceed the balance of Client's collected funds; provided, however, that Client shall be liable for any amount which Bank elects to transfer in excess of such balance.

**5.7 Examination of Transaction Records.** Client shall examine each Business Day the daily transfer advice furnished to Client by Bank for each Transfer Request and notify Bank immediately (and confirming such notice promptly in writing) of any unauthorized, incorrect or delayed transfers reflected in such advisories. Client acknowledges that time is of the essence in reviewing transfer advisories and reporting discrepancies in order to prevent or limit loss by reason of unauthorized, erroneous, or delayed transfers, and compliance with this requirement is a condition precedent to any recovery against Bank for its alleged error or negligence in connection with such Transfer Request.

**5.8 Compliance with Laws.** Client acknowledges and agrees that all Transfer Requests may not be made in violation of the laws of any state or country, including sanctions laws administered by the Office of Foreign Assets Control.

## 6. Limitation of Liability, Bank Damages; Indemnity

Notwithstanding anything in the General Terms and Conditions to the contrary:

**6.1 Limitation of Liability.** Bank shall not be liable for any damage, loss, expense, or cause of action (whether such action is based on contract, tort, or any other form of action) arising out of any of the following:

**i.** The insolvency, negligence, misconduct, or mistake or fault of any correspondent, transferee, destination or other bank, any funds recipient or any other person or entity to which or through which any Transfer Request is made, forwarded, or implemented, nor for loss or interception in transit; or

**ii.** Any claim that a Transfer Request authorized in accordance to these Service Terms was in fact unauthorized. Bank shall be deemed to have exercised due care in accepting all such authorized Transfer Requests; or

**iii.** Any claim made under any of the circumstances set forth below that a Transfer Request was not transmitted or implemented promptly or accurately: (a) where Client failed to comply with any of the responsibilities or conditions set forth in the Service Terms; or (b) where Bank delayed transmission of a Transfer Request in a good faith effort to secure further verification of its authenticity; or (c) where occasioned by cause beyond Bank's reasonable control, including without limitation, act of God or governmental authority, any natural disaster, fire, flood, storm, strike, civil commotion or labor unrest, act of terrorism, riot, malfunction or interruption of communications, computer, or transmission facilities, nonperformance by Bank's vendors, or errors or acts by any third party; or (d) any claim made that a Transfer Request was not transmitted where Bank, or any third party acting on behalf of Bank, rejects any Transfer Request or to freeze or block assets in any amount or to terminate Client's account pursuant to Bank's obligations under any regulations promulgated by the Office of Foreign Assets Control of the U.S. Treasury Department or pursuant to Bank's obligations under any other domestic or international laws applicable to the Transfer Request, including but not limited to the Bank Secrecy Act.

**6.2 Damages for Bank Delay or Errors.** Except as otherwise set forth in this Subsection, Bank's liability for claims for damages or other compensation as a result of Bank's unexcused delay or error in transmitting a Transfer Request shall not exceed an amount equal to interest on the funds at the federal funds rate paid by Bank on each day the error remains uncorrected, but in no event to exceed a period of two weeks. If Bank's unexcused error results in the transfer of funds to a transferee who has no claim to them, Bank's liability shall not exceed the lesser of the funds so transferred and not recovered and Client's actual loss. In no event shall Bank be liable for any exemplary, special, or consequential damages, including without limitation damages in the nature of legal expenses or loss of anticipated profits, regardless of whether Bank has been notified that such damages may or will be incurred.

**6.3 Client Indemnification.** Client agrees to indemnify and hold harmless Bank, its affiliates, and the directors, officers, and employees of each from and against all claims of Client or any other person arising out of, or in connection with, any action or inaction for which Bank would not be deemed liable pursuant to this Section.

©2024 First Horizon Bank. Member FDIC.

## 7. Foreign Exchange Transfers

**7.1 Foreign Currency Transfers and Drafts.** Client may provide Bank with a Transfer Request to transfer non-U.S. currencies ("FX Transfer") or Client may request Bank to issue on Bank's designated printers at designated locations, drafts in foreign currencies ("Foreign Drafts").

**7.2 Finality of FX Transfers.** Client may request that Bank amend or cancel an FX Transfer, but Bank will have no obligation to do so and will determine in its sole discretion whether or not it is feasible for Bank to do so. In the event Bank amends or cancels an FX Transfer at Client's request, Bank will not be obligated to act on similar requests with respect to any other FX Transfer or with respect to the same FX Transfer at a later time. Client understands that if Bank agrees to amend or cancel an FX Transfer at Client's request, Bank may do so by establishing a new FX Transfer which offsets the original FX Transfer to be amended or canceled, which may result in a financial loss to the Client.

**7.3 Foreign Drafts.** Any foreign Draft should be presented to Bank on which it is drawn ("the Drawee") within six (6) months from the date of the Foreign Draft. If not presented, the Drawee may refuse to pay because of delay. Bank will not be liable for the Drawee bank's failure or refusal to pay the Foreign Draft for any reason, including delayed presentation. Client assumes all payment risks.

**i.** If a Foreign Draft is payable in a currency other than that of the country indicated as the place of payment, the Drawee will pay it at the Drawee's buying rate for that currency on the date the Drawee pays the Foreign Draft unless the person presenting the Draft makes separate arrangements with the Drawee and pays any applicable charges.

**ii.** If for any reason the Drawee bank fails to pay the Foreign Draft, or the Foreign Draft is stopped, canceled or otherwise not negotiated, Bank shall make refunds only upon surrender of the Foreign Draft, properly endorsed, to Bank, or Bank's recovery from the Drawee the amount of the Foreign Draft, less any charges and expenses. Refund will be at Bank's buying rate of the currency for which the Foreign Draft is drawn, calculated at the date of the refund.

**7.4 No Investment Advice; Risk of Market Fluctuations.** Client understands that Bank is not an investment advisor and is not acting as a fiduciary to Client with respect to FX Transfers or Foreign Drafts. Bank does not give, and Bank disclaims, all investment advice with respect to any FX Transfer or Foreign Draft. Client bears the sole risk of any and all market fluctuations in any currency traded. Bank will convert the amount to be transferred to the currency of a designated foreign government or intergovernmental organization at Bank's rate for exchange in effect on the date the transfer is executed.

# Zero Balance Account Service

These Terms and Conditions provide information on the use of the Zero Balance Account ("ZBA") Service described below.

## 1. Description of Service

The ZBA Service allows Client to manage its daily cash flows by consolidating balances from multiple zero balance or subsidiary accounts into a single master account. Client shall designate a master Account ("Master Account") to be used in conjunction with one or more sub-Account(s) ("Sub-Account(s)") to concentrate deposits into the Master Account or fund multiple disbursing Sub-Account(s) from the Master Account.

## 2. Daily Posting and Funding

Checks can be written or deposits made to the Sub-Account or the Master Account. Funds are automatically transferred from the Master Account to cover the exact amount of net debits to any Sub-Account(s), including any target ledger balance at the end of posting on each Business Day as designated by Client from time to time ("Target Balance"). In the event there is a net credit in the Sub-Account(s) above the Target Balance, if any, at the close of each Business Day, the credit balance of such Sub-Account shall automatically be transferred to the Master Account.

## 3. Authorizations

Bank is authorized and agrees to treat the Master Account and all Sub-Account(s) as a single account for settlement purposes without further advice or instruction from Client. In addition to any right of setoff as provided for in the Account Agreement, Bank has the absolute right of offsetting the balance in one Account against the balance in the other Account.

## 4. Affiliates

If any of the Sub-Accounts are owned by an affiliate or subsidiary of Client, then (i) Client represents and warrants that it has all necessary power and authority to transfer funds into and out of such Sub-Account, and (ii) Client will indemnify Bank from any claim by any owner of such sub-Account or any third party with respect to a transfer into or out of such Sub-Account.

©2024 First Horizon Bank. Member FDIC.